**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
Email: migross@pomlaw.com
        jalieberman@pomlaw.com
        mjwernke@pomlaw.com

*Lead Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY  LLP**
Lionel Z. Glancy (CSB# 134180)
Robert V. Prongay (CSB# 270796)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
E-mail: info@glancylaw.com
        lglancy@glancylaw.com
        rprongay@glancylaw.com

*Liaison Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH THOMAS, RICHARD HAYES, HERB SMITH, and OKLAHOMA POLICE PENSION & RETIREMENT SYSTEM,<br><br>               Plaintiffs,<br>          v.<br><br>MAGNACHIP SEMICONDUCTOR CORP. SANG PARK, TAE YOUNG HWANG, MARGARET SAKAI, R. DOUGLAS NORBY, ILBOK LEE, NADER TAVAKOLI, RANDAL KLEIN, MICHAEL ELKINS, AVENUE CAPITAL MANAGEMENT II, L.P., BARCLAYS CAPITAL INC., DEUTSCHE BANK SECURITIES INC., CITIGROUP GLOBAL MARKETS INC., UBS SECURITIES LLC and NEEDHAM & COMPANY, LLC,<br><br>               Defendants. | Case No.: 3:14-cv-01160-JST<br><br>**CLASS ACTION**<br><br>**THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 6

PARTIES ............................................................................................................................. 6

SUBSTANTIVE ALLEGATIONS ................................................................................... 9

FRAUDULENT SCHEME AND COURSE OF BUSINESS ........................................ 11

THE MATERIALLY FALSE CLASS PERIOD STATEMENTS ................................ 11

THE TRUTH BEGINS TO EMERGE ........................................................................... 23

    The Restatement was an Admission of Material GAAP Violations ........................... 29

    The Restatement was also an Admission of Material Violations of Internal Controls .............. 30

THE MATERIALLY FALSE AND MISLEADING REGISTRATION STATEMENT ..................... 32

SCIENTER ALLEGATIONS .......................................................................................... 36

    The Company's Scienter ................................................................................................ 36

    The Executive Defendants' Scienter ............................................................................ 36

    The Executive Defendants' Motives ............................................................................ 39

    The Insider Sales ........................................................................................................... 41

    The Audit Committee Defendants' Scienter ................................................................ 41

    MagnaChip's GAAP Violations ................................................................................... 43

    MagnaChip's Stated Revenue Recognition Policies and Violations Thereof ............ 44

    "Sales" of Goods Before Shipment to Customers ....................................................... 46

    Revenue Recognition Without Recording Price Concessions ..................................... 47

    Improper Accounting for Inventory Reserves .............................................................. 48

    Inventory Reserves Generally ....................................................................................... 48

    Deferred Tax Assets ...................................................................................................... 50

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

i

PLAINTIFFS' CLASS ACTION ALLEGATIONS ............................................................. 51

COUNT I ........................................................................................................................... 53

    Violations of §10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder
        Against All MagnaChip Defendants ..................................................................... 53

COUNT II .......................................................................................................................... 56

    Violations of §20(a) of the Exchange Act Against The Individual Defendants ....................... 56

COUNT III ......................................................................................................................... 57

    Violations of §20(a) of the Exchange Act Against Avenue Capital ............................... 57

COUNT IV ......................................................................................................................... 62

    Violations of §20A of the Exchange Act Against Avenue Capital ............................... 62

COUNT V ........................................................................................................................... 63

    Violations of §11 of the Securities Act Against the Securities Act Defendants ....................... 63

COUNT VI .......................................................................................................................... 64

    For Violation of §12(a)(2) of the Securities Act Against the Securities Act Defendants
        and Avenue Capital ............................................................................................ 64

COUNT VII ........................................................................................................................ 65

    For Violation of §15 of the Securities Act  Against MagnaChip, Avenue Capital and the
        Executive Defendants ........................................................................................ 65

PRAYER FOR RELIEF ..................................................................................................... 66

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lead Plaintiff Keith Thomas and plaintiffs Richard Hayes, Herb Smith and Oklahoma Police Pension & Retirement System ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MagnaChip Semiconductor Corporation, ("MagnaChip" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons other than defendants who purchased or otherwise acquired MagnaChip securities between February 1, 2012 and February 12, 2015 (the "Class Period"), including purchasers of MagnaChip common stock pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with MagnaChip's February 6, 2013 follow-on public stock offering (the "2/13 Offering"), seeking to recover damages caused by defendants' violations of the federal securities laws.[1]

2.     MagnaChip designs and manufactures semiconductor products for high-volume consumer applications, including "smart phones". One of its major customers is Samsung. The Company sells its products to customers directly and through a network of distributors in the United States and Asia.

---

[1]    The Form S-3 Registration Statement (including a prospectus) relating to the 2/13 Offering was declared effective by the Securities and Exchange Commission ("SEC") on April 26, 2012 and MagnaChip filed a related Prospectus supplement with the SEC on February 6, 2013.    The Registration Statement and Prospectus supplement are collectively referred to as the "Offering Documents" herein.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3.      Throughout the Class Period, Defendants violated the federal securities laws by: (a) issuing materially false and misleading statements regarding the Company's business, prospects, operations and financial results; (b) failing to disclose the inadequacy of its internal controls and procedures over financial reporting; and (c) engaging in a wide-ranging scheme to materially inflate the Company's reported results. The size and scope of MagnaChip's fraud was so vast that the Company was required to restate nearly three years of results for fiscal 2011 and 2012, and the first nine months of 2013, resulting in a $142 million total reversal of earnings, wiping out 55% of its reported profits for those periods.

4.      In perpetrating this massive fraud, Defendants utilized a large tool box of accounting machinations, including:

a)      **Round Tripping Recorded As Sales**

MagnaChip made multi-million dollar cash payments to a maintenance vendor responsible for upkeep at the Company's Korean facilities, who kicked-back the monies by purchasing products from MagnaChip distributors, who then bought MagnaChip products with the Company's own cash, resulting in MagnaChip recording illusory sales;

b)      **Transfers to Warehouse Recorded As Sales**

MagnaChip transferred products from its manufacturing plant to its own warehouse without scheduling deliveries to customers, but nonetheless recorded the transfers as sales;

c)      **Unfinished Products Recorded As Sales**

MagnaChip recognized revenue before the products were manufactured, and/or ordered by customers;

d)      **Premature Shipments Recorded As Sales**

MagnaChip "pulled-in" orders from distributors and customers at quarter ends to meet sales targets (even though the customer contracts requested delivery in future quarters), while also providing side agreements that the products need not be paid for, if at all, until some later date. Nonetheless, MagnaChip recorded revenue immediately; and

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

e)   **Undisclosed "Concessions" Not Deducted from Sales**

To give the appearance of increased sales, MagnaChip granted distributors and customers various *unrecorded* sales "concessions" (including credit limit increases, price adjustments, payment term extensions, provision of free products, future discounts, and stock rotations), which should have precluded or limited revenue recognition, but nonetheless recorded the sales at the full "listed" price.

Defendants knew about (or recklessly disregarded) these improper revenue recognition practices, but nevertheless touted inflated sales targets, earnings results, understated expenses and overstated profit, which did not reflect the true state of the Company.  Indeed, defendants intended these improper revenue recognition practices to meet inflated sales targets, as well as to enable the Company to consistently beat analysts' expectations of MagnaChip's earnings.

5.      Defendants also utilized the following accounting devices to understate expenses and overstate profits:

a)   **Obsolete Inventory Not Reserved or Written Off**

The market for semiconductors used in smart phones and other products was highly volatile during the Class Period, with products rapidly becoming obsolete due to changing technology and consumer demands. The Company consistently failed to properly account for such obsolescence by creating reserves or writing down the value of the product as required, since doing so would have reduced profits; and

b)   **Improper Recognition of Deferred Tax Assets**

Before the Class Period, MagnaChip had accumulated significant tax credits (deferred tax assets) as a result of substantial operating losses. These credits were available to offset taxable profits when earned, and thereby increase earnings for financial reporting purposes. The Company improperly inflated revenue and understated expenses to produce an illusory profit in 2012, which it then further inflated by improperly forecasting continued illusory profits - thereby providing justification to maintain a significant portion of this tax credit. When the Company was ultimately forced to restate its previously reported income, it had to record a $65 million reversal, representing over 40% of its previously reported income for 2012.

6.      As a result of the foregoing machinations, MagnaChip's net earnings and stock prices were materially inflated throughout the Class Period. In direct response, the Company's stock soared from $5.81 to as high as $23.57 per share in October 2013.  Several of the Company's executives, the Individual Defendants named herein, directly benefitted from their misconduct, reaping huge bonuses for reporting inflated results.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3

7.     The fraudulent scheme also significantly benefitted MagnaChip's controlling shareholder, Avenue Capital Management II, L.P., and its affiliated funds ("Avenue Capital").  Avenue Capital controlled MagnaChip, owning as much as 70% of the Company's stock, which enabled it to appoint four of the seven members of MagnaChip's Board of Directors (three of whom were Avenue Capital's own employees). Avenue Capital was thereby able to determine who "ran" MagnaChip and their incentive compensation. The benefits Avenue Capital reaped from the scheme included:

   a.   MagnaChip's reports of inflated profits, which consistently beat analyst expectations, and caused its stock price to skyrocket, thereby materially increasing the value of Avenue Capital's stake in the Company;

   b.   To further prop up the stock price, Avenue Capital (through its control of the majority of the Board of Directors) caused MagnaChip to authorize a stock repurchase program for over $90 million; and

   c.   The scheme enabled Avenue Capital to unload 85% of its MagnaChip holdings on unsuspecting class members for $310 million before the Company finally admitted its fraudulent accounting practices.

8.     Based on defendants' false and misleading statements made to the market during the Class Period, MagnaChip was also able to secure the favorable corporate debt ratings needed to raise $225 million in a private debt placement conducted on July 15, 2013, and to register that debt for public sale through an exchange offer conducted on October 18, 2013.

9.     Plaintiffs and other investors did not begin to learn of the fraudulent scheme until January 27, 2014, when MagnaChip delayed the release of year-end 2013 results. Soon thereafter, the Company's Chief Executive Officer ("CEO"), Defendant Sang Park, and its Chief Financial Officer ("CFO"), Defendant Margaret Sakai, were ousted.

10.    The full scope of the fraudulent scheme was not disclosed until February 12, 2015, when the Company belatedly issued its year-end 2013 Form 10-K, and issued restated financial reports for 2011, 2012 and the first nine months of 2013 (the "Restatement"), which revealed for the first time the host of accounting errors employed, including revenue recognition, cost of goods sold, inventory reserves, capitalization, and expense recognition and allocation, including related business practices for distributors, non-distributor customers and vendors.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4

11.     The following chart evidences the enormity of the fraud:

| ($ in millions except per share data) | | 9 Months Ended Sept. 30, 2013 | | | |
|---|---|---|---|---|---|
| | | As Reported | Adjustment | Restated | % Overstated |
| Net sales | | $ 638.4 | $ (79.7) | $ 558.7 | 14.3% |
| Gross profit | | $ 208.7 | $ (70.8) | $ 137.9 | 51.3% |
| Operating income | | $ 83.8 | $ (77.3) | $ 6.4 | 1206.5% |
| Net income | | $ 43.7 | $ (85.7) | $ (42.0) | 204.0% |
| Earnings per Share (diluted) | | $ 1.17 | $ (2.35) | $ (1.18) | 199.2% |

| ($ in millions except per share data) | | Fiscal 2012 | | | |
|---|---|---|---|---|---|
| | | As Reported | Adjustment | Restated | % Overstated |
| Net sales | | $ 819.6 | $ (12.3) | $ 807.3 | 1.5% |
| Gross profit | | $ 263.5 | $ (20.3) | $ 243.2 | 8.3% |
| Operating income | | $ 105.8 | $ (21.5) | $ 84.3 | 25.5% |
| Net income | | $ 193.3 | $ (83.3) | $ 110.0 | 75.7% |
| Earnings per Share (diluted) | | $ 5.16 | $ (2.23) | $ 2.93 | 76.1% |

| ($ in millions except per share data) | | Fiscal 2011 | | | |
|---|---|---|---|---|---|
| | | As Reported | Adjustment | Restated | % Overstated |
| Net sales | | $ 772.8 | $ (29.7) | $ 743.1 | 4.0% |
| Gross profit | | $ 234.3 | $ (34.8) | $ 199.5 | 17.4% |
| Operating income | | $ 72.9 | $ (36.0) | $ 37.0 | 97.3% |
| Net income | | $ 21.8 | $ (33.1) | $ (11.3) | 292.9% |
| Earnings per Share (diluted) | | $ 0.55 | $ (0.84) | $ (0.29) | 289.7% |

12.     In the Restatement, MagnaChip's outside auditor, Samil PricewaterhouseCoopers ("PWC"), condemned management's lack of an "attitude of integrity and ethics against the pressure to achieve sales, gross margin and adjusted EBITDA targets" and the "circumvention of numerous internal controls."

13.     Following the Restatement, MagnaChip's shares plummeted 50% to less than $8 per share.

14.     The SEC's Enforcement Division is currently investigating defendants' accounting fraud.

**JURISDICTION AND VENUE**

15.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b), 78t(a) and 78t-1] and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); and §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77k, 77l(a)(2) and 77o].

16.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa), § 22 of the Securities Act, and 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District.  The Company maintains an office in this District and the Underwriter Defendants (as defined below) conducted the 2/13 Offering and the accompanying roadshow largely in this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

19.     Pursuant to the Court's Order of July 3, 2014 (Doc. #32), Keith Thomas was appointed Lead Plaintiff.  Plaintiff Richard Hayes commenced this action on March 12, 2014 through the filing of the Complaint (Doc. #1).  Messrs. Hayes and Thomas's Certifications have been previously filed with the Court and are incorporated herein.

20.      Plaintiff Herb Smith purchased shares of MagnaChip stock during the Class Period as set forth in his PSLRA Certification previously filed with the Court and incorporated herein.

21.     Plaintiff Oklahoma Police Pension & Retirement System ("Oklahoma Police") purchased or acquired MagnaChip stock as set forth in its Certification previously filed with the Court and incorporated herein.

22.     Plaintiffs, as set forth in their Certifications, acquired MagnaChip securities at artificially inflated prices during the Class Period and were damaged by the alleged wrongdoing.

23.     Defendant MagnaChip is a Delaware corporation with its principal executive offices located at 1, Hyangjeong-Dong, Heungdeok-Gu, Seoul, 361728.  As of January 31, 2015, the Company had more than 34 million shares of common stock issued and outstanding, which trades on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "MX."  The Company maintains corporate offices in this District.

24.     Defendant Sang Park ("Park") was, at relevant times, the Company's Chairman of the Board of Directors and CEO.  He "resigned" in May 2014.  Defendant Park signed the Form S-3 Registration Statement for the 2/13 Offering.

25.     Defendant Margaret Sakai ("Sakai") was, at relevant times, the Company's Executive Vice President, CFO and "principal accounting officer."  She "resigned" in March 2014.  Defendant Sakai signed the Form S-3 Registration Statement for the 2/13 Offering.

26.     Defendant Tae Young Hwang ("Hwang") was, and continues to be the Company's President and Chief Operating Officer ("COO").

27.     Defendant Randall Klein ("Klein") was, at all relevant times, a member of the Company's Board of Directors.  Klein became a director of MagnaChip in November 2009.  Klein was also a member of the Company's Audit Committee until March 2012.  At all relevant times, Klein was also an employee of Avenue Capital, serving as a Portfolio Manager and a Senior Vice President of certain U.S. funds.  Defendant Klein signed or authorized the signing of the Form S-3 Registration Statement for the 2/13 Offering.

28.     Defendant Michael Elkins ("Elkins") was, at all relevant times, a member of the Company's Board of Directors.  Elkins became a director of MagnaChip in November 2009.  Elkins was also a member of the Company's Audit Committee from approximately April 2013 through the end of the Class Period.   He was the Chairman of MagnaChip's Compensation Committee from approximately April 2013 through the end of the Class Period.  Elkins was also an employee of Avenue Capital, serving as a Portfolio Manager of certain U.S. funds.  He continued to be an employee until

December 31, 2012 at which time he became a "consultant" to Avenue Capital.  Defendant Elkins signed or authorized the signing of the Form S-3 Registration Statement for the 2/13 Offering.

29.    Defendant R. Douglas Norby ("Norby") was, at all relevant times, a member of the Company's Board of Directors.  Norby has served as a Non-Executive Chairman of the Board since May 2014.  He was the Chairman of the Audit Committee and a member of its Nominating and Corporate Governance Committee.  Defendant Norby signed or authorized the signing of the Form S-3 Registration Statement for the 2/13 Offering.

30.    Defendant Ilbok Lee ("Lee") was, at all relevant times, a member of the Company's Board of Directors.  Lee was also a member of the Company's Audit Committee from March 2012 until approximately April 2013.  Defendant Lee signed or authorized the signing of the Form S-3 Registration Statement for the 2/13 Offering.

31.    Defendant Nader Tavakoli ("Tavakoli") was, at all relevant times, a member of the Company's Board of Directors.  He was a member of the Audit Committee.  Defendant Tavakoli signed or authorized the signing of the Form S-3 Registration Statement for the 2/13 Offering.

32.    The Defendants referenced above in ¶¶ 24-26 are sometimes referred to herein as the "Executive Defendants."  The Defendants referenced above in ¶¶ 27-31 are sometimes referred to herein as the "Audit Committee Defendants."  The Defendants referenced above in ¶¶ 23-31 are sometimes referred to herein as the "MagnaChip Defendants."  The Defendants referenced above in ¶¶ 24-31 are sometimes referred to herein as the "Individual Defendants."

33.    Defendant Avenue Capital Management II, L.P. is a global investment management firm that is incorporated in Delaware with principal executive offices located at 399 Park Avenue, New York, New York.  Along with its affiliated funds, Avenue Capital specializes in investing in high yield debt, debt of insolvent or financially distressed companies, and equity of companies undergoing financial or operational turnarounds or reorganizations.  During the Class Period, Avenue Capital Management II, L.P. was the investment manager for the following affiliated funds, among others: Avenue Investments, L.P., Avenue International Master, L.P., Avenue-CDP Global Opportunities Fund, L.P., Avenue Special Situations Fund IV, L.P., and Avenue Special Situations Fund V, L.P. (the

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

8

"Avenue Funds" and together with Avenue Capital Management II, L.P, "Avenue Capital"). At all relevant times, Avenue Capital Management II, L.P. beneficially owned all MagnaChip shares owned by the Avenue Funds, along with voting power and dispositive power over those shares. Avenue Capital was the majority shareholder of MagnaChip during the Class Period. It appointed a majority of the members of the Company's Board of Directors and placed its own employees on the Company's Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee, and thereby was a "control" person of the Company.

34.    Non-defendant Steven Tan was Vice-President of Avenue Capital and was a director of MagnaChip from 2009 through August 2011.

35.    Non-defendant Brian Mulhern was an Avenue Senior Vice-President of Avenue Capital and served as a director of MagnaChip from 2011 through the present. Mulhern served on MagnaChip's Nominating and Corporate Governance Committee during the Class Period. Defendant Mulhern signed or authorized the signing of the Form S-3 Registration Statement for the 2/13 Offering.

36.    Defendants Barclays Capital Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., UBS Securities LLC and Needham & Company, LLC, investment banking firms that acted as underwriters of MagnaChip's 2/13 Offering helping to draft and disseminate the offering documents, are collectively referred to herein as the "Underwriter Defendants." In addition to underwriting the 2/13 Offering, the Underwriter Defendants also underwrote MagnaChip's IPO in March 2011 and two additional follow-on offerings in May 2012 and September 2013.

37.    Defendants MagnaChip, Park, Sakai, Elkins, Klein, Lee, Mulhern, Norby and Tavakoli, together with the Underwriter Defendants, are sometimes collectively referred to as the "Securities Act Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

38.    MagnaChip designs and manufactures analog and mixed-signal semiconductor products for high-volume consumer applications, including LCD, LED, 3d televisions, smartphones, desktop PC's, and tablet PCs. The Company sells its products and services through a direct sales force, as well

as through a network of authorized agents and distributors in the United States, Korea, Taiwan, China, Japan, Hong Kong, and Macau.  The Company is headquartered in Seoul, South Korea.

<u>**MagnaChip's Troubled History and "Turnaround"**</u>

39.     After it began operations in 2004, MagnaChip reported significant annual losses.  In 2006, the Company hired Defendant Park as its new CEO to jump-start its product and sales efforts.  The self-proclaimed turnaround strategy lasted less than a year before the bottom fell out of the Company.  In fact, MagnaChip scrapped its planned initial public offering ("IPO") in the United States in late 2007.

40.     Having accumulated a crushing deficit of $964.8 million, the Company filed for Chapter 11 bankruptcy protection on June 12, 2009.  On November 9, 2009, the Company's plan of reorganization became effective, enabling MagnaChip to restructure its balance sheet and reduce its debt to approximately $62 million, while creating a deferred tax asset of approximately $248 million before the application of any valuation allowance.  The reorganization completely wiped out MagnaChip's private equity shareholders.  When the Company re-emerged, Avenue Capital was its majority shareholder, owning 70.3% of the Company's shares.

41.     On March 10, 2011, the Company completed its IPO at $14 per share and listed its common stock on the NYSE.  As the IPO prospectus detailed, Avenue Capital was entitled to have "three designees serving as members of [the Company's] seven-member board of directors," and "[t]herefore, Avenue [Capital] [would] continue to have significant influence over [MagnaChip's] affairs for the foreseeable future."  Post IPO, Avenue Capital continued to control MagnaChip and, in exercising its power, Avenue Capital appointed four of the seven members to the Board of Directors.  Three of the directors were employees of Avenue Capital. Two of the appointees served on the Audit Committee.  As of February 1, 2012, Avenue Capital owned more than 20.7 million shares of MagnaChip common stock, controlling 55.5% of its voting stock.

42.     While the semiconductor industry is highly cyclical and is characterized by constant and rapid technological change and price erosion, causing significant upturns and downturns in semiconductor companies' reported results, after the IPO, MagnaChip's reported results curiously

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"managed" to consistently beat analysts' consensus estimates, causing the Company to stand out amongst its peers and which similarly caused its stock price to skyrocket to a Class Period high of $23.57 per share and enabled Avenue Capital to sell over $310 million of its MagnaChip shares at fraudulently inflated prices .

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

43.     The Exchange Act Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about MagnaChip.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MagnaChip securities was a success, as it: (i) deceived the investing public regarding MagnaChip's prospects and business; (ii) artificially inflated the prices of MagnaChip securities; (iii) permitted MagnaChip to sell for Avenue Capital $232.675 million worth of shares in the three Class Period offerings; (iv) permitted MagnaChip to raise more than $225 million in a July 2013 private debt placement and register that debt for resale in October 2013; (v) facilitated the sale of $33.5 million worth of MagnaChip common stock by defendant Avenue Capital on the open market at fraud-inflated prices during the Class Period on August 1, 2013; and (vi) caused Plaintiff and other members of the Class to purchase MagnaChip securities at fraud-inflated prices throughout the Class Period.

## THE MATERIALLY FALSE CLASS PERIOD STATEMENTS
### Fourth Quarter and Year End 2011

44.     On February 1, 2012, MagnaChip announced the following financial results for the quarter and year ended December 31, 2011:

(In millions except margin & share data)

|  | 4Q11 |
|---|---|
| Net sales | $180.8 |
| Gross profit | $ 51.5 |
| Gross Margin | 28.5% |
| Operating income | $ 15.3 |
| Net income | $ 23.7 |
| Earnings per Share (Basic) | $ 0.61 |
| Earnings per Share (Diluted) | $ 0.61 |
| Adjusted net income | $ 10.0 |
| Adjusted Earnings per Share (Diluted) | $ 0.26 |

(In millions except margin & share data)

|  | Fiscal 2011 |
|---|---|
| Net sales | $   772.8 |
| Gross profit | $   234.3 |
| Gross Margin | 30.3% |
| Operating income | $    72.9 |
| Net income | $    21.8 |
| Earnings per Share (Basic) | $     0.56 |
| Earnings per Share (Diluted) | $     0.55 |
| Adjusted net income | $    66.4 |
| Adjusted Earnings per Share (Diluted) | $     1.67 |

45.     The reported 4Q11 Adjusted EPS exceeded the analyst consensus estimate of $0.20 per diluted share by over 30%.

46.     During an investor conference call the same day, Defendant Park touted the results:

> I am very pleased that for the fourth consecutive quarter, we've again met our quarterly revenue guidance in what has been a challenging year for the semiconductor industry."

Defendant Sakai provided detailed commentary on the Company's various financial metrics, including revenue, gross profit, operating income, net income, adjusted net income (on non-GAAP measurement), accounts receivable, days sales outstanding, and net inventory.

47.     On this positive news, the Company stock price jumped $1.38 per share, or 14.2%, from $9.72 on January 31 to $11.10 per share on February 3, 2012.

48.     On March 8, 2012, the Company filed with the SEC its Form 10-K for the year ended December 31, 2011, which was signed by Defendants Park, Sakai and the Audit Committee Defendants.   The Form 10-K reiterated the Company's previously announced quarterly financial results.

49.     In addition, the Form 10-K contained certifications signed by Defendants Park and Sakai pursuant to the Sarbanes-Oxley Act ("SOX") attesting that:

a.     The financial information contained in the Form 10-K "fairly present in all material respects the financial condition, results of operations and cash flows of [the Company]";

b.     Defendants Park and Sakai had "[d]esigned such internal control over financial reporting . . . in accordance with generally accepted accounting principles" ("GAAP"); and

c.     The report disclosed "any change in the registrant's internal control over financial reporting . . . [and] [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

(Hereinafter referred to as "SOX Certification").

50.     The foregoing representations in ¶¶ 44-46, and 48-49 were materially false and misleading for the reasons set forth in ¶¶ 4-5 in the following amounts:

| (In millions except margin & share data) | As Reported | Adjustment | Restated | % Overstated |
|---|---|---|---|---|
| Net sales | $ 772.8 | $ (29.7) | $743.1 | 4.0% |
| Gross profit | $ 234.3 | $ (34.8) | $199.5 | 17.4% |
| Gross Margin | 30.3% | -3.5% | 26.9% | 12.9% |
| Operating income | $ 72.9 | $ (36.0) | $ 37.0 | 97.3% |
| Net income | $ 21.8 | $ (33.1) | $ (11.3) | 292.9% |
| Earnings per Share (Basic) | $ 0.56 | $ (0.85) | $ (0.29) | 293.1% |
| Earnings per Share (Diluted) | $ 0.55 | $ (0.84) | $ (0.29) | 289.7% |
| Adjusted net income | $ 66.4 | $ (34.2) | $ 32.2 | 106.3% |
| Adjusted Earnings per Share (Diluted) | $ 1.67 | $ (0.84) | $ 0.83 | 101.1% |

(Fiscal 2011 spans the As Reported, Adjustment, Restated, and % Overstated columns)

**First Quarter 2012**

51.     On April 25, 2012, MagnaChip announced the following financial results for the first quarter ended March 31, 2012:

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

13

| (In millions except margin & share data) | | 1Q12 |
|---|---|---|
| Net sales | $ | 177.0 |
| Gross profit | $ | 49.9 |
| Gross Margin | | 28.2% |
| Operating income | $ | 11.9 |
| Net income | $ | 15.3 |
| Earnings per Share (Basic) | $ | 0.41 |
| Earnings per Share (Diluted) | $ | 0.40 |
| Adjusted net income | $ | 6.5 |
| Adjusted Earnings per Share (Diluted) | $ | 0.17 |

52.     The reported 1Q12 Adjusted EPS exceeded the analyst consensus estimate of $0.14 per diluted share by over 21%.

53.     On an investor conference call that day, Defendant Park noted:

> I am very pleased that since going public in March 2011, we have met our revenue and gross margin guidance each quarter for five consecutive quarters in what has been [a] very challenging period for the industry.

Defendant Sakai provided investors detailed commentary on the important income statement and balance sheet metrics.

54.     On this news, the Company stock price jumped $0.82 per share or 7.6%, from $10.83 on April 25, 2012 to $11.65 per share on April 26, 2012.

55.     On May 15, 2012, the Company filed with the SEC its Form 10-Q for the quarter ended March 31, 2012, which reiterated the Company's previously announced quarterly financial results and contained SOX Certifications signed by Defendants Park and Sakai.

56.     The foregoing representations in ¶¶ 51-53, and 55 were materially misleading for the reasons set forth in ¶¶ 4-5 in the following amounts:

| (In millions except margin & share data) | As Reported | | Adjustment | | Restated | % Overstated |
|---|---|---|---|---|---|---|
| | | | | 1Q12 | | |
| Net sales | $ | 177.0 | $ | (1.0) | $176.0 | 0.5% |
| Gross profit | $ | 49.9 | $ | (4.4) | $ 45.5 | 9.7% |
| Gross Margin | | 28.2% | | -2.3% | 25.9% | 9.1% |
| Operating income | $ | 11.9 | $ | (2.3) | $ 9.6 | 24.2% |
| Net income | $ | 15.3 | $ | (1.9) | $ 13.4 | 14.2% |
| Earnings per Share (Basic) | $ | 0.41 | $ | (0.05) | $ 0.36 | 15.1% |
| Earnings per Share (Diluted) | $ | 0.40 | $ | (0.05) | $ 0.35 | 14.6% |

**Second Quarter 2012**

57.    On August 2, 2012, MagnaChip announced the following financial results for the second quarter ended June 30, 2012:

| (In millions except margin & share data) | | 2Q12 |
|---|---|---|
| Net sales | $ | 202.6 |
| Gross profit | $ | 62.9 |
| Gross Margin | | 31.0% |
| Operating income | $ | 23.0 |
| Net income | $ | 4.3 |
| Earnings per Share (Basic) | $ | 0.12 |
| Earnings per Share (Diluted) | $ | 0.12 |
| Adjusted net income | $ | 17.9 |
| Adjusted Earnings per Share (Diluted) | $ | 0.48 |

58.    The reported 2Q12 Adjusted EPS exceeded the analyst consensus estimate of $0.36 per diluted share by over 33%.

59.    On an investor conference call that day, Defendant Park noted:

> I am very pleased that we delivered second quarter revenue of $202.6 million and gross margin of 31% above the midpoint of our guidance range and better than Street consensus.

Defendant Sakai provided investors detailed commentary on the important income statement and balance sheet metrics.

60.    On this news, the Company stock price increased $2.00 per share, or 19.4%, from $10.31 on August 2, 2012 to $12.31 per share on August 3, 2012.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

61.     On August 8, 2012, the Company filed with the SEC its Form 10-Q for the quarter ended June 30, 2012, which reiterated the Company's previously announced financial results and contained SOX Certifications signed by Defendants Park and Sakai.

62.     The foregoing representations in ¶¶ 57-59 and 61 were materially false and/or misleading for reasons stated in ¶¶ 4-5 quantified as follows:

|  | 2Q12 | | | |
| --- | --- | --- | --- | --- |
| (In millions except margin & share data) | As Reported | Adjustment | Restated | % Overstated |
| Net sales | $    202.6 | $    (1.6) | $201.0 | 0.8% |
| Gross profit | $    62.9 | $    (3.0) | $ 59.9 | 4.9% |
| Gross Margin | 31.0% | -1.2% | 29.8% | 4.1% |
| Operating income | $    23.0 | $    (2.7) | $ 20.3 | 13.1% |
| Net income | $    4.3 | $    (1.9) | $  2.5 | 76.6% |
| Earnings per Share (Basic) | $    0.12 | $    (0.05) | $ 0.07 | 71.4% |
| Earnings per Share (Diluted) | $    0.12 | $    (0.05) | $ 0.07 | 71.4% |

### Third Quarter 2012

63.     On November 1, 2012, MagnaChip announced the following financial results for the third quarter ended September 30, 2012:

| (In millions except margin & share data) | 3Q12 |
| --- | --- |
| Net sales | $    221.9 |
| Gross profit | $    76.4 |
| Gross Margin | 34.5% |
| Operating income | $    35.6 |
| Net income | $    48.4 |
| Earnings per Share (Basic) | $    1.34 |
| Earnings per Share (Diluted) | $    1.30 |
| Adjusted net income | $    30.4 |
| Adjusted Earnings per Share (Diluted) | $    0.81 |

64.     The reported 3Q12 Adjusted EPS exceeded the analyst consensus estimate of $0.61 per diluted share by over 32%.

65.     In an investor conference call that same day, Defendant Park, noted that:

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> This is the seventh consecutive quarter that we have met or exceeded our
> financial guidance.

Defendant Sakai provided investors detailed commentary on the important income statement and balance sheet metrics.

66.     On this news, the Company stock price increased $1.57 per share, or 14%, from $11.25 on October 31 to $12.82 per share on November 2, 2012.

67.     On November 6, 2012, the Company filed with the SEC its Form 10-Q for the quarter ended September 30, 2012, which reiterated the Company's previously announced financial results and contained SOX Certifications signed by Defendants Park and Sakai

68.     The foregoing representations in ¶¶ 63-65 and 67 were materially false and misleading for reasons set forth in ¶¶ 4-5 in the following amounts:

|  | | 3Q12 | | |
| --- | --- | --- | --- | --- |
| (In millions except margin & share data) | As Reported | Adjustment | Restated | % Overstated |
| Net sales | $ 221.9 | $ (1.0) | $220.9 | 0.4% |
| Gross profit | $ 76.4 | $ (1.8) | $ 74.6 | 2.4% |
| Gross Margin | 34.5% | -0.7% | 33.8% | 1.9% |
| Operating income | $ 35.6 | $ (3.1) | $ 32.5 | 9.5% |
| Net income | $ 48.4 | $ (1.2) | $ 47.2 | 2.5% |
| Earnings per Share (Basic) | $ 1.34 | $ (0.04) | $ 1.30 | 3.1% |
| Earnings per Share (Diluted) | $ 1.30 | $ (0.03) | $ 1.27 | 2.4% |

**Fourth Quarter and Year End 2012**

69.     On January 30, 2013, MagnaChip announced the following financial results for the quarter and year ended December 31, 2012:

| (In millions except margin & share data) | 4Q12 |
| --- | --- |
| Net sales | $ 218.1 |
| Gross profit | $ 74.3 |
| Gross Margin | 34.1% |
| Operating income | $ 35.3 |
| Net income | $ 125.3 |
| Earnings per Share (Basic) | $ 3.50 |
| Earnings per Share (Diluted) | $ 3.38 |
| Adjusted net income | $ 28.7 |
| Adjusted Earnings per Share (Diluted) | $ 0.77 |

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

70.     The reported 4Q12 Adjusted EPS exceeded the analyst consensus estimate of $0.71 per diluted share by over 8%.

71.     In a conference call with investors held the same day, Defendant Park distinguished the Company's performance from its peers, noting that revenues had increased:

> 6.1% from 2011 and outpace[ed] the semiconductor industry, which declined 3% this year. While the macro environment remained weak, we have successfully aligned with the growing smartphone and tablet PC market, leveraged our strong relationship with the blue chip customers, and delivered 30% more new products in 2012 than the previous year.

Defendant Sakai provided investors detailed commentary on the Company's important income statement and balance sheet metrics.

72.     On February 22, 2013, the Company filed with the SEC its Form 10-K for the year ended December 31, 2012, which was signed by Defendants Park, Sakai, and the Audit Committee Defendants, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-K contained SOX Certifications signed by Defendants Park and Sakai.

73.     The foregoing representations in ¶¶ 69-72 were materially false and misleading for reasons set forth in ¶¶ 4-5.  MagnaChip's true financial performance as revealed by the Restatement was as follows:

|  | 4Q12 | | | |
| --- | --- | --- | --- | --- |
| (In millions except margin & share data) | As Reported | Adjustment | Restated | % Overstated |
| Net sales | $   218.1 | $    (8.7) | $209.4 | 4.1% |
| Gross profit | $    74.3 | $   (11.1) | $ 63.2 | 17.6% |
| Gross Margin | 34.1% | -3.9% | 30.2% | 12.9% |
| Operating income | $    35.3 | $   (13.4) | $ 21.9 | 61.3% |
| Net income | $   125.3 | $   (78.3) | $ 47.0 | 166.5% |
| Earnings per Share (Basic) | $    3.50 | $    (2.19) | $ 1.31 | 167.2% |
| Earnings per Share (Diluted) | $    3.38 | $    (2.11) | $ 1.27 | 166.1% |

| (In millions except margin & share data) | | | Fiscal 2012 | | |
|---|---|---|---|---|---|
| | As Reported | Adjustment | Restated | % Overstated |
| Net sales | $ 819.6 | $ (12.3) | $807.3 | 1.5% |
| Gross profit | $ 263.5 | $ (20.3) | $243.2 | 8.3% |
| Gross Margin | 32.2% | -2.0% | 30.1% | 6.7% |
| Operating income | $ 105.8 | $ (21.5) | $ 84.3 | 25.5% |
| Net income | $ 193.3 | $ (83.3) | $110.0 | 75.7% |
| Earnings per Share (Basic) | $ 5.29 | $ (2.28) | $ 3.01 | 75.7% |
| Earnings per Share (Diluted) | $ 5.16 | $ (2.23) | $ 2.93 | 76.1% |
| Adjusted net income | $ 83.5 | $ (19.0) | $ 64.5 | 29.5% |
| Adjusted Earnings per Share (Diluted) | $ 2.23 | $ (0.51) | $ 1.72 | 29.8% |

**First Quarter 2013**

74.     On April 30, 2013, MagnaChip announced the following financial results for the first quarter ended March 31, 2013:

| (In millions except margin & share data) | 1Q13 |
|---|---|
| Net sales | $   205.3 |
| Gross profit | $   65.7 |
| Gross Margin | 32.0% |
| Operating income | $   22.9 |
| Net income | $   (7.4) |
| Earnings per Share (Basic) | $   (0.21) |
| Earnings per Share (Diluted) | $   (0.21) |
| Adjusted net income | $   19.7 |
| Adjusted Earnings per Share (Diluted) | $   0.53 |

75.     The reported 1Q13 Adjusted EPS exceeded the analyst consensus estimate of $0.47 per diluted share by over 12%.

76.     In an investor conference call that same day, Defendant Park noted:

> We were, again, able to achieve our financial guidance for the ninth consecutive quarter.

Defendant Sakai provided investors detailed commentary on important income statement and balance sheet metrics.

77.     MagnaChip's apparent ability to consistently beat market expectations was a significant factor in analysts' recommendations of the stock to investors. For example, in a report issued on April 30, 2013, an analyst for Deutsche Bank stated:

> This quarter represents the 9th consecutive quarter that the company has met or beat guidance, exhibiting a level of stability and execution that is inconsistent with the stock's current valuation (~0.6x EV/Sales). Overall, we believe MX [MagnaChip] can continue to deliver on its growth strategy and narrow its valuation gap with peers. Consequently we reiterate our Buy rating and raise our P/T to $22.

At the time, MagnaChip's stock was selling for $16.04 per share.

78.     On May 3, 2013, the Company filed with the SEC its Form 10-Q for the quarter ended March 31, 2013, which reiterated the Company's previously announced results and contained SOX Certifications signed by Defendants Park and Sakai.

79.     The foregoing representations in ¶¶ 74-76 and 78 were materially false and misleading for reasons set forth in ¶¶ 4-5 in the following amounts:

| (In millions except margin & share data) | As Reported | | Adjustment | | Restated | % Overstated |
|---|---|---|---|---|---|---|
| | | | | 1Q13 | | |
| Net sales | $ | 205.3 | $ | (11.0) | $194.3 | 5.6% |
| Gross profit | $ | 65.7 | $ | (7.5) | $ 58.2 | 12.9% |
| Gross Margin | | 32.0% | | -2.1% | 30.0% | 6.9% |
| Operating income | $ | 22.9 | $ | (9.0) | $ 14.0 | 64.1% |
| Net income | $ | (7.4) | $ | (10.2) | $ (17.6) | 57.9% |
| Earnings per Share (Basic) | $ | (0.21) | $ | (0.28) | $ (0.49) | 57.1% |
| Earnings per Share (Diluted) | $ | (0.21) | $ | (0.28) | $ (0.49) | 57.1% |
| Adjusted net income | $ | 19.7 | $ | (8.1) | $ 11.6 | 69.9% |
| Adjusted Earnings per Share (Diluted) | $ | 0.53 | $ | (0.2) | $ 0.33 | 62.4% |

**Second Quarter 2013**

80.     On July 30, 2013 MagnaChip announced the following financial results for the second quarter ended June 30, 2013:

| (In millions except margin & share data) | | 2Q13 |
|---|---|---|
| Net sales | $ | 215.3 |
| Gross profit | $ | 71.0 |
| Gross Margin | | 33.0% |
| Operating income | $ | 30.2 |
| Net income | $ | 4.4 |
| Earnings per Share (Basic) | $ | 0.13 |
| Earnings per Share (Diluted) | $ | 0.12 |
| Adjusted net income | $ | 26.2 |
| Adjusted Earnings per Share (Diluted) | $ | 0.71 |

81.     The reported 2Q13 Adjusted EPS exceeded the analyst consensus estimate of $0.60 per diluted share by over 18%.

82.     In an investor conference call that day, Defendant Park noted:

> [w]e are excited that our effort to focus on the fast growing markets with our expanding list of partners has enabled us to deliver 10 consecutive quarters of meeting or exceeding our financial guidance.

Defendant Sakai provided investors detailed commentary on important income statement and balance sheet metrics.

83.     On this news, the Company stock price increased $3.20 per share, or 18.4%, from $17.36 on July 30, 2013 to $20.56 per share on July 31, 2013.

84.     On August 5, 2013, the Company filed with the SEC its Form 10-Q the quarter ended June 30, 2013 which reiterated the Company's results and contained SOX Certifications signed by Defendants Park and Sakai.

85.     The foregoing representations in ¶¶ 80-82 and 84 were materially false and misleading for reasons set forth in ¶¶ 4-5 in the following amounts:

| (In millions except margin & share data) | As Reported | | Adjustment | Restated | % Overstated |
|---|---|---|---|---|---|
| | | | 2Q13 | | |
| Net sales | $ | 215.3 | $ (21.0) | $194.3 | 10.8% |
| Gross profit | $ | 71.0 | $ (25.8) | $ 45.2 | 57.0% |
| Gross Margin | | 33.0% | -9.7% | 23.3% | 41.7% |
| Operating income | $ | 30.2 | $ (27.5) | $ 2.7 | 1033.5% |
| Net income | $ | 4.4 | $ (29.1) | $ (24.7) | 118.0% |
| Earnings per Share (Basic) | $ | 0.13 | $ (0.83) | $ (0.70) | 118.6% |
| Earnings per Share (Diluted) | $ | 0.12 | $ (0.82) | $ (0.70) | 117.1% |
| Adjusted net income | $ | 26.2 | $ (26.5) | $ (0.3) | 8825.7% |
| Adjusted Earnings per Share (Diluted) | $ | 0.71 | $ (0.7) | $ (0.01) | 8495.5% |

86.     On October 21, 2013, the price of MagnaChip stock reached its Class Period high of $23.57 per share.  This stock-price inflation during the Class Period allowed Avenue Capital to sell more than 16.1 million shares of its MagnaChip stock at artificially inflated prices for gross proceeds of $232.675 million.

**Third Quarter 2013**

87.     On October 29, 2013, MagnaChip announced the following financial results for the third quarter ended September 30, 2013:

| (In millions except margin & share data) | 3Q13 | | 9 Months Ended 9/30/13 | |
|---|---|---|---|---|
| Net sales | $ | 217.8 | $ | 638.4 |
| Gross profit | $ | 71.9 | $ | 208.7 |
| Gross Margin | | 33.0% | | 32.7% |
| Operating income | $ | 30.6 | $ | 83.8 |
| Net income | $ | 46.7 | $ | 43.7 |
| Earnings per Share (Basic) | $ | 1.32 | $ | 1.23 |
| Earnings per Share (Diluted) | $ | 1.24 | $ | 1.17 |
| Adjusted net income | $ | 28.6 | $ | 74.5 |
| Adjusted Earnings per Share (Diluted) | $ | 0.76 | $ | 2.00 |

88.     The reported 3Q13 Adjusted EPS exceeded the analyst consensus estimate of $0.71 per diluted share by over 7%.

89.     In an investor conference call that day, Defendant Park noted:

> We delivered another quarter of solid results, an 11th consecutive quarter of meeting or exceeding our financial guidance.

Defendant Sakai provided investors detailed commentary on important income statement and balance sheet metrics.

90.     The foregoing representations in ¶¶ 87-89 were materially false and misleading for reasons set forth in ¶¶ 4-5 in the following amounts:

|  |  | 3Q13 |  |  |
|---|---|---|---|---|
| (In millions except margin & share data) | As Reported | Adjustment | Restated | % Overstated |
| Net sales | $  217.8 | $  (47.0) | $170.8 | 27.5% |
| Gross profit | $  71.9 | $  (37.5) | $  34.4 | 108.9% |
| Gross Margin | 33.0% | -12.9% | 20.1% | 63.8% |
| Operating income | $  30.6 | $  (40.8) | $ (10.2) | 399.7% |
| Net income | $  46.7 | $  (46.4) | $  0.25 | 18494.0% |
| Earnings per Share (Basic) | $  1.32 | $  (1.31) | $  0.01 | 13100.0% |
| Earnings per Share (Diluted) | $  1.24 | $  (1.23) | $  0.01 | 12300.0% |
| Adjusted net income | $  28.6 | $  (40.7) | $ (12.1) | 336.4% |
| Adjusted Earnings per Share (Diluted) | $  0.76 | $  (1.08) | $ (0.32) | 335.4% |

| ($ in millions except per share data) | 9 Months Ended Sept. 30, 2013 |  |  |  |
|---|---|---|---|---|
|  | As Reported | Adjustment | Restated | % Overstated |
| Net sales | $  638.4 | $  (79.7) | $558.7 | 14.3% |
| Gross profit | $  208.7 | $  (70.8) | $137.9 | 51.3% |
| Gross Margin | 32.7% | -8.0% | 24.7% | 32.4% |
| Operating income | $  83.8 | $  (77.3) | $   6.4 | 1206.5% |
| Net income | $  43.7 | $  (85.7) | $ (42.0) | 204.0% |
| Earnings per Share (Basic) | $  1.23 | $  (2.41) | $ (1.18) | 204.2% |
| Earnings per Share (Diluted) | $  1.17 | $  (2.35) | $ (1.18) | 199.2% |
| Adjusted net income | $  74.5 | $  (75.2) | $  (0.7) | 10742.9% |
| Adjusted Earnings per Share (Diluted) | $  2.00 | $  (2.02) | $ (0.02) | 10806.7% |

## THE TRUTH BEGINS TO EMERGE

91.     Beginning in mid-2103, Defendants' ability to continually "manufacture" revenues and earnings in excess of market expectations was severely challenged when, as the Company subsequently admitted:

> The industry was affected by slower than anticipated growth reported by certain high end smartphone OEMs. The weakness resulted in an inventory correction in parts of the semiconductor supply chain. In particular, the product refresh cycle for a major

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

smartphone OEM during this period was well below what industry analysts had projected. These factors had a significant impact on revenue for some semiconductor companies during this period, including MagnaChip.

In addition to the challenging industry conditions, our own strategies negatively impacted our performance beginning in mid-2013. For example, we increased our product and customer concentration within high end smartphones. When the demand for certain high end smartphones unexpectedly missed forecasts, our financial results suffered as well.[2]

92.     On January 27, 2013, MagnaChip abruptly postponed its year-end and fourth quarter 2013 earnings release and investor conference call scheduled for the next day, explaining that more time was needed to complete its review.

93.     This delay prompted Moody's to issue a "credit negative" report on the Company, which caused MagnaChip stock to decline $1.41 per share or over 8%, to close at $16.16 per share the next day.

94.     On March 11, 2014, MagnaChip announced that:

a. The Company's Audit Committee had determined MagnaChip needed to restate its financial results for 2011 through 2013 due to improper revenue recognition for products sold through its distributors;

Revenue on these transactions was recognized when products were shipped to a distributor but should have been recognized when the distributor shipped the product to the customer.

b. The decision to restate was based on an ongoing review by "outside professional advisors into practices and procedures by management;"

c. The outside review had identified "material weaknesses" in MagnaChip's accounting procedures such that "internal controls over financial reporting and disclosure controls and procedures were not effective."

d. Defendant Sakai had been "relieved" of her position as the Company's "principal accounting officer" (without reference to her continued role as CFO).

e. While stating that prior financial statements "should not be relied upon", MagnaChip otherwise reassured investors that the accounting problem was one

---

[2] Investor Conference Call February 13, 2015.

1   of simply timing of revenue recognition, rather than the absence of legitimate sales; and would be limited to distributor related transactions.

95.   Buffeted by these (false) reassurances, MagnaChip's share price only fell 3%, to close at $13.93 per share on March 12, 2014. Analysts also thought the worse was behind the Company and that the stock was now properly priced. For example, Barclays's report dated March 12, 2014 opined:

> With the stock down nearly 30% (vs. +5% for S&P 500) since the initial postponement, we believe the market is already pricing in much of this issue.

96.   On March 28, 2014, after the market closed, the Company announced that "Margaret Sakai has resigned as the Company's Executive Vice President and Chief Financial Officer and from all other officer and director positions with the Company and its subsidiaries, *effectively immediately*." (emphasis supplied). The next trading day, MagnaChip shares fell 4% to close at $13.94 per share.

97.   Defendant Park's "resignation" followed on May 20, 2014. Korean media reported that his departure was "disciplinary" in nature. On this news, the Company's stock price declined $0.44, or 3.4%, from $12.99 on May 20, 2014 to $12.55 on May 21, 2014.

98.   On August 12, 2014, MagnaChip announced that its financial statements would be further delayed due to expansion of the investigation beyond "sales" to distributors to include issues of revenue recognition involving all customers; cost of goods sold; and inventory reserves. On this news, MagnaChip's share price declined $0.52 per share or 3.8% to close at $13.19 per share.

99.   On November 12, 2014, MagnaChip issued preliminary findings regarding the Restatement. While no amounts were disclosed, the Company identified the following specific illegal accounting practices in violation of Generally Accepted Accounting Principles ("GAAP") in which management had engaged (and Audit Committee members recklessly ignored):

- "various manufacturing-related business practices that facilitated premature revenue recognition on unfinished goods, semi-finished goods, and inventory manufactured in advance that affected revenue and sales targets;

- various sales practices that resulted in overstated revenue for particular reporting periods, including premature shipment of products to and pulled-in orders from distributors and customers at quarter end;

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

25

- cash payments to certain vendors, using expense and capital expenditure accounts at the Company, that (i) the vendors used to purchase products from certain distributors; (ii) the distributors then paid to the Company for those products; and (iii) in turn were applied to aged accounts receivable;

- various improper inventory reserve accounting, non-recurring engineering (NRE) accounting, warranty reserve accounting and capitalization of repair expenses as capital expenditures that affected gross margins;

- improper allocations of selling, general, and administrative costs ("SG&A") that understated such costs and smoothed the SG&A-to-revenue ratio trend;

- improper deferral of outsourcing and free sample expenses that smoothed expense trends;

- improper revenue recognition on a gross rather than net basis for certain products and customers; and

- various undisclosed business practices and related concessions for distributors and customers (including credit limit increases, payment term extensions, provision of free samples, future discounts, and stock rotations), with distributor and customer consent, that affected the Company's sales."

100.   This news caused MagnaChip's share price to drop $0.30 to $11.17 per share the next day.

101.   Indicative of the vast nature of the fraud, it took almost eleven months for MagnaChip to complete the restatement and issue its fiscal 2013 financial statements. On February 12, 2015, MagnaChip issued a press release entitled "MagnaChip Completes Restatement of Financial Results - Company Files Quarterly Reports with Financial Results for First Three Quarters of 2014 - Files 2013 Annual Report Containing Financial Results for FY 2013, 2012 and 2011," which stated in part:

> MagnaChip Semiconductor Corporation ("MagnaChip" or the "Company"), a Korea-based designer and manufacturer of analog and mixed-signal semiconductor products, today filed with the Securities and Exchange Commission (SEC) its Annual Report on Form 10-K for the year ended December 31, 2013, which contains audited financial statements of the Company as of and for the years ended December 31, 2013, 2012 and 2011. In addition, MagnaChip filed its quarterly reports on Form 10-Q for the first three quarters of 2014.
>
> "This is an important step forward for MagnaChip, and with the restatement behind us, we are fully focused on improving our operations and delivering value to our customers and shareholders," said YJ Kim, MagnaChip's interim Chief Executive Officer. "Our results for the first three quarters of 2014 show that we have challenges to overcome, but we believe that we are making the necessary

changes to ensure that we have the right strategy, products, people and cost structure in place to better anticipate and serve the changing marketplace."

Jonathan Kim, interim Chief Financial Officer and Chief Accounting Officer, commented, "The management team and the Board are intensely focused on improving our internal controls, including our control environment and our corporate culture, to ensure that we have the right processes, people and financial discipline in place.  We believe we have made solid progress to date, and we expect to fully address all of the material weaknesses in internal control over financial reporting described in our filings today by the end of 2015."

102.    Subsequently on February 12, 2015, after the market closed, MagnaChip finally issued the Restatement in a Form 10-K for fiscal 2013, restating its 2011 through 2013 results.   The restatement was purportedly caused by a host of accounting errors, including revenue recognition, cost of goods sold, inventory reserves, capitalization, and expense recognition and allocation, including related business practices for distributors, non-distributor customers and vendors.  In addition, it filed a Form 10-Q each fiscal quarter of 2013, which restated quarterly results for each period in 2012 and 2013 as follows:

| (In millions except margin & share data) | Fiscal 2011 | | | |
|---|---|---|---|---|
| | As Reported | Adjustment | Restated | % Overstated |
| Net sales | $   772.8 | $   (29.7) | $743.1 | 4.0% |
| Gross profit | $   234.3 | $   (34.8) | $199.5 | 17.4% |
| Gross Margin | 30.3% | -3.5% | 26.9% | 12.9% |
| Operating income | $   72.9 | $   (36.0) | $ 37.0 | 97.3% |
| Net income | $   21.8 | $   (33.1) | $ (11.3) | 292.8% |
| Earnings per Share (Basic) | $   0.56 | $   (0.85) | $ (0.29) | 293.1% |
| Earnings per Share (Diluted) | $   0.55 | $   (0.84) | $ (0.29) | 289.7% |
| Adjusted net income | $   66.4 | $   (34.2) | $ 32.2 | 106.3% |
| Adjusted Earnings per Share (Diluted) | $   1.67 | $   (0.84) | $  0.83 | 101.1% |

| (In millions except margin & share data) | | Fiscal 2012 | | | |
|---|---|---|---|---|---|
| | As Reported | Adjustment | | Restated | % Overstated |
| Net sales | $     819.6 | $      (12.3) | | $807.3 | 1.5% |
| Gross profit | $     263.5 | $      (20.3) | | $243.2 | 8.3% |
| Gross Margin | 32.2% | -2.0% | | 30.1% | 6.7% |
| Operating income | $     105.8 | $      (21.5) | | $ 84.3 | 25.5% |
| Net income | $     193.3 | $      (83.3) | | $110.0 | 75.7% |
| Earnings per Share (Basic) | $       5.29 | $      (2.28) | | $ 3.01 | 75.7% |
| Earnings per Share (Diluted) | $       5.16 | $      (2.23) | | $ 2.93 | 76.1% |
| Adjusted net income | $      83.5 | $      (19.0) | | $ 64.5 | 29.5% |
| Adjusted Earnings per Share (Diluted) | $       2.23 | $      (0.51) | | $ 1.72 | 29.8% |

| ($ in millions except per share data) | | 9 Months Ended Sept. 30, 2013 | | | |
|---|---|---|---|---|---|
| | As Reported | Adjustment | | Restated | % Overstated |
| Net sales | $     638.4 | $      (79.7) | | $558.7 | 14.3% |
| Gross profit | $     208.7 | $      (70.8) | | $137.9 | 51.3% |
| Gross Margin | 32.7% | -8.0% | | 24.7% | 32.4% |
| Operating income | $      83.8 | $      (77.3) | | $   6.4 | 1206.5% |
| Net income | $      43.7 | $      (85.7) | | $ (42.0) | 204.0% |
| Earnings per Share (Basic) | $       1.23 | $      (2.41) | | $ (1.18) | 204.2% |
| Earnings per Share (Diluted) | $       1.17 | $      (2.35) | | $ (1.18) | 199.2% |
| Adjusted net income | $      74.5 | $      (75.2) | | $   (0.7) | 10742.9% |
| Adjusted Earnings per Share (Diluted) | $       2.00 | $      (2.02) | | $ (0.02) | 10806.7% |

103.    PWC's opinion letter condemned Defendants' utter disregard for internal controls (2013 10-K, pg. 70), noting that the Company was "not maintaining an effective control environment" during the Class Period with respect to:

(i)    "an attitude of integrity and ethics against the pressure to achieve sales, gross margin and adjusted EBITDA targets;"

(ii)    "adherence to U.S. GAAP;"

(iii)    "utilization of the whistleblower program;"

(iv)    "prevention or detection of undisclosed business practices involving the circumvention of numerous internal controls under the management team then in place;" and

(v)    "appropriate level of accounting knowledge, experience and training commensurate with the Company's financial reporting requirements under U.S. GAAP."

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The auditors added that the Company had:

(vi)   "not maintain[ed] effective monitoring activities to evaluate and communicate internal control deficiencies in a timely manner to those parties responsible for taking corrective actions, including maintaining an effective internal audit function;"

(vii)   "not design[ed] effective controls over the completeness and accuracy of period end adjusting entries;" and

(viii)   "not design[ed] effective controls over the completeness and accuracy of the Company's income tax accounting and disclosures, which existed as of [the dates financial reports were issued]."

104.   The vast scope of the Restatement surprised investors and decimated MagnaChip's share price. As the analyst at Topeka Capital Markets stated:

We were surprised by the magnitude of impact to profitability in the restatement, and are downgrading our rating to hold.

105.   The Restatement was issued after the close of trading on February 12, 2015.  The next trading day its share price was cut in half (from $15.02 per share to $7.52 per share) as trading volume spiked to 15.5 million shares – a 50 fold increase.

106.   Over the next few days, MagnaChip's share price continued to decline by another $2.00 per share as investors studied the Restatement, realized its implications for the Company's future, and sold off their shares, further driving down MagnaChip's share price.

**The Restatement was an Admission of Material GAAP Violations**

107.   Restatements are required for "material" accounting errors that existed at the time financial statements were prepared.  *See* SFAS 154. (ASC 250-10). By issuing the Restatement, MagnaChip acknowledged that its financial statements for the restated periods were materially inaccurate, and did not comply with GAAP and were therefore false and misleading *when issued*. 17 C.F.R. § 210.4-01(a)(1).

108.   While some of the improperly recognized revenue was deferred to later periods, "a significant portion was reversed" – meaning it was completely fictitious to begin with.

109.   GAAP also makes a distinction between a change in estimate and the corrections of historic facts.  If an estimate is changed, then no restatement is necessary. However, if facts in existence

at the time were not properly recorded or considered, then the original statement must be corrected. Corrections are to be adjusted by recording adjustments to current and previously issued financial statements. ASC 250-05-04, 250-10-20.  Thus, by restating, MagnaChip admitted that these were not judgmental mistakes in estimation, but that it had ignored or misused known facts that existed at the time the financial statements were prepared, evidencing knowing or reckless misconduct.

### **The Restatement was also an Admission of Material Violations of Internal Controls**

110.   In making its assessment of internal control over financial reporting, MagnaChip's management used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission Report, *Internal Control – Integrated Framework* (1992) ("COSO Report").[3] The COSO Report, borrowing from generally accepted auditing standards, defines fair presentation in financial statements as containing the following:

- the accounting principles selected and applied have general acceptance;
- the accounting principles are appropriate in the circumstances;
- the financial statements are informative of matters that may affect their use, understanding and interpretation; and
- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[4]

111.   In the Restatement, MagnaChip also admitted that it failed to live up to the COSO standards and that its prior statements (as reflected in the SOX certifications) regarding the effectiveness of its internal controls were in fact false when made:

**Control Environment:**

We did not maintain an effective control environment based on the criteria established in the COSO Framework. Specifically, we did not maintain a control environment that effectively emphasized (i) an attitude of integrity and ethics against the pressure to achieve sales, gross margin and adjusted EBITDA targets,

---

[3] 2013 Form 10-K page 70.  The COSO report was originally issued in September 1992 as a four-volume set.  An *Addendum to Reporting to External Parties* was issued in May 1994.  On May 14, 2013 COSO released an updated version of the entire framework.  Unless otherwise noted, all references to the COSO report refer to the 1992 issuance.

[4] COSO Report, Risk Assessment, pg. 35.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(ii) adherence to U.S. GAAP, (iii) utilization of the whistleblower program, and (iv) prevention or detection of undisclosed business practices involving the circumvention of internal controls under the management team then in place, resulting in the inaccurate accounting for certain transactions with respect to sales, cost of sales, inventory, fixed assets, provisions and income taxes, among others. In addition, we did not maintain an appropriate level of accounting knowledge, experience and training commensurate with our financial reporting requirements under U.S. GAAP.

**Monitoring Activities:**

We did not effectively evaluate and communicate internal control deficiencies in a timely manner to those parties responsible for taking corrective actions. Specifically, we did not maintain an effective internal audit function whereby the internal control team exercised full authority to independently report to the Audit Committee in order to provide adequate monitoring of control activities related to financial reporting throughout the organization. As a result, (i) the Company's monitoring activities, including internal audit function that should have prevented or detected errors or failure to abide by internal controls were not effective; and (ii) incomplete information was provided to the Company's Audit Committee, which limited the Audit Committee's ability to effectively oversee the accounting and financial reporting processes and internal control over financial reporting of the Company.

**Controls over the Period End Closing and Financial Reporting:**

We did not design effective controls over the completeness and accuracy of our period end adjusting entries. Specifically, controls over the analysis, documentation, review and approval of the accounting and reporting of entries were not designed effectively to ensure the accuracy and completeness of the entries recorded.

**Income Tax Accounting and Disclosures:**

We did not design effective controls over the completeness and accuracy of our income tax accounting and disclosures. Specifically, we did not design effective controls over the review of tax rules and regulations and the analysis and review of accounting implications with respect to current and deferred income taxes, uncertain tax positions and related disclosures.

These material weaknesses resulted in the restatement of the Company's consolidated financial statements and related financial disclosures for the years ended December 31, 2011 and 2012 and each of the first three quarters of 2012 and 2013. These material weaknesses also resulted in adjustments to our net sales, cost of sales, selling, general and administrative expenses, research and development expenses, other income, income tax expense, and related assets and liabilities as well as the related financial disclosures for each of the first three

quarters of 2013 and to our accounting records for the quarter ended December 31, 2013. In addition, these material weaknesses could result in further misstatements of the financial statements or disclosures that would result in a material misstatement of the annual or interim consolidated financial statements that would not be prevented or detected.

## THE MATERIALLY FALSE AND MISLEADING REGISTRATION STATEMENT

112.    On or about April 13, 2012, MagnaChip filed with the SEC a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process.  Under the shelf registration, MagnaChip would sell securities described in various future prospectus supplements in one or more offerings.  The prospectus supplements would form part of the registration statement for each offering.  The securities were to be issued by MagnaChip.  The Form S-3 expressly incorporated by reference certain filings MagnaChip had previously made with the SEC and all future filings until any offering conducted under the shelf registration statement was completed.  The SEC declared the shelf registration statement effective on April 26, 2012.

113.    On February 6, 2013, the 2/13 Offering was priced at $14.50 per share and the final Prospectus was filed, which formed part of the Registration Statement, pursuant to which Avenue Capital sold 5.75 million shares of common stock to the public (including exercising the underwriters' overallotment), raising $83.375 million in gross proceeds for Avenue Capital.

114.    The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

115.    The Offering Documents expressly incorporated by reference MagnaChip's Annual Report on Form 10-K for the year ended December 31, 2011, filed with the SEC on March 8, 2012, and included the Company's 2011 financial statements and financial information for the quarter and year ended December 31, 2012, including the following information:

MAGNACHIP SEMICONDUCTOR CORPORATION AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands of US dollars, except share data)
(Unaudited)

| | Three Months Ended | | | Year Ended | |
|---|---|---|---|---|---|
| | December 31, 2012 | September 30, 2012 | December 31, 2011 | December 31, 2012 | December 31, 2011 |
| Net sales | $ 218,084 | $ 221,872 | $ 180,826 | $ 819,592 | $ 772,831 |
| Cost of sales | 143,796 | 145,432 | 129,287 | 556,091 | 538,515 |
| Gross profit | 74,288 | 76,440 | 51,539 | 263,501 | 234,316 |
| Gross profit % | 34.1% | 34.5% | 28.5% | 32.2% | 30.3% |
| Selling, general and administrative expenses | 19,281 | 21,388 | 17,627 | 78,971 | 68,367 |
| Research and development expenses | 19,660 | 19,470 | 18,652 | 78,723 | 76,787 |
| Restructuring and impairment charges | — | — | — | — | 4,096 |
| Special Expense for IPO Incentive | — | — | — | — | 12,146 |
| Operating income | 35,347 | 35,582 | 15,260 | 105,807 | 72,940 |
| Other income (expense) | | | | | |
| Interest expense, net | (5,655) | (5,748) | (5,844) | (22,600) | (24,984) |
| Foreign currency gain (loss), net | 33,656 | 21,782 | 16,832 | 55,961 | (11,633) |
| Loss on early extinguishment of senior notes | — | — | — | — | (5,459) |
| Other | 634 | 695 | (862) | 2,119 | (1,052) |
| | 28,635 | 16,731 | 10,326 | 35,480 | (43,128) |
| Income before income taxes | 63,982 | 52,313 | 25,586 | 141,287 | 29,812 |
| Income tax expense (benefit) | (61,304) | 3,901 | 1,881 | (52,014) | 8,019 |
| Net income | $ 125,286 | $ 48,412 | $ 23,705 | $ 193,301 | $ 21,793 |
| Earnings per common share: | | | | | |
| Basic | $ 3.50 | $ 1.34 | $ 0.61 | $ 5.29 | $ 0.56 |
| Diluted | $ 3.38 | $ 1.30 | $ 0.61 | $ 5.16 | $ 0.55 |
| Weighted average number of shares—Basic | 35,843,367 | 36,199,655 | 38,632,975 | 36,567,684 | 38,775,842 |
| Weighted average number of shares—Diluted | 37,074,657 | 37,324,787 | 39,110,759 | 37,496,965 | 39,774,898 |

S-4

116.    The Company has acknowledged that its financial statements for 2011 and 2012, which were included in the Offering Documents, were materially false and misleading and were required to be restated.  *See* ¶¶ 43-72, *infra*.  Indeed, on February 12, 2015, MagnaChip disclosed for the first time the material negative adjustments to fiscal years 2011 and 2012 in connection with the Restatement:

The adjustments recorded in the fiscal years ended December 31, 2012 and 2011 in connection with the Restatement are aggregated as follows:

| | Net Income (Loss) Years Ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (In thousands) | |
| As Previously Reported | $ 193,301 | $ 21,793 |
| Adjustments: | | |
| Revenue Recognition | (8,737) | (16,418) |
| Inventory Reserves | (7,810) | (10,075) |
| Understated Employee Benefits | (1,091) | (2,472) |
| Settlement Obligations | 879 | (2,116) |
| Tax Matters | (65,637) | (1,319) |
| Other Adjustments | (867) | (694) |
| Total Adjustments | (83,263) | (33,094) |
| As Restated | $ 110,038 | $ (11,301) |

117.    Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.   This is particularly true for issuers utilizing shelf registration statements, which require continuous updating and incorporate those continuous disclosures into the registration statement.  At the time of the 2/13 Offering, the Company's financial statements were materially overstated.

118.    The Offering Documents also expressly incorporated Management's Report on Internal Control over Financial Reporting from MagnaChip's Form 10-K for the year ended December 31, 2011

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

33

which acknowledged that the "Company's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act)" and that MagnaChip's "internal control over financial reporting is a process designed under the supervision of our chief executive officer and our chief financial officer, and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  The 2011 Form 10-K continued, stating that:

> Management conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2011, based on the criteria set forth in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on the Company's assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2011 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. generally accepted accounting principles. The Company's independent registered public accounting firm, Samil PricewaterhouseCoopers, has issued an audit report on the Company's internal control over financial reporting which appears in Item 8 of this Annual Report on Form 10-K.

119.    In addition, MagnaChip's auditor, PWC, stated that "the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011."

120.    In fact, MagnaChip had material weaknesses in its internal control over financial reporting for fiscal 2011 and 2012.  *See* ¶ 103, *infra*.

121.    The Individual Defendants are liable for the false and misleading statements in the Registration Statement used to conduct the 2/13 Offering due to their signatures thereto.

122.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement used to conduct the 2/13 Offering as follows:

123.    (a)    The Underwriter Defendants are investment banking houses which specialize, inter alia, in underwriting public offerings of securities.  They served as the underwriters of the 2/13 Offering and shared more than $3.44 million in fees collectively.  The Underwriter Defendants determined that in return for their share of the 2/13 Offering proceeds, they were willing to merchandize MagnaChip stock in the 2/13 Offering.  The Underwriter Defendants arranged a multi-city

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

roadshow prior to the 2/13 Offering during which they, and the Officer Defendants, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from MagnaChip that MagnaChip would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that MagnaChip had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted MagnaChip and the Officer Defendants in planning the 2/13 Offering, and purportedly conducted an adequate and reasonable investigation into the business and operations of MagnaChip, an undertaking known as a "due diligence" investigation.   The due diligence investigation was required of the Underwriter Defendants in order to engage in the 2/13 Offering.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning MagnaChip's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents all the way back to March 2010 when they began preparing to take MagnaChip public in the IPO, agents of the Underwriter Defendants met with MagnaChip's lawyers, management and top executives and engaged in "drafting sessions" between at least January and February 2013 related to the 2/13 Offering.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the 2/13 Offering; (ii) the terms of the 2/13 Offering, including the price at which MagnaChip stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about MagnaChip would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.   As a result of those constant contacts and communications between the Underwriter Defendants' representatives and MagnaChip management and top executives, the Underwriter Defendants were negligent in not knowing of MagnaChip's existing problems as detailed herein.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    (e)    The Underwriter Defendants caused the Registration Statement to be filed with the SEC

2    and declared effective in connection with offers and sales thereof, including to Plaintiff

3    Oklahoma Police and the Subclass (as defined below).

4    124.    Class members who purchased MagnaChip stock in or traceable to the 2/13 Offering

were unaware that the Company lacked sufficient internal controls and procedures over financial

reporting and had improperly recognized revenues and prepared and filed materially false and

misleading financial statements for fiscal 2011 and 2012.  However, they would learn these facts and

see substantial declines in MagnaChip's stock price when this information was revealed.

### SCIENTER ALLEGATIONS

**The Company's Scienter**

125.    As detailed above, by restating its previously reported financial results, MagnaChip has

admitted that the financial statements issued during the Class Period were materially false when issued.

The Company's reckless disregard for the truth is evidenced by the large and highly material amounts

restated, the variety of devices employed to conduct the deception, the pervasiveness of the fraud –

effecting sales in every geographic region and each division in which the Company does business, the

clear violation of the Company's own accounting policies, and the deliberate evasion of financial

internal controls.

**The Executive Defendants' Scienter**

126.    In 1Q 2013 and 3Q 2013, MagnaChip made cash payments to a maintenance supplies

vendor totaling $6.5 million that were sham round-trip transactions in violation of GAAP.  Upon

information and belief, the Executive Defendants personally approved and directed these transactions

with the specific intention of inflating MagnaChip's revenues and profits.

127.    The round trip transactions consisted of MagnaChip paying millions in cash to "a

maintenance supplies vendor, that (i) the vendor used to purchase products from distributors; (ii) the

distributors then paid to the Company for those products; and (iii) in turn were applied to the

Company's aged accounts receivable". [2013 10K pg. 118, fn a, c].

128.    Of the $6.5 million in cash payments, $5.0 million or 75.3% amounted to overpayments for which MagnaChip received no consideration in return.   Viewed another way, MagnaChip overpaid the vendor 133% of the true sale price.

129.    It is highly unlikely that middle or lower level managers would engage in these multi-million dollar transactions without the approval and direction of CFO Margaret Sakai, COO Tae Young Hwang, or CEO Sang Park.   Such payments were of a sufficient magnitude to require executive approval, particularly in the absence of any tangible goods being provided to MagnaChip in exchange for the payments.   No middle manager (indeed no one at any level) would alone bear the risk that the vendor might not carry out its end of the scheme and not actually purchase the $5 million of goods from MagnaChip's distributor (thus keeping all of the overpayments for itself).   If the maintenance vendor had failed complete his end of the scheme, then those MagnaChip employees involved would have faced a risk of jail time for embezzling Company funds.   Thus, it is inconceivable that any MagnaChip employee would have had access to such large sums, and delivered them to a maintenance company, without explicit approval of the Executive Defendants.

130.    The improper business practices at issue in this case were all part of the Company's core operations, such as sales forecasts, inventory management and customer and distributor relationships. Because the Executive Defendants are the CEO, CFO and COO of MagnaChip they had day-to-day operational control over and thorough knowledge of these core operations.

131.    Indeed, at outset of the Class Period, the Executive Defendants had been with the Company many years, serving in various capacities, including through bankruptcy reorganization, and as a result were knowledgeable about all aspects of MagnaChip's financial and business operations, especially core business matters such as the Company's operations, revenue recognition policies and practices, and internal controls.

132.    Defendant Park had been MagnaChip's CEO since 2006. Defendant Sakai had been MagnaChip's CFO since April 2009, and had previously served as the Company's Senior Vice President, Finance since November 2006.   Defendant Hwang had served as the Company's COO since November 2009 and in other executive roles with the Company since October 2004.   They ran the

Company as "hands-on" managers, oversaw MagnaChip's operations and finances, and made the materially false and misleading statements described herein. They also were involved in deciding which disclosures would be made by MagnaChip.

133.    Defendants Park and Sakai also signed MagnaChip's filings with the SEC during the Class Period, including SOX certificates stating the financial reports were accurate and complied with GAAP.  In these filings, Defendants Park and Sakai also certified that they were responsible for, designed, and had evaluated the Company's disclosure and internal controls over financial reporting, and that the controls were effective.

134.    Defendant Park's intimate knowledge of MagnaChip's core true financial condition and operations is further evident from the commentary he routinely added in conference calls with analysts following the release of quarterly financial results. By of example, in connection with release of results for the Second Quarter of 2012, Park stated:

    a.    "We have a business mix model which Foundry business cost at our plan. So, book-to-bill ratio is not really a fixed way of selling new. But we have a very strong wafer loading for the foundry business and our brand we have a pretty reasonable good backlog as of today."

    b.    "Obviously, there are more customers, probably end customers not going to change a lot but yeah we're adding more sales channel and bring more foundry customer."

    c.    "Obviously, the whole, the supply chain from us to Samsung, maybe about five months through the layers, and therefore whatever business in five months from now and we still see strong the wafer loading, so probably customers looking as a healthy business in couple quarters."

    d.    "I have been talking about shifting customer base and that relate to average sales price went up from 2010 to 2011. And I project that, that trend will continue into 2012. So, there is a lot of shifting going on and that shifting is again leading to higher resource price for wafer. And that's going to help us to grow into following years plus that we've been adding 5% to 15% of capacity last three years and there will be a continuously trend."

135.    Defendant Sakai's intimate awareness is similarly evident from her masterful commentary during these same conference calls on sophisticated financial metrics including revenue, gross profit, operating income, net income, adjusted net income, account receivable, days of sales

outstanding and net inventory.  It is further reflected in remarks such as those made in connection with the investor conference call held in connection with year-end 2012 results, wherein she noted:

> d.   "It's depending on the product mix right now. Then for the first quarter, we are expecting pretty much the same level. And then as we are currently evaluating our days of inventory target range."

> e.   "We do have only one -- the customer that is revenue is 10% greater than -- greater than 10% of total company revenue."

Similarly, in connection investor conference call held in connection with the first quarter 2013 results, she noted:

> f.   "We are expecting between 1% to 2% of gross margin improvement every year based on the revenue growth and then our strategy execution with the normalized fab utilization which is above 85%."

136.   There is no question that the Company's CFO and "principal accounting officer", Defendant Sakai, was intimately knowledgeable of proper revenue recognition requirements.  Prior to her long tenure at the Company, Sakai had served as CFO for several other companies, had worked as an Audit Supervisor at Coopers & Lybrand, is a Certified Public Accountant with a B.A. degree in Accounting from Babson College.

**The Executive Defendants' Motives**

137.   Throughout the Class Period, the Executive Defendants were eligible to and did receive short term cash incentive payments tied to the inflated results.  As MagnaChip's annual report stated:

> Short-term cash incentives comprise a significant portion of the total target compensation package and are designed to reward executives for their contributions to meeting and exceeding our goals and to recognize and reward our executives in achieving these goals. Incentives are designed as a percentage of base salary and are awarded based on individual performance and our achievement of the annual, long-term and strategic quantitative goals set by our Committee.

138.   Avenue Capital controlled the Compensation Committee that decided the amount of cash incentives to be paid to the Executive Defendants. It thus rewarded the Executive Defendants for enabling Avenue Capital to pocket hundreds of millions of dollars in profits.

139.    The Executive Defendants were also the beneficiaries of a profit sharing plan adopted as of January 1, 2010 incentivized to maximize reported revenues.  As described in the Company's SEC filings;

> Our Board intends for the Profit Sharing Plan to incentivize our named executive officers, officers and employees to *exceed expectations* throughout our entire fiscal year."

The Executive Defendants' profit sharing bonuses were determined by their ability to meet a "Base Target", which was "calculated as a percentage of [MagnaChip's] forecasted gross annual revenue for the upcoming fiscal year."

140.    The Executive Defendants were beneficiaries of discretionary bonuses as well. The discretionary bonuses were determined by the Compensation Committee, which were based upon a subjective assessment of their respective individual contributions and not any numerical or formulaic factors. From 2011 to 2013, the Executive Defendants received  the following Profit Share Plan and discretionary bonuses:

| Defendant Park Cash Compensation | | | | | | |
|---|---|---|---|---|---|---|
| Year | Base | Profit Share Plan Bonus | Profit Share Plan Bonus as % of Total Cash Compensation | Discretionary Bonus | Profit Share Plan & Discretionary Bonus as % of Total Cash | Total Cash Compensation |
| 2011 | $ 553,444 | $ 211,124 | 27.61% | $ - | 27.61% | $ 764,568 |
| 2012 | $ 605,570 | $ 311,751 | 28.52% | $ 175,648 | 44.59% | $ 1,092,969 |
| 2013 | $ 633,634 | $ 172,978 | 21.45% | $ - | 21.45% | $ 806,612 |

| Defendant Sakai Cash Compensation | | | | | | |
|---|---|---|---|---|---|---|
| Year | Base | Profit Share Plan Bonus | Profit Share Plan Bonus as % of Total Cash Compensation | Discretionary Bonus | Profit Share Plan & Discretionary Bonus as % of Total Cash | Total Cash Compensation |
| 2011 | $ 316,327 | $ 90,190 | 22.19% | $ - | 22.19% | $ 406,517 |
| 2012 | $ 350,279 | $ 123,333 | 23.55% | $ 50,185 | 33.13% | $ 523,797 |
| 2013 | $ 368,128 | $ 71,752 | 16.31% | $ - | 16.31% | $ 439,880 |

| Defendant Hwang Cash Compensation | | | | | | |
|---|---|---|---|---|---|---|
| Year | Base | Profit Share Plan Bonus | Profit Share Plan Bonus as % of Total Cash Compensation | Discretionary Bonus | Profit Share Plan & Discretionary Bonus as % of Total Cash | Total Cash Compensation |
| 2011 | $ 315,471 | $ 101,482 | 24.34% | $ - | 24.34% | $ 416,953 |
| 2012 | $ 332,001 | $ 133,710 | 27.24% | $ 25,093 | 32.36% | $ 490,804 |
| 2013 | $ 363,902 | $ 76,439 | 17.36% | $ - | 17.36% | $ 440,341 |

### The Insider Sales

141.    On August 9, 2013, Defendant Tavakoli sold 15,000 MagnaChip shares for gross proceeds of $287,192, which represented approximately 59% of his holdings at the time. Just three days later on August 12, 2013, Defendant Tavakoli sold another 10,000 MagnaChip shares for gross proceeds of $191,250, which represented approximately 64% of his holdings at the time.  Based on 18,750 shares the Company issued to him in March 2010 for his services and his exercise of options of 11,800 shares at $13.56 per share, he earned approximately $393,692 in profit on his sale of MagnaChip shares.  These were his only stock sales during the Class Period and occurred just a few months before PWC discovered MagnaChip's fraud.  He did not sell any MagnaChip shares prior to the start of the Class Period.

142.    On May 14, 2012, Hwang Tae Young sold 15,000 MagnaChip shares for gross proceeds of $166,650, which represented approximately 14% of his holdings at the time.  Based on shares the Company granted to him in December 2009 for his services, he earned $166,650 in profit.  These were his only stock sales during the Class Period. He did not sell any MagnaChip shares prior to the start of the Class Period.

### The Audit Committee Defendants' Scienter

143.    Pursuant to its Charter, the Audit Committee was responsible for the following with regards to its review of financial reporting, policies and processes:

    a.    "Review and discuss with management and the independent auditor the Company's annual audited financial statements…"

    b.    "Review and discuss with management and the independent auditor the Company's quarterly financial statements."

    c.    "Review and discuss with management and the independent auditor the Company's disclosure under "Management's Discussion and Analysis of

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Financial Condition and Results of Operations" appearing in the Company's periodic reports."

d.  "Review and discuss with management all press releases regarding the company's financial results and any other information provided to securities analysts and rating agencies, including any non- GAAP financial information."

e.  "Periodically meet separately with management, with internal auditors and with the independent auditor."

f.  "Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments."

g.  "Review with management its assessment of the effectiveness and adequacy of the Company's internal control structure, and review with the independent auditor" the attestation thereof.

h.  Review with management the "Company's procedures and controls designed to assure that information required to be disclosed in the Company's periodic public reports is recorded, processed, summarized and reported in such reports within the time periods specified by the SEC."

i.  "Review any special audit steps adopted in light of material control deficiencies. Review with the independent auditor and management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented."

j.  "Review the significant reports to management prepared by the internal auditors."

144.  As Chairman of the Audit Committee since 2006, Defendant Norby was well aware of revenue recognition requirements.  He had served as CFO to numerous companies, received a B.A. degree in Economics from Harvard University, an M.B.A. from Harvard Business School, and was selected to serve as Chairman of the Audit Committee because of "his extensive experience as a chief financial officer, his extensive experience in accounting and his experience as a public company director and audit committee chair."

145.  The Audit Committee Members were on notice of the structural flaws that contributed to the rampant fraud at MagnaChip as early as 2010. In connection with certification of year end 2009 financial statements, MagnaChip's outside auditors noted "material weakness" in internal controls given the: (i) lack of a sufficient number of financial personnel with the requisite financial accounting experience; and (ii) the Company's controls over non-routine transactions were not effective to ensure that accounting considerations are identified and appropriately recorded." This was a direct reference to

the fact that the tasks of Chief Accounting Officer and Chief Financial Officer were the responsibility of one person, Defendant Sakai.

146.    Despite the Company's proclamation that these weaknesses had been remedied, throughout the Class Period Audit Committee members permitted MagnaChip to continue operating without a Chief Accounting Officer.  Thus, the Audit Committee set the stage whereby the person responsible for generating the final earnings could readily manipulate the inputs to achieve the desired ends. This was at minimum, a red flag that the Audit Committee ignored.

147.    During the Class Period, the Audit Committee Defendants were also knowledgeable about the Company's revenue recognition policies and practices, and internal controls.  They also signed the Company's annual financial statements.  The primary purpose of the Audit Committee was to assist the Board of Directors in fulfilling its oversight responsibilities by reviewing and reporting to the Board on the integrity of the financial reports and other financial information provided by the Company to the public, the SEC and any other governmental regulatory body, and on the Company's compliance with other legal and regulatory requirements.  Furthermore, Defendants Park and Sakai each certified that, at all times during the Class Period, the Audit Committee Defendants were informed of all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

148.    The foregoing reflects that the Audit Committee had the tools to know, and either knew of, or recklessly ignored, the rampant fraud at MagnaChip.

**MagnaChip's GAAP Violations**

149.    MagnaChip prepared its financial statements in accordance with accounting principles accepted in the United States of America.  These accounting principles are known as U.S. GAAP.

150.    GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices for preparing financial statements. Preparation of financial statements in conformity with GAAP is "an implicit and integral part of management's responsibility." AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

151.     SEC and NASDAQ rules and regulations require that publicly traded companies such as MagnaChip include GAAP complaint financial statements that comply with reports filed with the SEC. *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.  SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

**MagnaChip's Stated Revenue Recognition Policies and Violations Thereof**

152.     The Company's revenue recognition policy required that before revenue could be recorded, that it meets four of the most basic "bright-line" conditions for recording revenue.  If any condition fails to be satisfied, revenue recognition must be delayed until the period in which the final condition is met. As stated MagnaChip's Form 10-K's, which were signed by Defendants Park, Sakai and the Audit Committee Defendants:

> We recognize revenue when risk and reward of ownership passes to the customer either upon shipment, upon product delivery at the customer's location or upon customer acceptance, depending on the terms of the arrangement.  [2011 and 2012 Form 10-K]

> *Revenue is recognized when persuasive evidence of an arrangement exists,* the product has been delivered and title and risk of loss have transferred, the price is fixed and determinable, and collection of the resulting receivable is reasonably assured. Utilizing these criteria, product revenue is recognized either upon shipment, upon delivery of the product at the customer's location or upon customer acceptance, depending on the terms of the arrangements. The Company's revenue recognition policy is consistent across its product lines, marketing venues, and geographic areas. [2011 and 2012 notes to financial statements]

153.     The Company's stated (but violated) revenue recognition policy was consistent with GAAP.  Financial Accounting Statement Bulletin ("FASB") Statement of Concepts No. 5 ("FASB CON No. 5") provides the basic requirements for revenue to be recognizable: (i) revenue must have been realized or realizable (collectible); and (ii) revenue must be earned. In addition, more specific guidance for determining the proper timing of revenue recognition exists in the Securities and Exchange Commission ("SEC") Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in*

*Financial Statements.*[5]  Under SAB 104, revenue is generally realized or realizable and earned when all of the following four conditions are met:

- Persuasive evidence of an arrangement exists,
- Delivery has occurred or services have been rendered,
- The seller's price to the buyer is fixed or determinable, and
- Collectability is reasonably assured.[6]

154.    As explained below, MagnaChip violated its own revenue recognition policies throughout the Class Period by recording revenue before title and risk of loss had been transferred to its distributors; before there was persuasive evidence of an arrangement; before there was effective delivery; before its sales price was fixed or determinable; and before the collectability of the sales price on certain contracts were reasonably assured.

155.    MagnaChip recorded revenue that never should have been recorded at all (completely fictional revenue), in addition to prematurely recognizing revenue before it was earned.

156.    Throughout the Class Period, MagnaChip purportedly derived 23% to 29% of its net revenues from sales through distributors. A material portion of these revenues were recorded in violation of the Company's own revenue recognition policies, as well as GAAP. The company further disclosed that in some circumstances, revenue was recognized prior to the time that risk of loss had been transferred to it distributors.

157.    In situations where the risk of loss has not been transferred to a distributor the sale is to be accounted for as a consignment arrangement.  Where title remains with the seller until the distributor either resells the merchandise, pays for the goods, or uses the goods, the transaction should be accounted for as a consignment arrangement.  In some cases the distributor has unlimited rights to return any unsold inventory back to the manufacturer.  As a result, the seller retains ownership of the inventory and delivery for accounting purposes has not occurred.  MagnaChip found itself in this

---

[5] *Revenue Recognition* was written as part of Staff Accounting Bulletin 104 effective December 17, 2003.  Staff Accounting Bulletins reflect the SEC staff's views regarding accounting-related disclosure practices.  They represent interpretations and policies followed by the SEC in administering the disclosure requirements of the federal securities laws.

[6] SAB Topic 13.A1.  *See also* ASC 605-10-S99.

situation with respect to certain of its distributor relationships.  MagnaChip should not have recognized revenue until the risk of loss had transferred to its distributors which most likely would have been when the goods were re-sold to its end user customers.

158.     In connection with the Restatement, MagnaChip acknowledged the need to clarify its revenue recognition policy with respect to sales to distributors in order to preclude further recognition of revenues where there were side "business arrangements:"

> A portion of the Company's sales are made through distributors for which revenue recognition criteria are usually met when the product is shipped to or accepted by the distributors, consistent with the principles described above**. However, the risk of loss may not pass upon shipment of products to the distributors due to a variety of reasons, including the nature of the business arrangement with the distributors**. For example, the financial condition of a distributor may indicate that payments by the distributor to the Company are contingent on resale of products to an end customer. In this situation, the Company defers recognition of revenue and cost of revenue on transactions with such distributor until the Company is informed by the distributor that the product has been resold to the end customer.

[2013 Form 10-K at page 80] (emphasis added).

159.     In connection with the Restatement, MagnaChip also admitted that it made:

> cash payments to certain vendors, using expense and capital expenditure accounts at the Company, that (i) the vendors used to purchase products from certain distributors; (ii) the distributors then paid to the Company for those products; and (iii) in turn were applied to aged accounts receivable.

[2013 Form 10-K at page 119]. These sham "round-trip' transactions, which exceeded $5.0 million in 1Q 2013 and 3Q 2013, lacked any economic substance and should not have been recorded as revenue.

### "Sales" of Goods Before Shipment to Customers

160.     MagnaChip employed a variety of devices to accelerate revenue recognition well before payment, if any, was due from the customer. One device involved recognizing revenue on unfinished and semi-finished products.  These products were completed and shipped to the distributor or end customer well *after* the related revenues were recognized.

161.    This was a glaring violation of MagnaChip's accounting policy and GAAP – to recognize revenue on products for which the manufacturing process is not yet finished and the goods are not yet ready for sale or shipment in violation of SAB 104's "delivery criterion".

162.    Such premature revenue recognition was clearly deliberate. If a product is still on the factory floor waiting to be completed, the sales price cannot possibly have been earned; the product could not have been shipped or delivered; nor could the risk of loss have been transferred to the customer.

163.    MagnaChip also admitted that it had improperly recognized revenue "when the products were taken from its manufacturing facility to warehouse, rather than when the products were delivered to the customer's location The arrangement related to these transactions did not have a fixed schedule for delivery to a customer's location…". This activity did not meet the criteria for a "bill and hold" sale.  The SEC has identified certain criteria that must be used by public companies before revenue can be recognized under a bill and hold arrangement and one of the criteria is that there must be a fixed delivery schedule (with specific dates) that is consistent with the buyer's business purpose.

164.    By recognizing revenue before obtaining a fixed delivery schedule to a customer's location MagnaChip knowingly violated the following GAAP and SEC regulations:  ASC 605-10-S99, A3a (SAB Topic 13A3a).

**Revenue Recognition Without Recording Price Concessions**

165.    It is axiomatic that for products actually shipped to and accepted by customers a company may recognize as revenue only the actual price that the customer agreed to pay.  MagnaChip's Form 10-Ks issued during the Class Period acknowledged this;

> Other than product warranty obligations, yield provisions and customer acceptance provisions, *sales contracts do not include any other post-shipment obligations that could have an impact on revenue recognition.* In addition, the Company does not currently provide any credits, rebates or price protection or similar privileges that could have an impact on revenue recognition.

166.    In practice, MagnaChip routinely provided to distributors and customers various types of "concessions" that either reduced the amount to be paid, or permitted return of the product altogether.

Such concessions included future discounts, price adjustments, and free products.  All of these were designed to incentivize distributors and customers to purchase products, and enable the Company to appear to meet (or beat) sales targets.

167.    Consistent with GAAP and MagnaChip's own revenue recognition policies, such concessions, when known or reasonably estimable, should have been recorded as a deduction from revenues at the time when the revenues were recognized. The Company admitted not only that it failed to account for the concessions correctly, but also that it failed to record these concessions in its books and records in any way.  In short, MagnaChip intentionally concealed these revenue-diminishing concessions.  Furthermore, in many of these transactions, the sales price was not fixed or determinable because the future discount or price adjustment is not known by the seller at the time of shipment.  In these cases the sale price should not have been recorded as revenue until the uncertainty disappears.  In both of these situations, MagnaChip violated SEC SAB 104.

**Improper Accounting for Inventory Reserves**

**Inventory Reserves Generally**

168.    GAAP requires that inventory be recorded at the lower of cost or market value. The general rule is that GAAP requires a departure from the historical cost principle when the future revenue producing ability (utility) of the inventory declines below its original cost. Such loss of value must be recorded when the value of goods has been impaired due to obsolescence, physical deterioration, or changes in price levels or likely demand.   A portion of MagnaChip's reserve was based on the age of its inventory.  [2012 Form 10-K pg. 76]  The older the inventory, the more likely that the inventory will become obsolete especially in the semiconductor industry.

169.    When such a loss occurs, the reduction must be charged as an expense in the income statement in the period in which the reduction occurred, not in the period in which the inventory is ultimately sold.  ASC-330-10-35-1-2.

170.    In addition to recording the loss of inventory value as an expense on the income statement, companies must also add to reserves for losses that are recorded on its balance sheet.  The reserve account is typically left on the books and merely adjusted at the end of each period to agree

with the difference between cost and the lower of cost or market at each balance sheet date.  If the reserve is deemed to be inadequate it is increased on the balance sheet and additional losses are recorded in the income statement.

**MagnaChip Understated its Inventory Reserves**

171.    MagnaChip's misconduct with respect to its inventory reserves violated GAAP in two respects.   First, it misclassified a material portion of its inventory.   MagnaChip categorized its inventory as raw materials, raw materials in transit, work in progress, semi-finished goods and finished goods.  Obviously, the value of the inventory increased as it moved along the production cycle.

172.    MagnaChip inflated the value of its inventory by misclassifying the stage of the production cycle for the products still waiting to be finished. As the Company subsequently admitted in the Restatement:

> the Company corrected errors with respect to obsolete and aged inventory reserves that were previously understated due to the misclassification or errors in certain inventory items.

[2013 Form 10-K page 86].

173.    MagnaChip also mishandled accounting for its inventory reserve. A substantial portion of the reserves was based on management's determination of the inventory on hand could be sold within six months:

> If actual demand for our products is less than our estimates, additional reserves for existing inventories may need to be recorded in future periods.

[2012 Form 10-K page 76].

174.    As noted in ¶¶ 4.e., 165-167, MagnaChip's management inflated reported revenue through a variety of machinations (*e.g.* price concessions).   The inflated sales figures enabled management to inflate six month sales forecasts, and provided the illusion of sufficient demand to avoid increasing inventory reserves. While the gap between projected sales and actual demand was a problem throughout the Class Period, it became particularly acute in the second half of 2013 (when sales of smartphones significantly shrunk).

175.    Defendants' failure to create adequate inventory reserves was endemic throughout the Class Period. As the Company subsequently admitted in the Restatement:

> the failure of the anticipated orders from final customers materializing resulted in significantly higher excess and obsolete reserves for the restatement and subsequent periods.

[2013 10-K at 86].

**Deferred Tax Assets**

176.    As noted above, MagnaChip had a long history of incurring significant losses. Such losses created net operating loss carryforwards ("NOLs") that were recorded on the Company's Balance Sheet as a Deferred Tax Asset As of the beginning of the Class Period (y/e 2011), this asset was valued at approximately $220 million before the valuation allowance of $209 million leaving a net balance of $11 million.[7]

177.    U.S. tax laws allowed MagnaChip to use this asset to offset taxable income in future years, thus reducing the amount of taxes MagnaChip would have to pay.

178.    As of December 31, 2012, MagnaChip had recorded Deferred Tax Assets of approximately $172 million before the valuation allowance of approximately $100 million leaving a net balance of approximately $72 million.[8]

179.    When the company reported substantial profits in 2012 management made a decision to significantly reduce its valuation allowance from the prior year. This reduction in its valuation allowance had the effect of increasing its deferred tax assets and increasing its net income by approximately $53 million.

180.    Defendants' decision to significantly reduce the valuation allowance against the deferred tax assets at year end 2012 was a knowing violation of GAAP and intended to inflate MagnaChip's

---

[7] The DTA of $11 million was reduced by approximately $3.5 million of deferred tax liabilities resulting in a net balance of approximately $7 million that was reported on MagnaChip's balance sheet at December 31, 2011.

[8] The DTA of $72 million was reduced by approximately $2.2 million of deferred tax liabilities resulting in a net balance of approximately $ 69 million that was recorded on MagnaChip's balance sheet at December 31, 2012.

reported sales and earnings because (1) the profits for 2012 had been materially inflated by *inter alia* inflating revenue and manipulating costs of goods, thereby inflating taxable income 25.5%, and (2) it was self-evident at least by year end 2012 that (i) the smartphone industry was significantly retrenching, (ii) the Company's actual sales were shrinking; and (iii) there was no reasonable expectation of any profits being realized in the near future.  This is the type of negative information that management was consciously aware of, but failed to consider in direct violation of GAAP. [ASC 740-10-30-17].  Therefore, there was no basis for MagnaChip to maintain a significant portion of the deferred tax asset balance at the end of 2012 without recognizing a significant reserve ("valuation allowance") against it.

181.    Defendants have admitted the foregoing in its restatement by virtue of reversing the reduction in its valuation allowance, thereby reducing 2012 earnings by $64.9 million.  In its restated financial statements the company determined that it needed to restore a full valuation allowance against the deferred tax assets. 2013 Form 10-K pg. 87.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

182.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of: (i) a Class consisting of all those who purchased or otherwise acquired MagnaChip securities during the Class Period (the "Class"); and (ii) a Subclass of all those who purchased or otherwise acquired MagnaChip securities pursuant and/or traceable to the false and misleading Offering Documents issued in connection with the 2/13 Offering (the "2/13 Offering Subclass"), and (iii) a Subclass of all those who purchased MagnaChip shares "contemporaneous" with sales thereof by Avenue Capital on August 1, 2013, and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

183.    The members of the Class and Subclass (the "Classes") are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MagnaChip securities were actively traded on the NYSE.  While the exact number of members of the Classes is unknown to Plaintiffs at this time

and can be ascertained only through appropriate discovery, 5 million shares were sold in the 2/13 Offering and MagnaChip had more than 34 million shares of common stock outstanding as of June 1, 2015.  Accordingly, Plaintiffs believe that there are hundreds or thousands of members in the proposed Classes.  Record owners and other members of the Classes may be identified from records maintained by MagnaChip or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

184.    Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

185.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Classes.

186.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MagnaChip;

- whether the Individual Defendants caused MagnaChip to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of MagnaChip securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

187.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

188.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- The omissions and misrepresentations were material;

- MagnaChip securities are traded in an efficient market;

- The Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- The Company traded on the NYSE and was covered by multiple analysts;

- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold MagnaChip securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

189.     Based upon the foregoing, Plaintiffs and the members of the Classes are entitled to a presumption of reliance upon the integrity of the market.

## <u>COUNT I</u>

### <u>Violations of §10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder Against All MagnaChip Defendants</u>

190.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

191.     This Count is asserted against all MagnaChip Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

192.     During the Class Period, MagnaChip Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MagnaChip securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire MagnaChip securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

193.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the MagnaChip Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MagnaChip securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MagnaChip's finances and business prospects.

194.     By virtue of their positions at MagnaChip, the MagnaChip Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of the MagnaChip Defendants were committed willfully or with reckless disregard for the truth.  In addition, each

MagnaChip Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

195.    Information showing that the MagnaChip Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of MagnaChip, the Individual Defendants had knowledge of the details of MagnaChip's internal affairs.

196.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of MagnaChip.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MagnaChip's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of MagnaChip securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning MagnaChip's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired MagnaChip securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

197.    Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of MagnaChip securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of MagnaChip securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

198.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

199.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

200.    This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**COUNT II**

**Violations of §20(a) of the Exchange Act**
**Against The Individual Defendants**

201.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

202.    During the Class Period, the Individual Defendants participated in the operation and management of MagnaChip, and conducted and participated, directly and indirectly, in the conduct of MagnaChip's business affairs.  Because of the Individual Defendants' senior positions, they knew the adverse non-public information about MagnaChip's misstatement of income and expenses and false financial statements    In particular, defendants were aware of and had control over the improper business practices that gave rise to the Restatement of MagnaChip's revenue, costs of goods sold and inventory reserves.

203.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MagnaChip's financial condition and results of operations, and to correct promptly any public statements issued by MagnaChip which had become materially false or misleading.

204.    Because of their positions of control and authority, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MagnaChip disseminated in the marketplace during the Class Period concerning MagnaChip's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MagnaChip to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of MagnaChip within the meaning of Section 20(a) of

the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MagnaChip securities.

205.    Each of the Individual Defendants, therefore, acted as a controlling person of MagnaChip.

206.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MagnaChip.

207.    This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT III

### Violations of §20(a) of the Exchange Act
### Against Avenue Capital
### (Control Person Liability)

208.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209.    Avenue Capital was a "control person" of MagnaChip and thus liable under Section 20(a) of the Exchange Act for the Company's violations of Section 10(b).

210.    Indeed, Avenue Capital was the primary (if not intended) beneficiary of the fraudulent scheme. Whereas the Company was able raise a few million dollars from investors through public offerings of its stock at inflated prices, *Avenue Capital was able to pocket $310,000,000 from sales of its MagnaChip shares at inflated prices as part of public offerings.*

### Avenue Capital Controlled MagnaChip

211.    When MagnaChip filed for bankruptcy in June 2009, the reorganization completely wiped out its private equity shareholders Citigroup Venture Capital, CVC Asia Pacific and Francisco Partners.  When the Company emerged from bankruptcy in November 2009, Avenue Capital was its majority shareholder, owning 27,365,928 shares, or approximately 70%, of the Company.  Avenue Capital was determined not to suffer the same fate as MagnaChip's prior investors.

212.    As a majority owner of the Company, Avenue Capital exercised significant control over MagnaChip.  Avenue Capital had the power to elect a majority of the Board of Directors.  Exercising

this power, Avenue Capital appointed four of the seven Board members, including three of its own employees.

213.   As the Company acknowledged in its public filings during the Class Period:

   a.   "Avenue will continue to have significant influence over [the Company's] affairs for the foreseeable future." 2012 10K, pg. 32

   b.   "Avenue will be able to control most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, including mergers and sales of substantially all of our assets." 2011 10K, pg. 34.

   c.   "Because we are a 'controlled company,' we rely on exemptions from the provisions of Section 303A of the NYSE that would otherwise require the Company to have [Audit, Compensation and Nominating and Corporate Governance Committees] composed entirely of independent directors." 2012 Proxy Statement.

214.   Up until May 7, 2012, MagnaChip was deemed a "controlled company." for purposes of the NYSE listing requirements. 2012 10K, pg. 3.   Moreover, a majority of MagnaChip's Board of Directors was not "independent" as defined under SEC and NYSE rules.

**MagnaChip's Benefit From the Fraud Through Stock Sales**

215.   Avenue Capital used its control of MagnaChip to cash out its investment in the Company at enormous profits bolstered by the fraudulent scheme.

216.   Avenue Capital acquired its 27,365,928 shares at an average cost of $1.12 per share in the Company's November 2009 rights offering.[9]   Thus, its total cost basis for its 27,365,928 MagnaChip shares is approximately $30,649,839.

---

[9] Avenue Capital purchased 22,016,423 shares at $1.12 per share in MagnaChip's November 2009 rights offering. Avenue Capital acquired another 3,750,000 shares in exchange for providing a backstop service and agreeing to purchase any unsubscribed units in the Company's November 2009 rights offering. Avenue Capital acquired 1,043,544 shares in return for releasing its legal claims arising from ownership of three series of MagnaChip notes. All of these shares are assigned a value of $1.12 per share, the market value paid in the November 2009 rights offering. Lastly, 555,961 of

217.     Pursuant to the Company's IPO on March 10, 2011, 9.5 million shares were offered at a price of $14.00 per share.  However, only 950,000 of those shares were offered by the Company for total proceeds of $12,369,000.  The vast majority of shares offered, 6,576,389, were offered by Avenue Capital, reaping $85,624,584.78 in total proceeds and a net profit of approximately $78,259,029.  Not only did the Company receive a small percentage of the proceeds from the IPO, but it was also required to pay the offering expenses, totaling approximately $10.8 million thus netting the Company only slightly more than $1,500,000 from the IPO.

218.     Following the IPO, there were 39,351,985 MagnaChip shares outstanding, of which Avenue Capital beneficially owned approximately 20,789,539, or 53%.

219.     Avenue Capital's plan to recoup its investment in MagnaChip was in jeopardy following the IPO as MagnaChip's stock steadily declined throughout 2011, closing the year at $7.48 per share. During this time, Avenue Capital did not sell a single share of stock.

220.     At the start of the Class Period, everything (apparently) changed.  Following the drum beat of reports that beat analyst estimates, by February 1, 2012 the Company's stock price had recovered to over $10.16 per share and continued to rise as its financial performance improved.

221.     Evidencing Avenue Capital's ability to capitalize from control of MagnaChip, Avenue Capital caused MagnaChip to file a shelf registration statement enabling Avenue Capital to sell more of its shares to the market.  Within days of the registration statement being declared effective, Avenue Capital offered and sold another 7 million shares of stock at $10.86 per share for total proceeds of $76,009,500 and a profit of $68,169,500 pursuant to a prospectus dated May 1, 2012.  The Company did not receive any proceeds from these stock sales. Nevertheless, it was again required to pay the expenses in connection with the offering, totaling approximately $861,253.

---

Avenue Capital's total shares are issuable only upon exercise of warrants. [February 18, 2011 S-1/A, pg. 140-142].

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

222.    As the Company continued to issue earnings reports that beat analysts' expectations, MagnaChip's rose to over $14.00 per share by early February 2013, and skyrocketed to above $22.00 by September 2013.

223.    Avenue seized on these share price gains to dump its stock on unsuspecting investors. Pursuant to a prospectus dated February 8, 2013, Avenue Capital sold 5.75 million shares of stock at $13.81125 for total proceeds of $79,414,688 and a profit of $72,974,688.  The Company did not receive any proceeds from the sale of stock. However, once again, it was required to pay the expenses in connection with Avenue Capital's offering, totaling approximately $650,000.

224.    On August 1, 2013, Avenue Capital sold another 1,694,600 shares at $19.76 per share for total proceeds of $33,485,296 and a profit of $31,587,344. (Plaintiff Keith Thomas purchased 750 shares of MagnaChip the next day at $19.75 per share)

225.    Finally, pursuant to a prospectus dated September 9, 2013, Avenue Capital sold another 1.7 million shares of stock at $21.00 per share for total proceeds of $35.7 million and a profit of $33.8 million.  Once again, the Company did not receive any proceeds from the sale of stock but nevertheless was required to pay the expenses in connection with Avenue Capital's offering, totaling approximately $450,000.

226.    During the Class Period, Avenue Capital sold 16,144,600 MagnaChip shares for total proceeds of approximately $224,609,484 and a profit of $206,527,532.

227.    All told, between the time of the IPO on March 10, 2011 and September 2013, *Avenue Capital dumped 85% of its holdings in MagnaChip*, reducing its holding from 27,365,928 to 4,644,939 shares for *total proceeds of approximately $310,234,068 and a profit of $284,786,561*.

**MagnaChip Aided Avenue Capital Through Share Repurchase Programs**

228.    Avenue Capital was not only aided by MagnaChip's fraudulently inflated earnings reports, but also by the Company's repurchase of publicly held shares, which further inflated the stock price enabling Avenue Capital sell its shares at ever higher prices. This stock repurchase program was adopted by the same the Board of Directors that Avenue Capital controlled.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

229.   On October 11, 2011, the Company announced that its Board of Directors had adopted a stock repurchase program whereby the Company could repurchase up to $35.0 million of common stock.  In August 2012, the Board of Directors extended and increased the program by an additional $25 million.  On July 30, 2013, the Board of Directors approved a new stock repurchase program authorizing the repurchase of up to $100 million of common stock.  As of December 31, 2013, MagnaChip had repurchased 6,578,765 shares of its common stock in the open market at an aggregate cost of $90.9 million pursuant to these stock repurchase programs.

**Violations of §20(a)**

230.   During the Class Period, Avenue Capital participated in the operation and management of MagnaChip, and conducted and participated, directly and indirectly, in the conduct of MagnaChip's business affairs.  Because of Avenue Capital's position as the Company's largest shareholder, its control over the Board by virtue of its right to appoint a majority of MagnaChip's directors, its participation through its appointees on the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committees, and control over Board members, it was a control person of the Company.

231.   Because of its position of control and authority, Avenue Capital was able to, and did, control the contents of the various reports, press releases and public filings which MagnaChip disseminated in the marketplace during the Class Period concerning MagnaChip's results of operations.

232.   Avenue Capital had the power to direct the actions of, and exercised the same to cause, MagnaChip to engage in the unlawful acts and conduct complained of herein.  Avenue Capital exercised control over the general operations of MagnaChip and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

233.   By reason of the above conduct, Avenue Capital is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MagnaChip.

234.   This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT IV

## Violations of §20A of the Exchange Act
## Against Avenue Capital
### (Insider Trading)

235.   This Claim is brought against Avenue Capital under §20A of the Exchange Act, 15 U.S.C. § 78t-1 on behalf of the §20A Subclass.

236.   On August 1, 2013, Avenue Capital sold 1,694,600 of MagnaChip shares at $19.76 per share, for a total of $33,485,296. Lead Plaintiff Keith Thomas purchased 750 shares of MagnaChip the next day at $19.75 per share.

237.   By virtue of its appointees to MagnaChip's Audit Committee, who were also employees of Avenue Capital, Avenue Capital had access to the Company's and was aware of and/or recklessly disregarded the Company's true financial condition.

238.   Avenue Capital through its Audit Committee appointees had access to MagnaChip's material, nonpublic and highly confidential information concerning the improper business and accounting practices giving rise to the Restatement and the knowledge that MagnaChip's financial reports were materially misstated during the Class Period. By virtue of its receipt thereof, Avenue Capital was duty bound not to benefit therefrom, a duty which it violated by selling its shares at inflated prices.

239.   Defendant Avenue Capital thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

240.   The measure of damages for trading while in possession of material nonpublic information under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, is the disgorgement of profits gained and losses avoided by such trading.

241.   Plaintiff Thomas and the Subclass of investors who likewise purchased MagnaChip shares contemporaneously with Avenue Capital's August 1, 2013 sales are entitled to disgorgement of the amounts by which Avenue Capital profited from such trades.

242.   By virtue of the foregoing, Defendant Avenue Capital is liable for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

243. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

### COUNT V

### Violations of §11 of the Securities Act
### Against the Securities Act Defendants

244. Plaintiff Oklahoma Police incorporates ¶¶ 1-42, 44-124 and 149-187 by reference. This Count is brought on behalf of the 2/13 Offering Subclass by Plaintiff Oklahoma Police pursuant to §11 of the Securities Act, 15 U.S.C. §77k, against the Securities Act Defendants.

245. This Count does not sound in fraud. All of the preceding allegations of scienter, fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff Oklahoma Police does not allege that the Securities Act Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

246. The Registration Statement for the 2/13 Offering were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

247. MagnaChip is the registrant for the 2/13 Offering. The defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

248. As issuer of the shares, MagnaChip is strictly liable to Plaintiff Oklahoma Police and the 2/13 Offering Subclass for any misstatements and omissions.

249. None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

250. By reason of the conduct alleged herein, each defendant named in this Count violated, and/or controlled a person who violated, §11 of the Securities Act.

251. As detailed on its certification previously filed with the Court, Plaintiff Oklahoma Police acquired MagnaChip stock pursuant and/or traceable to the Registration Statement for the 2/13 Offering.

252.    Plaintiff Oklahoma Police and the 2/13 Offering Subclass have sustained damages.  The value of MagnaChip common stock has declined substantially subsequent to and due to these defendants' violations.

253.    At the time of their purchases of MagnaChip stock, Plaintiff Oklahoma Police and other members of the 2/13 Offering Subclass were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts before February 12, 2015 when MagnaChip restated its financial results for fiscal 2011 and 2012.  Less than one year has elapsed from the time that Plaintiff Oklahoma Police discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff Oklahoma Police filed its Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff Oklahoma Police filed this Complaint.

<u>**COUNT VI**</u>

<u>**For Violation of §12(a)(2) of the Securities Act Against the Securities Act Defendants and Avenue Capital**</u>

254.    Plaintiff Oklahoma Police incorporates ¶¶ 1-42, 44-124 and 149-187 by reference. This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of Oklahoma Police and the 2/13 Offering Subclass against the Securities Act Defendants and Avenue Capital.

255.    This Count does not sound in fraud. All of the preceding allegations of scienter, fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff Oklahoma Police does not allege that the Securities Act Defendants or Avenue Capital had scienter or fraudulent intent, which are not elements of this claim.

256.    By means of the defective Prospectus, the Securities Act Defendants and Avenue Capital promoted and sold MagnaChip stock to Oklahoma Police and other members of the 2/13 Offering Subclass.

257.    The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The Securities Act Defendants and Avenue Capital owed Oklahoma Police and the other members of the 2/13 Offering Subclass who purchased MagnaChip

stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

258.    Plaintiff Oklahoma Police did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time plaintiff Oklahoma Police acquired MagnaChip stock.

259.    By reason of the conduct alleged herein, the Securities Act Defendants and Avenue Capital violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff Oklahoma Police Pension and the other members of the 2/13 Offering Subclass who purchased MagnaChip stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, plaintiff Oklahoma Police and the other members of the 2/13 Offering Subclass who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their stock to the defendants sued in this Count. Subclass members who have sold their stock seek damages to the extent permitted by law.

### COUNT VII

### For Violation of §15 of the Securities Act
### Against MagnaChip, Avenue Capital and the Executive Defendants

260.    Plaintiff Oklahoma Police incorporates ¶¶1-42, 44-124 and 149-187 by reference.  This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of Oklahoma Police and the 2/13 Offering Subclass against MagnaChip, Avenue Capital and the Executive Defendants.

261.    This Count does not sound in fraud. All of the preceding allegations of scienter, fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff Oklahoma Police does not allege that MagnaChip, Avenue Capital or the Executive Defendants had scienter or fraudulent intent, which are not elements of this claim.

262.     Avenue Capital controlled MagnaChip at the time of the 2/13 Offering and directed MagnaChip to undertake the 2/13 Offering to facilitate Avenue Capital's stock sales. The Executive Defendants were each control persons of MagnaChip at the time of the 2/13 Offering by virtue of their positions as directors and/or senior officers of MagnaChip. The Executive Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of MagnaChip, including Avenue Capital. MagnaChip controlled the Executive Defendants and all of MagnaChip's employees.

263.     Defendants MagnaChip, Avenue Capital and the Executive Defendants were each culpable participants in the violations of §§11 and/or 12(a)(2) of the Securities Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise marketed and participated in the process which allowed the 2/13 Offering to be successfully completed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the representatives of the Classes;

B.     Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury.

Dated:  June 26, 2015                                      **POMERANTZ LLP**

<u>*/s/ Marc I. Gross*</u>
Marc I. Gross
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:     (212) 661-1100
Facsimile:     (212) 661-8665
Email: migross@pomlaw.com
            jalieberman@pomlaw.com
            mjwernke@pomlaw.com

*Lead Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (CSB# 219683)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone:  (212) 686-1060
Fax:          (212) 202-3827
Email:  lrosen@rosenlegal.com

*Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (CSB# 134180)
Robert V. Prongay (CSB# 270796)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email: info@glancylaw.com

***Liaison Counsel for Plaintiffs***

**ROBBINS GELLER RUDMAN & DOWD LLP**
Dennis J. Herman (CSB# 220163)
Sunny S. Sarkis (CSB# 258073)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

67

Telephone:  (415) 288-4545
Facsimile: (415)288-4534
dennish@rgrdlaw.com
ssarkis@rgrdlaw.com

*Counsel for Plaintiff Oklahoma Police Pension &*
*Retirement System*

1

## CERTIFICATE OF SERVICE

2

3    I hereby certify that on June 26, 2015 a copy of the foregoing was filed electronically via the

4    Court's CM/ECF system, and served by mail on anyone unable to accept electronic filing as indicated

5    on the Notice of Electronic Filing.  Notice of this filing will be sent by e-mail to all parties by operation

6    of the Court's electronic filing system. I hereby certify that I caused to be mailed the foregoing

7    document or paper via the United States Postal Service to the non-CM/ECF participants indicated on

8    the Court's Manual Notice List.  Parties may access this filing through the Court's CM/ECF System.

9    I certify under penalty of perjury under the laws of the United States of America that the

10    foregoing is true and correct. Executed on June 26, 2015.

11

12

13    _____
      /s/ *Marc I. Gross*
      Marc I. Gross

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28