UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEITH THOMAS, et al.,

        Plaintiffs,

    v.

MAGNACHIP SEMICONDUCTOR CORP., et al.,

        Defendants.

Case No.  14-cv-01160-JST

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**

Re: ECF Nos. 121, 123, 126, 130, 155

    Before the Court are five motions to dismiss filed by Nader Tavakoli, ECF No. 121; by Avenue Capital Management II, L.P., Michael Elkins, and Randal Klein, ECF No. 123; by Ilbok Lee, Magnachip Semiconductor Corp., and R. Douglas Norby, ECF No. 126; by Barclays Capital Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Needham & Company, LLC, and UBS Securities LLC, ECF No. 130; and by Margaret Sakai, ECF No. 155.  On December 11, 2015, the parties informed the Court that a settlement had been reached in regards to all claims asserted against all defendants except for Avenue Capital Management II, L.P.  ECF No. 174. Accordingly, the motions to dismiss in regards to all other defendants are denied as moot.

    For the reasons stated below, the motions to dismiss in regards to Avenue Capital Management II, L.P. are granted in part and denied in part.  The parties have also filed five requests for judicial notice, ECF Nos. 125, 128, 132, 140, 157, which the Court will grant.

## I.    BACKGROUND

    Plaintiffs in this case bring claims under both the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 ("the Securities Act"), related to allegations that Magnachip made materially false and misleading statements in its financial statements and other information related to securities offerings.  Magnachip announced in 2013 that it needed to restate many of its financial reports for the prior few years due to accounting errors, and later restated its

1   financial results for the reporting periods during those years, in some instances reporting a loss

2   rather than a profit.  The claims were first brought in two separate cases that were later

3   consolidated by this Court.  See ECF No. 112.

4       **A.       Factual Background**

5       For the purpose of this order, the following allegations in the Third Amended Complaint

6   ("TAC"), ECF No. 114, are taken to be true.

7       Magnachip, a Delaware corporation with its principle place of business in Seoul, Korea,

8   designs and manufactures "analog and mixed-signal semiconductor products" for a number of

9   high volume consumer applications including smartphones, tablets, and PCs.  TAC, ECF No. 114,

10  at ¶¶ 23, 38.  Magnachip began operations in 2004, but struggled and filed for Chapter 11

11  bankruptcy protection in 2009.  Id. at ¶¶ 39-40.  Following Magnachip's reorganization, Avenue

12  Capital, a "global investment marketing firm" that "specializes in investing in high yield debt,

13  debt of insolvent or financially distressed companies, and equity of companies undergoing

14  financial or operational turnarounds or reorganizations," was the majority owner of Magnachip by

15  virtue of owning 70.3% of Magnachip's shares.  Id. at ¶¶ 33, 40.  Avenue Capital was entitled to

16  have three designees serving as members of the seven-member board of directors, and, in

17  exercising its power, appointed four out of the seven, three of which were Avenue employees and

18  two of which served on the "Audit Committee" for the company.  Id. at ¶ 41.

19  Magnachip eventually executed an IPO on March 10, 2011, at $14 per share.  Id. at ¶ 41.

20  Despite the "highly cyclical" nature of the semiconductor industry, Plaintiffs allege that

21  Magnachip's reported results "curiously 'managed' to consistently beat analysts' consensus

22  estimates," which caused its stock price to "skyrocket" to $23.57 per share and "enabled Avenue

23  Capital to sell over $310 million of its Magnachip shares."  Id. at ¶ 42.

24  MagnaChip also conducted a follow-on public stock offering on February 6, 2013 (the

25  "2/13 Offering").  Id. at ¶ 1.  On or about April 13, 2012, Magnachip filed Form S-3 Registration

26  forms with the SEC using a "shelf" registration that would allow it to sell securities in continuing

27  offerings.  Id. at ¶ 112.  For the February 6, 2013 offering, Magnachip's stock was priced at

28  $14.50 per share, and Avenue Capital sold 5.75 million shares of common stock to the public.  Id.

United States District Court
Northern District of California

United States District Court
Northern District of California

at ¶113.  Plaintiffs' Securities Act claims arise from stock purchases they made pursuant to this 2/13 Offering.  Id. at ¶¶ 244, 254, 260.

Magnachip consistently reported positive results for each quarter from the beginning of 2011 through the third quarter of 2013.  Id. at ¶¶ 44-90.  On January 27, 2014, however, it "abruptly postponed its year-end and fourth quarter 2013 earnings release."  Id. at ¶ 92.

On March 11, 2014, Magnachip announced that its Audit Committee had determined that "Magnachip needed to restate its financial results for 2011 through 2013 due to improper revenue recognition for products sold through its distributors."  Id. at ¶ 94.  It stated that this decision was "based on an ongoing review by 'outside professional advisors,'" which had "identified 'material weaknesses' in Magnachip's accounting procedures such that 'internal controls over financial reporting and disclosure controls and procedures were not effective.'"  Id.  It also announced that Defendant Margaret Sakai had been "relieved" of her position as "principal accounting officer."  Id.  Finally, "[w]hile stating that prior financial statements 'should not be relied upon', MagnaChip otherwise reassured investors that the accounting problem was one of simply timing of revenue recognition, rather than the absence of legitimate sales; and would be limited to distributor related transactions."  Id.  Defendant Sang Park resigned in May 20, 2014 from his position as CEO of the company.  Id. at ¶ 97.

On August 12, 2014, Magnachip announced that its financial statements would be "further delayed due to expansion of the investigation beyond 'sales' to distributors to include issues of revenue recognition involving all customers; cost of goods sold; and inventory reserves."  Id. at ¶ 98.  On November 12, 2014, Magnachip issued "preliminary findings" regarding the restatement identifying several "specific illegal accounting practices in violation of Generally Accepted Accounting Principles ('GAAP')".  Id. at ¶ 99.

Magnachip issued its restatement of its financial results on February 12, 2015.  Id. at ¶ 102.  The restatement showed that Magnachip had overstated its earnings throughout 2011 to 2013 — in the fiscal year 2011, for example, a reported net income of $21.8 million was restated to a loss of $11.3.  Id.  The following day, Magnachip's stock price was cut in half, from its previous price of $15.02 per share to $7.52 per share.  Id. at ¶ 105.  Over the next few days, Magnachip's share

1   price continued to decline.  Id. at ¶ 106.

2       **B.**    **Procedural Background**

3       On March 12, 2014, the day after Magnachip first announced it would be issuing

4   restatements of its financial reports, plaintiff Richard Hayes filed a class action complaint against

5   Magnachip and multiple Magnachip officers.  See Complaint, ECF No. 1.  The complaint alleged

6   claims under the Exchange Act.  Id.  On July 3, 2014, the Court appointed Keith Thomas

7   (hereinafter, "Lead Plaintiff") as Lead Plaintiff of the case.  ECF No. 32.

8       On April 21, 2015, in a separate case, the Oklahoma Police Pension & Retirement System

9   ("OPPRS") filed a class action complaint against Magnachip, Avenue Capital, various officers at

10   both companies, and several institutions serving as underwriters for Magnachip's transactions.

11   See ECF No. 1, Case No. 3:15-cv-01797-JST.  In addition to asserting the same claims as Lead

12   Plaintiff, OPPRS also asserted claims for Securities Act violations.  Id.  On April 27, 2015,

13   Magnachip moved to relate the two cases.  ECF No. 74.  Lead Plaintiff then filed a motion to

14   consolidate the cases, though initially suggested cabining off OPPRS's Securities Act claims.

15   ECF No. 78.  OPPRS opposed the motion, ECF No. 86, while the Defendants argued for

16   consolidating the cases in full, ECF No. 89, 91.  On June 15, 2015, the Court consolidated the two

17   cases in full.  ECF No. 112.

18       The Plaintiffs filed their most recent complaint, the Third Amended Complaint, on June

19   26, 2015.  ECF No. 114.  The complaint brings claims under both the Exchange Act and the

20   Securities Act.  The defendants named in the complaint are Magnachip; three of Magnachip's

21   current and former officers (Sang Park, Margaret Sakai, and Tae Young Hwang); two members of

22   the Board of Directors and the Audit Committee who were also Avenue Capital employees

23   (Randall Klein and Michael Elkins); three additional members of the Board of Directors and the

24   Audit Committee (R. Douglass Norby, Ilbok Lee, and Nader Tavakoli); Avenue Capital; and the

25   Underwriters to Magnachip's offerings (Barclays Capital Inc., Deutsche Bank Securities Inc.,

26   Citigroup Global Markets Inc., UBS Securities LLC, and Needham & Company, LLC).  Id.

27       Four sets of defendants filed motions to dismiss on July 27, 2015: Mr. Tavakoli

28   ("Tavakoli"), ECF No. 121; Avenue Capital and Mr. Klein and Mr. Elkins, ("Avenue

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1  Defendants"), ECF No. 123, Magnachip and Mr. Norby and Mr. Lee ("Magnachip Defendants"),

2  ECF No. 126; and by Barclays Capital Inc., Citigroup Global Markets Inc., Deutsche Bank

3  Securities Inc., Needham & Company, LLC, and UBS Securities LLC ("Underwriter

4  Defendants"), ECF No. 130.  A fifth motion to dismiss was filed on November 9, 2015[1] by

5  Margaret Sakai ("Sakai"), ECF No. 155.[2]

6          The five motions to dismiss were heard together and submitted on December 1, 2015.

7  ECF No. 169.  On December 11, 2015, the Plaintiffs filed a Notice of Settlement, informing the

8  Court that a settlement had been reached that will result in the release of all claims asserted against

9  Magnachip, Mr. Park, Mr. Hwang, Ms. Sakai, Mr. Norby, Mr. Lee, Mr. Tavakoli, Mr. Klein, Mr.

10  Elkins, and the Underwriter Defendants.  ECF No. 174.  The settlement did not release any claims

11  against Avenue Capital.  Id.  At a telephonic case management conference held on January 22,

12  2016, the parties informed the Court that they will file a motion for preliminary settlement by

13  February 5, 2016 but that no agreement with Avenue Capital had at that time been reached.  ECF

14  No. 182.  Plaintiffs subsequently filed a motion for preliminary approval of the settlement.  ECF

15  No. 185.  Accordingly, the motions to dismiss in regards to all Defendants other than Avenue

16  Capital are denied as moot without prejudice to their re-filing if the settlement agreement is not

17  approved.  In the remainder of this order, the Court will consider and resolve the motions to

18  dismiss in regards to Avenue Capital.  Because all Defendants extensively incorporate the

19  arguments from their co-defendants briefs, the Court considers these briefs in full as well as the

20  Plaintiffs' responses.

21  _____

22  [1]      Ms. Sakai's brief was filed at a later date because, as the parties informed the Court, she
was not served until September 8, 2015.  See ECF Nos. 159, 161.  The parties also informed the
23  Court that two remaining defendants, Mr. Park and Mr. Hwang, had still not been served.
Pursuant to the Court's order, Plaintiffs filed a motion for alternative service or for discovery to
24  obtain Mr. Park's and Mr. Hwang's addresses.  ECF No. 176.  In light of the settlement
agreement, that motion was vacated as moot.  ECF No. 183.
25  [2]      The Court will refer to the briefs in regards to each of these motions by the stage of
briefing (the Motion, Opposition, or Reply) and the party that filed it (for example, the
26  Underwriter Defendants or the Magnachip Defendants), along with the ECF docket number.  By
stipulation, the plaintiffs jointly filed two briefs in response to the first four motions to dismiss.
27  See ECF No. 136.  The first brief was filed by counsel for plaintiffs in the Hayes/Thomas case,
ECF No. 137, while the second brief was filed by the counsel for plaintiffs in the OPPRS case,
28  ECF No. 138.  For the sake of clarity, the Court will refer to these as the "Lead Plaintiff
Opposition" and the "OPPRS Opposition," respectively.

## II.      LEGAL STANDARD

The Court has federal question jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1331.

On a motion to dismiss, courts accept the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To be entitled to the presumption of truth, a complaint's claims "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

While a plaintiff generally need only plead "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')."  Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014).  Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission.  15 U.S.C. § 78u–4(b)(2)(A).  The PSLRA also provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1)(B).

The Ninth Circuit has held that under the PSLRA, securities fraud plaintiffs must plead all the elements of a securities fraud action with particularity.  Oregon Pub. Employees Ret. Fund, 774 F.3d at 605.  "These requirements present no small hurdle for the securities fraud plaintiff."  In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 701 (9th Cir. 2012).

## III.      DISCUSSION

Plaintiffs assert seven causes of action against the various Defendants under the Exchange Act and the Securities Act.

The claims brought are as follows:  (I) violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) against defendants Magnachip, Park, Sakai, Hwang, Klein, Elkins, Norby, Lee, and Tavakoli; (II) violation of section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against defendants Park, Sakai, Hwang, Klein, Elkins, Norby, Lee, and Tavakoli; (III) violation of section 20(a) against Avenue Capital; (IV) violation of section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Avenue Capital; (V) violation of section 11 of the Securities Act, 15 U.S.C. § 77k, against defendants Magnachip, Park, Sakai, Elkins, Klein, Lee, Norby, Tavakoli, and the Underwriter Defendants; (VI) violation of section 12(a)(2), 15 U.S.C. § 77l(a)(2), against defendants Magnachip, Park, Sakai, Elkins, Klein, Lee, Norby, Tavakoli, the Underwriter Defendants, and Avenue Capital; and (VII) violation of section 15 of the Securities Act, 15 U.S.C. § 77o, against Magnachip, Avenue Capital, Park, Sakai, and Hwang.  See TAC, ECF No. 114, ¶¶ 23-37, 190-263.

The only counts brought against Avenue Capital, and which therefore must be resolved following the Notice of Settlement, are counts III, IV, VI, and VII: violation of sections 20(a) and 20A of the Exchange Act, and violations of sections 12(a)(2) and section 15 of the Securities Act.

**A.  Judicial Notice**

Before addressing Plaintiffs' claims, the Court considers the four requests for judicial notice filed by Defendants, ECF Nos. 125, 128, 132, 157 and a fourth request filed by Plaintiffs, ECF No. 140.  While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Federal Rule of Evidence 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute."  Courts have previously taken judicial notice of documents on which complaints necessarily rely, Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 981 n.18 (9th Cir. 1999).

1    Defendants request judicial notice of numerous reports, press releases, and other filings

2    with the SEC, many of which were referenced by Plaintiffs in their complaint. <u>See</u> ECF Nos. 125,

3    128, 132, 157. Plaintiffs do not object to the Court taking judicial notice of these documents

4    generally, but they request judicial notice is taken only of the facts of their existence, not of any

5    allegations made within. Lead Plaintiffs' Opposition, ECF No. 137 at 23. Defendants' requests

6    are accordingly granted.

7    Plaintiffs request judicial notice of three documents, two of which are public reports by

8    financial analysts and one of which was filed by Magnachip with the SEC. ECF No. 140 at 3.

9    Defendants do not object to this request. The request is granted.

10    **B.    Exchange Act Claims**

11    Though Plaintiffs do not bring section 10(b) claims against Avenue Capital, the viability of

12    their section 20(a) claims against Avenue Capital depends on the existence of a primary violation

13    of securities law, which in this case is alleged in connection with Plaintiffs'10(b) claims against

14    the other defendants. Avenue Capital asserts that Plaintiffs' 20(a) claims fail in part because they

15    have not plausibly plead a primary violation. Avenue Defendants' Motion, ECF No. 123 at 21.

16    Therefore, the Court begins by examining the 10(b) claims before turning to the 20(a) claims and

17    lastly to the 20A claims.

18    **1.    10(b) Claims**

19    Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful "for any

20    person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any

21    manipulative or deceptive device or contrivance in contravention of such rules and regulations as

22    the Commission may prescribe[.]" Rule 10b–5, which is promulgated by the SEC under the

23    authority of section 10(b), in turn makes it unlawful for any person "(a) To employ any device,

24    scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to

25    state a material fact necessary in order to make the statements made, in light of the circumstances

26    under which they were made, not misleading, or (c) To engage in any act, practice, or course of

27    business which operates or would operate as a fraud or deceit upon any person, in connection with

28    the purchase or sale of any security." 17 C.F.R. § 240.10b–5. "The basic elements of a Rule 10b-5

United States District Court
Northern District of California

8

1    claim, therefore, are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a

2    connection with the purchase or sale of a security, (4) transaction and loss causation, and

3    (5) economic loss." In re Daou Sys., Inc., 411 F.3d 1006, 1014 (9th Cir. 2005) (citing Dura

4    Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005)).

5         Defendants assert that Plaintiffs have not viably alleged a Rule 10b-5 violation based on

6    three issues: (1) scienter, (2) loss causation, and (3) whether defendants "made" the material

7    misrepresentations.  For the reasons detailed below, the Court concludes that Plaintiffs have

8    successfully pleaded a primary violation under Rule 10b-5.

9                             a.      Scienter

10        The Avenue Defendants, Magnachip Defendants, Tavakoli, and Sakai all argue that

11   Plaintiffs have failed to allege they acted with the requisite scienter.  The scienter required for a

12   PSLRA claim is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs,

13   Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). "[T]he complaint must allege that

14   the defendants made false or misleading statements either intentionally or with deliberate

15   recklessness." In re Daou Sys., Inc., 411 F.3d 1006, 1015 (9th Cir. 2005).  Recklessness, in this

16   context, "may be defined as a highly unreasonable omission, involving not merely simple, or even

17   inexcusable negligence, but an extreme departure from the standards of ordinary care, and which

18   presents a danger of misleading buyers or sellers that is either known to the defendant or is so

19   obvious that the actor must have been aware of it." Hollinger v. Titan Capital Corp., 914 F.2d

20   1564, 1569 (9th Cir. 1990) (internal quotation marks omitted).  Because scienter is a subjective

21   inquiry, "the ultimate question is whether the defendant knew his or her statements were false, or

22   was consciously reckless as to their truth or falsity." Gebhart v. SEC, 595 F.3d 1034, 1042 (9th

23   Cir. 2010).

24        The "strong inference" of scienter required by the PSLRA "need not be irrefutable, *i.e.,* of

25   the 'smoking-gun' genre, or even the most plausible of competing inferences." Tellabs, Inc., 551

26   U.S. at 324 (internal quotation marks omitted).  It must, however, "be more than merely

27   'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other

28   explanations." Id.  "A court must compare the malicious and innocent inferences cognizable from

United States District Court
Northern District of California

9

the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009).  Courts cannot conduct this analysis "in a vacuum." Tellabs, Inc., 551 U.S. at 323.  To evaluate whether a complaint satisfies the "strong inference" requirement, courts must consider "*all* of the facts alleged, taken collectively," not "scrutinized in isolation."  In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 701 (9th Cir. 2012) (emphasis in original).

The Magnachip Defendants, Sakai, and Tavakoli all argue that Plaintiffs have failed to allege any specific facts that they knew, or were reckless in failing to know material information regarding the alleged false statements.  See Magnachip Defendants' Motion, ECF No. 126 at 14; Sakai's Motion, ECF No. 155 at 15; Tavakoli's Motion, ECF No. 121 at 11.

### i.      Magnitude and Nature of Violation

Plaintiffs offer several arguments in response.  First, Plaintiffs assert that scienter can be inferred from the "magnitude, obviousness, and reasonableness" of the violation.  Lead Plaintiffs' Opposition, ECF No. 137 at 26 (quoting In re Medicis Pharm. Corp. Sec. Litig., No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at *4 (D. Ariz. Aug. 9, 2010)).  Thus, violations that have a "significant impact on core business operations" can lead to a stronger inference.  Id. at 27. (quoting In re Medicis, 2010 WL 3154863 at *5)  Similarly, a "very obvious" violation of an accounting rule that is "extremely clear" will lead to a stronger inference than a violation where the accounting rule is "subject to competing interpretations that are reasonable."  Id. (quoting In re Medicis, 2010 WL 3154863 at *5)  Here, they argue that Magnachip violated "arguably the most fundamental and straightforward corporate accounting principle" — namely, when to recognize revenue — through devices such as "sham 'round-trip transactions,'" TAC, ECF No. 114 at ¶ 159, "recognizing revenue on unfinished and semi-finished products," Id. at ¶ 160, and neglecting to include "concessions" to buyers that lowered the price, including "future discounts, price adjustments, and free products," Id. at ¶ 167.  See Lead Plaintiffs' Opposition, ECF No. 137 at 28-29.  They also point to the magnitude of the effect that the violations had on Magnachip's reported profits, stating that Magnachip's total revenue was inflated by $121.7 million and total net income

by almost 500%, and that without the violations, Magnachip would have missed analyst estimates every single quarter.  Id. at 29-30.

These were not minor accounting errors.  To the contrary, they dramatically affected Magnachip's financial results, and in ways that strongly suggest a typical corporate executive should have noticed them.  "Accounting errors that prove to have a significant impact on core business operations-i.e. cash, revenue, profits, liquidity, or viability of a product, sometimes give rise to a compelling inference of scienter."  In re Medicis, 2010 WL 3154863, at *5.  This is particularly so where the magnitude of the accounting error is great, the GAAP provisions that were violated "are relatively straightforward or basic," or "the mistake is pervasive over a long period of time."  Id.

As Defendants point out, Plaintiffs' own case law suggests that allegations regarding the nature and magnitude of the alleged accounting violations will rarely be enough by themselves to show scienter.  See, e.g., In re Diamond Foods, Inc. Sec. Litig., No. C 11-05386, 2012 WL 600923 at *8-9 (N.D. Cal. Nov. 30, 2012); In re Medicis, 2010 WL 3154863 at *5-7.  Nevertheless, within the "holistic" approach that the Court takes for its scienter inquiry, it is appropriate to draw at least some inference of scienter from the significance of Magnachip's accounting errors.

### ii.     Magnachip Management Allegations

Second, Plaintiffs argue that Magnachip admitted its own management was responsible for the errors that led to the allegedly false statements.  Lead Plaintiffs' Opposition, ECF No. 137 at 25.  They point to Magnachip's statement on March 11, 2014 that the decision to issue restatements was prompted by ongoing review into "practices and procedures by management," and conclusions by outside auditors that management was "not maintaining an effective control environment" and there was "circumvention of numerous internal controls under the management team then in place."  TAC, ECF No. 114 at ¶¶ 94, 103.  They argue that "[a]dmissions of management's actual participation in the improper practices are powerful evidence of scienter."  Lead Plaintiffs' Opposition, ECF No. 137 at 26.

Defendants argue that these admissions are not helpful unless they establish that defendants "'*knew specific facts at the time* that rendered their accounting determinations

11

1    fraudulent.'"  See Magnachip Defendants' Reply, ECF No. 148 at 14 (quoting Rudolph v.

2    UTStarcom, 50 F. Supp. 2d 880, 889 (N.D. Cal. 2008).  It is true, of course, that admissions that

3    particular individuals knew particular facts would be far more significant than a general admission

4    of fault.  But generalized statements pointing to management remain relevant because they

5    discourage the otherwise equally compelling inference that Magnachip's accounting violations

6    were caused through "innocent bookkeeping error."  Rudolph v. UTStarcom, 50 F. Supp. 2d at

7    890.  Moreover, if there are enough other suggestions of knowledge or recklessness on the part of

8    defendants, an admission of fault by "management" as a whole may be enough for a court to infer

9    scienter even if the company was unwilling ─ or unable at the time ─ to disclose specifically who

10   was responsible.

                            iii.    Further Inferences

12       Third, Plaintiffs argue that several other facts provide additional inferences of scienter.

13   Lead Plaintiffs' Opposition, ECF No. 137 at 30-33.  They note that Magnachip's dismissal of

14   defendants Sakai and Park (though both of them resigned) contributes to an inference of scienter.

15   Lead Plaintiff's Opposition, ECF NO. 137 at 30.  Courts have held that such resignations may be

16   relevant; however, "[w]here a resignation occurs slightly before or after a defendant corporation

17   issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the

18   resignation occurred as a result of restatement's issuance itself in order for a resignation to be

19   strongly indicative of scienter."  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1002 (9th

20   Cir. 2009).

21       Plaintiffs also point to the SEC's ongoing investigation of Magnachip, which some courts

22   have acknowledged as "one more piece of the scienter puzzle,"  In re UTstarcom, Inc. Sec. Litig.,

23   517 F. Supp. 2d 964, 976 (N.D. Cal. 2009).  They further point to Sakai's and Park's signing of

24   Sarbanes-Oxley (SOX) certifications stating that Magnachip's financial quarterly statements were

25   accurate, and Defendants' potential motives for committing the violations, including securing a

26   favorable corporate debt rating, inflating Magnachip's stock price, and securing personal bonuses

27   tied to more favorable results.

28       These allegations by themselves are not sufficient to plead scienter.  See Zucco Partners,

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1   552 F.3d at 1004 (signatures of SOX certifications are not "substantial" in the scienter calculus);

2   Seaman v. Cal. Bus. Bank, No. 13-cv-02031, 2013 WL 5890726, at *6 (N.D. Cal. Oct. 30, 2013)

3   (same for motives of defendants).  Plaintiffs, however, are not relying on these allegations alone.

4   They are arguing instead that the allegations are part of a broader picture from which a court may,

5   at the initial pleading stage, infer a compelling claim of scienter.  This is squarely in line with

6   applicable case law.  See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.

7   Holding Corp., 320 F.3d 920, 944-45 (9th Cir. 2003).

8          Plaintiffs also allege, in relation to individual defendants Lee, Norby, Elkins, Klein, and

9   Tavakoli, that their membership in Magnachip's Audit Committee leads to a further inference of

10  scienter.  Lead Plaintiff's Opposition, ECF No. 137 at 35.  They assert that the audit committee's

11  obligation — indeed, its reason for existence — is to review the company's financial statements

12  and its accounting procedures, and therefore the Defendants acted recklessly by disregarding those

13  responsibilities despite attesting that they had met them.  Id. at 37.

14         Defendants argue that mere membership in an audit committee is insufficient to meet the

15  heightened pleading standard of Rule 9(b) and the PSLRA, and contrasts this case with others

16  involving more specific allegations.  Avenue Defendants' Motion, ECF No. 123 at 18; see also,

17  e.g., Novak v. Kasaks, 216 F.3d 300, 311-312 (2d Cir. 2000) (complaint alleged that committee

18  member defendants knew about fraudulent inventory mark-ups but refused to fix them to avoid

19  damaging company's financial prospects).  But combined with other allegations, it may be "at

20  least as compelling as any opposing innocent inference," Zucco Partners, 552 F.3d at 991, to

21  conclude that responsible members of an Audit Committee should have noticed significant errors

22  in revenue recognition, and that at the very least, a failure to do so was reckless on their part.

23                          **iv.    Core Operations Inference**

24         Lastly, Plaintiffs argue that, given these other inferences, scienter can be assumed based on

25  the inference that executive officers have knowledge of the "core operations" of their company.

26  Lead Plaintiffs' Opposition, ECF No. 137 at 34.  Generally, a plaintiff cannot "rely[] exclusively

27  on the core operations inference to plead scienter under the PSLRA."  S. Ferry LP, No. 2 v.

28  Killinger, 542 F.3d 776, 784 (9th Cir. 2008).  However, allegations regarding management's role

in a company may be relevant when "used in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations'" or in "rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter." Id. at 785-86.

### v.   Stock Sales

Defendants argue that because many of the individual defendants did not sell any stock while the alleged fraud was ongoing, the Court should draw the inference that they therefore lacked scienter of that fraud. See Sakai Motion, ECF No. 155 at 25; Tavakoli Reply, ECF No. 145 at 15. They argue that if the individual defendants in fact knew about the overstatements of revenue, they would not have kept their stock and incurred the same losses as all investors when the price declined after Magnachip's restatements. See In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142.

The Court does not agree. "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 944 (9th Cir. 2003) (citing to Hanon v. Dataprods. Corp., 976 F.2d 497, 507 (9th Cir. 1992)). Indeed, there are several explanations for why an individual defendant would not sell stock even if she knew about false financial statements, such as a desire to avoid drawing the market's attention to the problem. Further, even if an individual who *knows* of company misstatements may on the whole be less likely to keep her stock, the same cannot be said of an individual who is merely deliberately reckless in failing to be aware of such misstatements. Given that many of Plaintiffs' allegations lend themselves more to recklessness than knowledge (for example, their argument that the individual Defendants recklessly neglected their duties as Audit Committee members), Defendants' argument is unpersuasive.

### vi.   Plaintiffs' Allegations as a Whole

In sum, Plaintiffs have alleged that the violations committed by Magnachip had such a significant effect on its revenue and was of such a fundamental nature that it can be inferred that

14

1    most reasonable, non-reckless executives would have become aware of them.  They alleged that

2    Magnachip admitted, albeit somewhat vaguely, that management may be at fault for these

3    violations.  They alleged that two high-level officers were dismissed at the same time the

4    violations were announced, that other officers signed documents attesting to the accuracy of the

5    false statements, and that defendants had strong motives to commit them.  Finally, they alleged

6    that many of the individual defendants served on a committee whose responsibility was to police

7    for such violations.  While each of these allegations alone might be insufficient to plead a "cogent

8    and compelling" claim of scienter, taken as a whole the Court concludes they meet the standard

9    under the PSLRA.

10                            **b.    Loss Causation**

11        The Magnachip Defendants argue that Plaintiffs have also failed to prove loss causation.

12   Magnachip Defendants' Motion, ECF No. 126 at 24.  Loss causation, "i.e. a causal connection

13   between the material misrepresentation and the loss" experienced by the plaintiff, is a necessary

14   element of pleading a securities fraud claim under section 10(b) of the Exchange Act.  Dura

15   Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005). "A complaint fails to allege loss causation if it

16   does not 'provide[ ] [a defendant] with notice of what the relevant economic loss might be or of

17   what the causal connection might be between that loss and the misrepresentation[.]'  Stated in the

18   affirmative, the complaint must allege that the defendant's share price fell significantly after the

19   truth became known.'"  Meltzer Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1062

20   (9th Cir. 2008) (quoting Dura Pharm., 544 U.S. at 347).  "The burden of pleading loss causation is

21   typically satisfied by allegations that the defendant revealed the truth through 'corrective

22   disclosures' which 'caused the company's stock price to drop and investors to lose money.'"

23   Lloyd v. CVB Fin. Corp., No. 13-56838, 2016 WL 384773, at *8 (9th Cir. Feb. 1, 2016) (citing

24   Halliburton Co. v. Erica P. John Fund, Inc., ___ U.S. ___, 134 S.Ct. 2398, 2406 (2014)).

25        "Typically, 'to satisfy the loss causation requirement, the plaintiff must show that the

26   revelation of that misrepresentation or omission was a substantial factor in causing a decline in the

27   security's price, thus creating an actual economic loss for the plaintiff.'"  Nuveen Mun. High

28   Income Opportunity Fund v. City of Alameda, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting

United States District Court
Northern District of California

15

1    McCage v. Ernst & Young, LLP, 494 F.3d 418, 425-26 (3d. Cir. 2007)).  For example, loss

2    causation is adequately alleged where plaintiffs stated that a company had engaged in improper

3    accounting practices and that the "stock fell precipitously after [the company] began to reveal

4    figures showing the company's true financial condition." Id. at 1119-1120 (quoting In re Daou

5    Sys., Inc., 411 F.3d 1006, 1026 (9th Cir. 2005)).

6            In asserting that loss causation is not shown here, the Magnachip Defendants argue that

7    Plaintiffs "cite seven purported corrective disclosures that they allege cause Magnachip's stock

8    price to drop," but that "five of these purported disclosures" did not "reveal[] to the market the

9    pertinent truth that was previously concealed or obscured by the Company's alleged fraud."

10   Magnachip Defendants' Motion, ECF No. 126 at 24.  For example, they assert that Magnachip's

11   announcements of Sakai's resignation and Park's retirement did not, "in and of themselves" reveal

12   any false or fraudulent conduct by Magnachip. Id. at 25.  Plaintiffs respond that these disclosures

13   sufficiently plead loss causation under the "materialization of the risk" theory, in which "the stock

14   price declines in response to an event that is the materialization of a risk that was created and/or

15   concealed by defendants' fraud." Lead Plaintiffs' Opposition, ECF No. 137 at 40 (citing to

16   Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005).

17           As the Magnachip Defendants correctly note, Magnachip Defendants' Reply, ECF No. 148

18   at 18, the Ninth Circuit has not adopted the materialization of the risk theory.  Nuveen, 730 F.3d at

19   1122 n.5.  Regardless, the Court concludes that the TAC adequately pleads loss causation.  As

20   Nuveen also makes clear, "Disclosure of the fraud is not a sine qua non of loss causation, which

21   may be shown even where the alleged fraud is not necessarily revealed prior to the economic

22   loss." Id. at 1120.  This means that any particular corrective disclosure is relevant only insofar as

23   it may provide a data point regarding the market's reaction to information about a defendant's

24   alleged misconduct.  The fundamental inquiry before the Court remains whether there is "a causal

25   connection between the material misrepresentation and the loss." Dura Pharm., 544 U.S. at 342.

26           Here, Plaintiffs allege that beginning with Magnachip's January 27, 2013 postponement of

27   its financial report and through its February 12, 2015 release of its restatement of its financial

28   results, Magnachip's stock steadily declined, from over $17 a share to less than $6 a share.  TAC,

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    ECF No. 114 at ¶¶ 92-106.  Plaintiffs further allege that over this period of time, Magnachip

2    received a "credit negative" report, Id. at ¶ 93, outside auditors suggested that Magnachip was

3    "not maintaining an effective control environment," Id. at ¶ 103, and market analysis downgraded

4    their ratings of the company, Id. at ¶ 104.  Perhaps most significantly, Plaintiffs allege that

5    Magnachip's stock price was cut in half, from $15.02 per share to $7.52 per share, the day after it

6    revealed the effects of its accounting errors on its financial results.  Id. at ¶ 105.  These allegations

7    are sufficient to plead a claim that Plaintiffs' economic loss was caused by Magnachip's

8    misrepresentations.  See In re Daou, 411 F.3d at 1026 (finding loss causation sufficiently pleaded

9    by allegations that "Daou's stock fell precipitously after defendants began to reveal figures

10   showing the company's true financial condition" and an analyst was anonymously quoted as

11   saying "You have got to question whether they are manufactured earnings.").

12                          **c.        "Making" the Alleged Misrepresentations**

13            The final argument raised against Plaintiffs' 10(b) claims is that they fail to show that any

14   Defendants made the alleged misrepresentations.  The Supreme Court has held that only a

15   "maker" of an allegedly false statement can be held liable for that statement under Section 10(b)

16   and Rule 10b−5.  Janus Capital Grp. v. First Deriv. Traders, 131 S. Ct. 2296, 2302 (2011).  "For

17   purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority

18   over the statement, including its content and whether and how to communicate it."  Id.  The

19   Supreme Court analogized the concept of a "maker" of a statement with that of a speaker as

20   opposed to his or her speechwriter:  "Even when a speechwriter drafts a speech, the content is

21   entirely within the control of the person who delivers it. And it is the speaker who takes credit—or

22   blame—for what is ultimately said."  Id.

23            Plaintiffs argue that they sufficiently alleged that Defendants made the false statements by

24   stating that all of the individual Defendants signed the 2011 and 2012 Form-10Ks filed with the

25   SEC, which included the allegedly false financial statements that ground Plaintiffs' claims.  Lead

26   Plaintiffs' Opposition, ECF No. 137 at 45-46; see also TAC, ECF No. 114, ¶¶ 48, 72.  Plaintiffs'

27   argument is supported by Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9th Cir. 2000), in

28   which the Ninth Circuit held that a corporate official who "signs a SEC filing containing

17

1   misrepresentations" is, in doing so, "mak[ing] a statement so as to be liable as a primary violator

2   under § 10(b)." As the Ninth Circuit noted, "when a corporate officer signs a document on behalf

3   of the corporation, that signature will be rendered meaningless unless the officer believes that the

4   statements in the document are true." Id. Moreover, "by placing responsibility in corporate

5   officers to ensure the validity of corporate filings, investors are further protected from misleading

6   information." Id.

7           Defendants argue that Howard should only apply to inside directors, who presumably have

8   a greater knowledge of the day-to-day operations of the company, and not to outside directors,

9   who presumably do not. They contend that "outside directors are differently situated than officers,

10  and signing an SEC filing, in and of itself, is not sufficient to plead a securities fraud claim against

11  an outside director." Magnachip Defendants' Motion, ECF No. 126 at 17 (citing to Wojtunik v.

12  Kealy, 394 F. Supp. 2d 1149, 1165 (D. Ariz. 2005) and other cases). The majority of the

13  individual Defendants — with the exception of Sakai, Park, and Hwang — were merely members

14  of the Board of Directors and Audit Committee rather than executive officers in Magnachip, and

15  therefore, according to Defendants, should not be held liable.

16          Neither authority nor public policy support the establishment of the distinction for which

17  Defendants argue. For one thing, Howard itself addresses the issue. Citing many of the same

18  cases as Defendant, Howard explains that these cases are better classified as cases in which the

19  defendants arguably lacked scienter rather than in which they did not "make" the relevant

20  statements. 228 F.3d at 1062. In other words, Defendants' true objection here is not that outside

21  directors do not have "ultimate authority" over their statements — after all, they had just as much

22  control over their decisions to sign the SEC forms as inside directors — but rather that they lacked

23  the knowledge and awareness of the company's inner workings possessed by inside directors. Yet

24  as explained above, the Court has separately found that scienter is adequately pleaded.

25          For another, Defendants ignore the fact that most of their cases are concerned with the

26  "group pleading doctrine," by which "plaintiffs are allowed to plead claims for fraud against

27  officers of the corporation using group pleading presumptions that the fraud was the collective

28  action of the officers." In re Ross Sys. Sec Litig., No. C-94-0017 DLJ, 1994 WL 583114 at *5-6

United States District Court
Northern District of California

18

(N.D. Cal. July 21, 1994); <u>see also</u> <u>Wojtunik v. Kealy</u>, 394 F. Supp. 2d 1149, 1164 (D. Ariz. 2005); <u>In re Gupta Corp. Sec. Litig.</u>, 900 F. Supp. 1217, 1241 (N.D. Cal. 1994); <u>Stack v. Lobo</u>, 903 F. Supp. 1361, 1376 (N.D. Cal. 1995).  These cases indeed hold that outside directors should not be held liable for signing allegedly false statements — but within the context of plaintiffs' attempts to make use of the group pleading doctrine.  This is because the doctrine is based on the assumption that all of a company's officers are "directly involved in the day-to-day affairs, management, or control of the company," which is not always the case for outside directors. <u>Stack</u>, 903 F. Supp. at 1376.

Accordingly, the Court concludes that Plaintiffs have sufficiently pleaded that the Defendants "made" allegedly false statements.  In light of this and the preceding discussion, the Court concludes Plaintiffs' have sufficiently asserted a 10(b) violation.

### 2.  20(a) Claims

Section 20(a) of the Exchange Act extends liability for 10(b) violations to those who are "controlling persons" of the alleged violations.  <u>See Hollinger v. Titan Capital Corp.</u>, 914 F.2d 1564, 1572 (9th Cir. 1990).  In order to prove a prima facie case under section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws, and (2) that the defendant exercised "actual power or control" over the primary violator.  <u>Howard v. Everex Sys., Inc.</u>, 228 F.3d 1057, 1065 (9th Cir. 2000).  "'Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'"  <u>Id.</u> at 1065 (quoting <u>Kaplan v. Rose</u>, 49 F.3d 1363, 1382 (9th Cir. 1994)).[3]

The Court has already addressed Defendants' arguments that Plaintiffs have failed to plead a primary violation.  It now turns to Defendants' arguments that Plaintiffs have also failed to plead that Avenue Capital is a "controlling person."[4]

---

[3]     Plaintiffs argue that the heightened fraud pleading standard should not apply to 20(a) claims because unlike section 10(b), fraud is not a necessary element of pleading a claim under section 20(a).  Lead Plaintiffs' Opposition, ECF No. 137 at 49.  The Court does not address this argument, as it concludes that Plaintiffs sufficiently allege control even under the higher pleading standard.

[4]     In light of the Notice of Settlement, the Court does not address Defendants' arguments

United States District Court
Northern District of California

1    Plaintiffs assert that Avenue Capital's control over Magnachip's statements is established

2    through its role as majority shareholder, and its corresponding power to appoint the majority of

3    Magnachip's Board of Directors.  Lead Plaintiffs' Opposition, ECF No. 137 at 52.  Though

4    Avenue sold enough of its stock to lose its status as majority shareholder shortly after the

5    beginning of the class period, Plaintiffs argue that Avenue nevertheless retained its control since

6    its appointees continued to serve on the Board of Directors and the Audit Committee.  Id.  They

7    argue that Avenue's control can be established through the following facts: (a) that it has

8    substantial holdings of the controlled entity; (b) it places its designees on the board, and (c) these

9    designees signed the document(s) containing false statements.  Id. at 53.  They rely on In re Am.

10   Apparel, 2013 WL 10914316 at *36-37 and In re UTStarcom, Inc. Sec. Litig., 517 F. Supp. 2d

11   964, 979-80 (N.D. Cal. 2009) as support.  Id.

12   Defendants offer two responses to Plaintiffs' argument.  First, they assert that applicable

13   case law establishes that minority shareholders — which Avenue became after selling much of its

14   stock — cannot be considered to have "control" over companies in which they own their minority

15   share.  Avenue Defendants' Reply, ECF No. 146 at 14.  Second, they argue that In re Am. Apparel

16   and In re UTStarcom are distinguishable because the complaints in both of those cases involved

17   specific allegations that the minority shareholder had a significant role in company decisions,

18   while the TAC in this case does not.  Id. at 15.

19   Regarding the latter argument, Plaintiffs plead in the TAC that Magnachip stated in its

20   public filings that "Avenue will continue to have significant influence over [the Company's]

21   affairs for the foreseeable future" and "will be able to control most matters requiring stockholder

22   approval, including the election of directors and approval of significant corporate transactions."

23   TAC, ECF No. 114 at ¶ 213.  They also allege that Avenue "used its control of Magnachip to cash

24   out its investments in the Company at enormous profits."  Id. at ¶ 214.  These allegations are

25   comparable to the ones made in In re Am. Apparel, 2013 WL 10914316 at *37 (plaintiffs alleged

26   acknowledgments by executive officers that defendant was "going to be involved in 'management

27

28   regarding whether the other Defendants are "controlling persons."  See Avenue Defendants'
     Motion, ECF 123 at 21; Magnachip Defendants' Motion, ECF No. 126 at 26.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    decisions as far as strategic issues'") and in In re UTStarcom, 617 F. Supp. 2d at 979 (plaintiffs

2    alleged that defendant, through their officers serving as directors, "had the power to cause [the

3    Company] to engage in the unlawful conduct complained of" and "were able to, and did, directly

4    and indirectly, control the conduct of [the Company's] business").

5         As for Defendants' argument that minority status precludes possession of "control," the

6    Court concludes that Defendants' cited case law is distinguishable because none of it involves a

7    party who began the class period as a majority shareholder only to lose that status shortly

8    thereafter.  Rather, Defendants' cases stand merely for the proposition, which no one here

9    disputes, that a party that has always held only a minority share of the company does not, by virtue

10   of that fact alone, possess "control" over that company.  See Avenue Defendants' Reply, ECF No.

11   146 at 14 (citing to Silsby v. Icahn, 17 F. Supp. 3d 348, 371 (S.D.N.Y. 2014); In re Kosmos

12   Energy Ltd. Sec. Litig., 955 F. Supp. 2d 658 (N.D. Tex. 2013); In re Flag Telecom Holdings, Ltd.

13   Sec. Litig., 308 F. Supp. 2d 249, 273-74 (S.D.N.Y. 2004); In re Splash Tech. Holdings, Inc. Sec.

14   Litig., No. 99 Civ. 109, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29. 2000); Sloane Overseas

15   Fund, Ltd. v. Sapiens Int'l Corp., N.V., 941 F. Supp. 1369, 1379 (S.D.N.Y. 1996); In re Gupta

16   Corp. Sec. Litig., 900 F. Supp. 1217, 1243 (N.D. Cal. 1994); O'Sullivan v. Trident Microsys.,

17   Inc., No. 93 Civ. 20621, 1994 WL 124453, at *19 (N.D. Cal. Jan. 31, 1994)).

18        Defendants' motions to dismiss Plaintiffs' 20(a) claims are denied.

19                         **3.    20A Claims**

20        Section 20A(a) of the Exchange Act imposes liability on parties who engage in insider

21   trading, for "damages suffered by individuals who trade contemporaneously with the insider."

22   Johnson v. Aljian, 590 F.3d 778, 779 n.8 (9th Cir. 2007).  Insider trading is defined as "purchasing

23   or selling a security while in possession of material, nonpublic information."  15 U.S.C. § 78t-1(a).

24        Here, Plaintiffs have alleged that Lead Plaintiff purchased shares of Magnachip stock on

25   August 2, 2013, the day after Avenue Capital sold a portion of its stock on August 1, 2013.  See

26   TAC, ECF No. 114 at ¶ 236.  This is sufficient to allege that Lead Plaintiff traded

27   "contemporaneously" with Avenue.  See In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d

28   1132, 1205 (C.D. Cal. 2008) (trading on the same day or the day after is "contemporaneous").

1    A more difficult question is whether Avenue engaged in insider trading.  An initial matter,

2    though not discussed by the parties, is whether section 20(A) requires the defendant to "actually

3    use" the inside information as part of their investment decision, or merely requires the defendant

4    to possess such information at the same time it conducts its transactions.  Two district courts in

5    this circuit have considered the issue and reached different results.  In In re Countrywide Financial

6    Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1203 (C.D. Cal. 2008), the court held that "scienter and

7    loss causation for insider trading requires that the insider *actually use* (scienter) the inside

8    information in deciding to make the trade (loss causation)."  The court cited to U.S. v. Smith, 155

9    F.3d 1051, 1067-69 (9th Cir. 1998), which reached the same conclusion, albeit in a criminal case.

10   The In re Countrywide court acknowledged that Smith was a criminal case and that the Ninth

11   Circuit explicitly left open whether the same standard applied to civil cases, but it concluded that

12   only the "actual use" standard "satisfies the PSLRA and the Ninth Circuit's demanding deliberate

13   recklessness or actual knowledge or intent standards."  588 F. Supp. 2d at 1203 n.82.

14   The court in Johnson v. Aljian, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004), on the

15   other hand, considered the same issue and reached a different result.  It also acknowledged the

16   Smith holding, but declined to import Smith's holding in a criminal context to civil cases.  Instead,

17   it relied on the Second Circuit's scienter standard, described in U.S. v. Teicher, 987 F.2d 112, 120

18   (2d Cir. 1993).  In Teicher, the Second Circuit concluded that "a requirement of casual connection

19   between the [inside] information and the trade could frustrate attempts to distinguish between

20   legitimate trades and those conducted in connection with inside information."  987 F.2d at 121.

21   The less strict "knowing possession" standard, by contrast, "recognizes that one who trades while

22   knowingly possessing material inside information has an informational advantage over other

23   traders."  Id.  "Unlike a loaded weapon which may stand ready but unused, material information

24   can not lay idle in the human brain."  Id.

25   This Court agrees with the Second Circuit and Johnson v. Aljian that Section 20A requires

26   only that a party know the inside information while making the trade, not that she actually use that

27   information.  This conclusion comports with the language of the section, which prohibits

28   "purchasing or selling a security *while in possession of* material, nonpublic information."  15

United States District Court
Northern District of California

1   U.S.C. § 78t-1(a) (emphasis added).

2       Plaintiffs allege that Avenue Capital "through its Audit Committee appointees had access

3   to MagnaChip's material, nonpublic and highly confidential information concerning the improper

4   business and accounting practices giving rise to the Restatement and the knowledge that

5   Magnachip's financial reports were materially misstated during the Class Period."  TAC, ECF No.

6   114 at ¶ 238.  The Court has already concluded, in its analysis of Plaintiffs' 10(b) claims, that the

7   individual Avenue Defendants Elkins and Klein are alleged to have the requisite scienter regarding

8   Magnachip's misrepresentations.  Plaintiffs argue that because Elkins and Klein were also Avenue

9   employees, their knowledge can be imputed to Avenue itself,  Lead Plaintiff's Opposition, ECF

10  No. 137 at 55 n.26, citing to W. R. Grace & Co. v. W. U. S. Indus., Inc., 608 F.2d 1214, 1218 (9th

11  Cir. 1979) and Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1435 (9th Cir. 1995).

12      Plaintiffs' cases are not entirely on point, as Defendants note. Avenue Defendants' Reply,

13  ECF No. 146 at 21.  W.R. Grace was a patent infringement case in which the Ninth Circuit held

14  that an employee's knowledge of a fraudulent affidavit could be imputed to his employer

15  corporation under established agency-principal doctrines.  608 F.2d at 1218.  Nordstrom, Inc. was

16  an insurance coverage case in which the insurer argued that it was responsible only for individual

17  officer defendants, and not Nordstrom itself, in defending a securities fraud case.  54 F.3d at 1427.

18  Plaintiffs cite to a portion of the opinion that acknowledges that corporations are "liable for

19  actions by senior management personnel that are intrinsically corporate and bear the imprimatur of

20  the corporation itself."  Id. at 1435 (internal quotation marks and citation omitted).

21      Here, Plaintiffs have not offered allegations regarding agency-principal relationships or

22  actions that are "intrinsically corporate."  But they have alleged that Elkins and Klein had scienter

23  of Magnachip's false statements and further that they were employees of Avenue Capital while

24  also serving as officers of Magnachip.  These facts do not establish without a doubt that Elkins's

25  and Klein's inside information regarding Magnachip's financial statements was imputed to

26  Avenue, but they are enough to suggest that "the malicious inference is at least as compelling as

27  any opposing innocent inference." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991

28  (9th Cir. 2009).

23

United States District Court
Northern District of California

1   Accordingly, Defendants' motions to dismiss Plaintiffs' Section 20A claims are denied.

2   **C.    Securities Act Claims**

3       Though Plaintiffs raise claims under sections 11, 12(a)(2), and 15 of the Securities Act in

4 their TAC, only the latter two claims apply to Avenue Capital.  However, as explained below,

5 sections 11 and 12(a)(2) often overlap in their analysis.  As the parties do in their briefing, the

6 Court therefore discusses the claims related to these two sections together.  It concludes that

7 Plaintiffs' claims under these sections, and accordingly their claims under section 15, must be

8 dismissed.

9              **1.    11 and 12(a)(2) claims**

10       "Section 11 creates a private right of action for any purchaser of a security where 'any part

11 of the registration statement, when such part became effective, contained an untrue statement of a

12 material fact or omitted to state a material fact required to be stated therein or necessary to make

13 the statements therein not misleading.'" <u>Rieckborn v. Jefferies LLC</u>, 81 F. Supp. 3d 902, 914

14 (N.D. Cal. 2015) (quoting 15 U.S.C. § 77k(a)).  "To prevail on a Section 11 claim, a plaintiff must

15 demonstrate (1) that the registration statement contained a misrepresentation or omission; and (2)

16 that the misrepresentation or omission was material." <u>Id.</u> (citing to <u>In re Daou Sys., Inc.</u>, 411 F.3d

17 1006, 1027 (9th Cir.2005)).

18       Section 12(a)(2) functions as the "sibling" to Section 11 of the Securities Act, allowing

19 plaintiffs to bring suit against parties who are statutory sellers of securities pursuant to

20 misrepresentations in registration statements. <u>Id.</u> at 925.  "To plead a claim under Section

21 12(a)(2), the plaintiff must allege that (1) the defendant is a statutory seller; (2) the sale was

22 effected by means of a prospectus or oral communication; and (3) the prospectus or oral

23 communication contained a material misstatement or omission." <u>Maine State Ret. Sys. v.</u>

24 <u>Countrywide Fin. Corp.</u>, No. 2:10-CV-0302 MRP, 2011 WL 4389689, at *8 (C.D. Cal. May 5,

25 2011) (citing to 15 § U.S.C. 77l(a)(2)).[5]

26 _____

27   [5]    Plaintiffs allege that because neither section 11 nor section 12(a) requires a showing of
fraud, only the standard pleading requirements of Rule 8(a) are applicable to claims under those

28 sections.  However, such claims for which the alleged violations are "grounded in fraud" must
nevertheless meet the heightened 9(b) standard. <u>In re Stac Elec. Sec. Litig.</u>, 89 F.3d 1399, 1405

1    Defendants raise two arguments that these claims are not sufficiently pleaded against

2    Avenue Capital: (1) that they are time-barred, and (2) that Plaintiffs lack statutory standing.[6]  As

3    detailed below, the Court will grant Defendants' motions to dismiss these claims based on both

4    grounds.

5               a.        Whether Plaintiffs' Claims are Time-Barred

6    Defendants first argue that Plaintiffs' Securities Act claims are time-barred.  Claims

7    brought under the Securities Act are barred "unless brought within one year after the discovery of

8    the untrue statement or the omission, or after such discovery should have been made by the

9    exercise of reasonable diligence."  15 U.S.C. § 77m.  The one-year period "begins to run once the

10   plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting

11   the violation — whichever comes first."  Merck & Co. v. Reynolds, 559 U.S. 633, 653 (2010).[7]

12   "Plaintiffs are considered to have discovered a fact when a 'reasonably diligent plaintiff would

13   have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient

14   detail and particularity to survive a 12(b)(6) motion to dismiss.'"  F.D.I.C. v. Countrywide

15   Financial Corp., No. 2:12-CV-4353 MRP, 2012 WL 5900973 at *3 (C.D. Cal. Nov. 21, 2012)

16   (quoting City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir.

17   2011)).  This is a "fact intensive" inquiry, and some courts have held it is "usually not

18   appropriate" to conduct it at the pleading stage.  Rafton v. Rydex Series Funds, No. 10-cv-01171-

19   LHK, 2011 WL 31114 at *9 (N.D. Cal. Jan. 5, 2011) (citation omitted).  "At the pleading stage,

20   the question is whether it is plausible that [the] disclosures were insufficient to supply a

---

22   (9th Cir. 1996).  Plaintiffs attempt to avoid the heightened pleading standard by "specifically
     exclude[ing]" all allegations of fraud from their Securities Act claims, TAC, ECF No. 114 at ¶¶
23   245, 255, 261, but this is unavailing.  See Reickborn v. Jefferies LLC, 81 F. Supp. 3d 902, 918
     (N.D. Cal. 2015) ("A plaintiff cannot escape the requirements of Rule 9(b) by virtue of a general
24   disclaimer that a [Section 11] claim is based on negligence rather than fraud." (internal quotation
     marks and citation omitted)).
     [6]    The other Defendants besides Avenue Capital also argued that they were not statutory
25   sellers.  Because Avenue Capital did not contest that it was a statutory seller, the Court does not
     address this issue.
26   [7]    Though Merck was an Exchange Act case, its reasoning applies equally to the similar
27   timeliness requirements for Securities Act claims.  See, e.g., Booth v. Strategic Realty Trust, Inc.,
     No. 13-CV-04921-JST, 2014 WL 3749759, at *5 (N.D. Cal. July 29, 2014); F.D.I.C. v.
28   Countrywide Financial Corp., No. 2:12-CV-4353 MRP, 2012 WL 5900973 at *2-3 (C.D. Cal.
     Nov. 21, 2012).

25

United States District Court
Northern District of California

United States District Court
Northern District of California

1    reasonably diligent plaintiff with the information necessary to plead the Section 11 claims with

2    sufficient detail and particularity to survive a 12(b)(6) motion." Booth v. Strategic Realty Trust,

3    Inc., No. 13-CV-04921-JST, 2014 WL 3749759, at *6 (N.D. Cal. July 29, 2014).

4         The focus of the dispute is whether Magnachip's announcement in March 11, 2014 that it

5    needed to restate its financial results for 2011 through 2013 gave reasonably diligent plaintiffs

6    enough information to discover Magnachip's alleged misrepresentations.  If so, the Securities Act

7    claims, which were first raised by OPPRS in April of 2014, would be time-barred because they

8    were brought thirteen months after the announcement.

9         Plaintiffs argue that there were not sufficient facts to support their claims until at least

10   August 12, 2014, when Magnachip first announced that the effect of its restatements would be

11   "material."  See OPPRS Opposition, ECF No. 138 at 18.[8]  They contend that the March 11, 2014

12   announcement "revealed only that the Company would restate its financial results for 2011

13   through 2013 to correct timing errors in revenue recognition on some sales made through its

14   distributors."  OPPRS Opposition, ECF No. 138 at 16.  They argue that it was not made clear until

15   August 2014 that these errors would have a material effect on the financial information provided

16   to investors.  Id. at 17.  Thus, for example, Plaintiffs explain that if a "timing error" had caused the

17   revenues to be overstated for the fiscal year for 2011, the same error would be expected to cause

18   revenues to be understated in the fiscal year for 2012, leaving the revenue impact "neutral" for

19   Magnachip.  Id. at 17 n.7.  They analogize to Reickborn v. Jefferies, 81 F. Supp. 3d 902 (N.D. Cal.

20   2015).  In that case, defendants argued that plaintiffs' Securities Act claims were time-barred due

21   to the company's disclosure that it was changing its metric for "day sales outstanding," or DSO, to

22   avoid excluding certain contract receivables.  Id. at 909, 915.  The court held, however, that the

23   disclosure did not "ma[ke] plain the linkages between Velti's method of calculating its reported

24   DSO and its alleged understatement of reserves and overstatement of revenues."  Id. at 915.

25

26   _____

27   [8]  The Underwriter Defendants also contend that Plaintiffs should not be allowed to argue they
     lacked sufficient information to bring their claims until August 12, 2014 because the Lead
     Plaintiffs first filed their complaint on March 12, 2014.  Underwriter Reply, ECF No. 144, at 9.
28   The Court will not address this argument except to say it is based on a selective reading of the
     prior history of the case and the consolidation of OPPRS's claims with those of the Lead Plaintiff.

1    Plaintiffs here argue that Magnachip's March 11, 2014 announcement similarly did not reveal the

2    "timing errors" would ultimately render the financial reports to be materially false.

3         Defendants argue that the March 11 announcement would still have put a "reasonably

4    diligent" investor on notice that the financial reports should not be relied upon as true; indeed,

5    Plaintiffs themselves allege that Magnachip stated that the prior financial reports "should not be

6    relied upon."  TAC, ECF No. 114 ¶ 94.  Defendants analogize to In re Magnum Hunter Resources

7    Corp. Sec. Litig., 616 Fed. Appx. 442 (2d Cir. 2015).  In that case, the defendant Magnum Hunter

8    "repeatedly disclosed ongoing control weaknesses in late-2012 through mid-2013 while

9    continuing to warn of possible additional problems."  Id. at 446.  The Second Circuit rejected

10   plaintiffs' argument that their claims were not time-barred because the full extent of the "internal

11   control weaknesses" was only revealed in the later 2013 disclosures.  Id. at 447.  It held that "[w]e

12   have never permitted the statute of limitations to be tolled until a company's disclosures touch on

13   every specific allegation that a plaintiff chooses to put in his complaint."  Id.

14        This case appears to lie somewhere in between the two cited by Plaintiffs and Defendants.

15   The March 11 and August 12 announcements were not merely a series of "repeated disclosures of

16   ongoing weaknesses" as in Magnum Hunter.  At the same time, the March 11 announcement did

17   "make plain" that the accounting errors cited by Magnachip would cause changes to Magnachip's

18   financial results, unlike in Reickborn.  Nevertheless, Plaintiffs may be correct that the March 11

19   announcement, in and of itself, did not sufficiently put them on notice to begin their one-year

20   clock.

21        However, as Defendants point out, there were several other sources of information that a

22   reasonably diligent investor would likely uncover.  Most significant is the March 12 complaint

23   filed by the Lead Plaintiffs, in which they allege similar claims to those later brought by OPPRS in

24   April of the following year.  Underwriter Defendants' Opposition, ECF No. 130 at 15.  Indeed,

25   Lead Plaintiffs alleged in their initial complaint that "defendants made false and/or misleading

26   statements" in relation to the fact that Magnachip "was improperly recognizing revenues" and "as

27   a result of the above, the Company's financial statements were materially false and misleading at

28   all relevant times."  Complaint, ECF No. 1 at 3.  At base, these allegations are the same as those

1  now alleged in Plaintiffs' Securities Act claims.  Defendants also point to several news stories

2  regarding Magnachip's announcements, as well as numerous law firms who publicized

3  announcements or calls for suggested class action litigation against Magnachip in early 2014.

4  Underwriter Defendants Opposition, ECF No. 130 at 11.

5          Plaintiffs contend that "Defendants ignore significant differences between OPPRS's initial

6  complaint and the March 12, 2014 complaint, including the pleading of information about the

7  magnitude and impact of the accounting violations."  OPPRS's Opposition, ECF No. 138 at 26.

8  However, the one-year time period does not reset simply because additional information is

9  revealed that could make for a stronger claim.  See Stitching Pensioenfonds ABP v. Countrywide

10 Fin. Corp. 802 F. Supp. 2d 1125, 1137 (C.D. Cal. 2011) ("A statute which does not begin to run

11 until every possible phrasing or permutation of the defendant's wrongdoing has been publicly

12 reported would never run.  Each new news report or interview with company executives would

13 reset the clock.").

14         Accordingly, the Court concludes that the combination of the March 11 announcement, the

15 Lead Plaintiffs' initial complaint filed the next day, and the other coverage surrounding the

16 announcement would have put a reasonably diligent investor on notice of potential Securities Act

17 claims against Defendants.

18         Plaintiffs argue in the alternative that their claims are not time-barred because they relate

19 back to the original complaint filed on March 12.  However, the Ninth Circuit has held that an

20 amended complaint that adds new plaintiffs relates back to the original complaint only if "there is

21 an identity of interests between the original and newly proposed plaintiff."  In re Syntex Corp.

22 Sec. Litig., 95 F.3d 922, 936 (9th Cir. 1996).  Here, there is no identity of interests because the

23 later complaint filed by OPPRS was based on a different securities transaction and different

24 disclosures by Magnachip.  See id.  Plaintiffs' claims under sections 11 and 12(a)(2) are therefore

25 time-barred.

26                         b.        Statutory Standing

27         In the alternative, the Court concludes Plaintiffs also lack statutory standing for their

28

28

1    section 11 and 12(a)(2) claims.[9]  "To have standing to bring a Section 11 claim, plaintiffs must be

2    able to trace their shares back to an allegedly misleading registration statement."  In re Ubiquiti

3    Networks, Inc. Sec. Litig., 33 F. Supp. 3d 1107, 1117 (N.D. Cal. 2014) (citing In re Century

4    Alum. Co. Sec. Litig., 729 F.3d 1104, 1106 (9th Cir. 2013)).  Statutory standing under Section

5    12(a)(2) requires further that plaintiffs show they purchased their shares "in a public offering, as

6    opposed to the secondary market.  Id. at 1126 (citing Gustafson v. Alloyd Co., Inc., 513 U.S. 561,

7    577 (1995)).

8         The Ninth Circuit has explained that the "level of factual specificity" needed to trace

9    shares back to a particular offering and registration statement "will vary depending on the

10   context."  In re Century Alum. Co. Sec. Litig., 729 F.3d 1104, 1107 (9th Cir. 2013).  For example,

11   "[w]hen all of a company's shares have been issued in a single offering under the same registration

12   statement, this 'tracing' requirement generally poses no obstacle."  Id. at 1106 (citation omitted).

13   However, when a company has issued shares under multiple registration statements, as was the

14   case here, the plaintiff "must prove that her shares were issued under the allegedly false or

15   misleading statement, rather than some other registration statement."  Id.

16        This can be done in two ways.  First, plaintiff can prove that they purchased the shares

17   directly in the offering itself.  Id.  Second, plaintiffs can prove "that their shares, although

18   purchased in the aftermarket, can be traced back to the secondary offering."  Id.  This second

19   method is "often impossible," because it requires plaintiffs "to trace the chain of title for their

20   shares back to the [pertinent] offering, starting with their own purchases and ending with someone

21   who bought directly in the [pertinent] offering."  Id. at 1106-07.  Most trading, however, "is done

22   through brokers who neither know nor care whether they are getting newly registered or old

23   shares."  Id. (citation omitted).

24        Plaintiffs contend that general allegations that securities purchases are "traceable" to a

25   false registration statement are sufficient to allege statutory standing, citing to In re Petrobras Sec.

26

27   ───────────────

     [9]     Because the claim here is in regards to statutory standing under the Securities Act rather
28   than Article III standing, this claim is properly considered under Fed. R. Civ. Pro. 12(b)(6) rather
     than Rule 12(b)(1).  See In re Century Alum. Co. Sec. Litig., 729 F.3d 1104, 1109 (9th Cir. 2013).

1    Litig., No. 14-cv-9662 (JSR), 2015 WL 4557364 at *13 (S.D.N.Y. July 30, 2015).  In other

2    circuits, the question of statutory standing for Securities Acts claims appears to be somewhat

3    unsettled, and courts in those circuits have deemed general allegations to be sufficient.  See In re

4    Ariad Pharm., Inc., 98 F. Supp. 3d 147, 168-69 (D. Mass. 2015) (collecting cases and declining to

5    follow In re Century "[i]n the absence of additional guidance or evidence that the Ninth Circuit is

6    not an outlier among circuits on the issue").  The Ninth Circuit, however, has explicitly rejected

7    general allegations as sufficient pleadings of statutory standing in light of the changes to pleading

8    standards effected by Bell Atlantic Corp. v. Twombly, 550 U.S. 554 (2007) and Ashcroft v. Iqbal,

9    556 U.S. 662 (2009).  See In re Century, 729 F.3d at 1107.

10          Plaintiffs do not argue or allege that they purchased their shares directly from defendants.

11   Instead, they allege generally that "Plaintiff Oklahoma Police acquired Magnachip stock pursuant

12   and/or traceable to the Registration Statement for the 2/13 Offering"  TAC, ECF No. 114 at ¶ 251.

13   They assert this can be shown because they purchased their shares on the day of the 2/13 Offering

14   (February 6, 2013) and for the same offering price ($14.50).  OPPRS Opposition, ECF No. 138 at

15   29.  However, these same allegations were rejected by the Ninth Circuit in In re Century, 729 F.3d

16   at 1107-08.  In that case, the plaintiffs alleged that they "purchased Century Aluminum common

17   stock directly traceable to the Company's Secondary Offering," and argued that additional

18   allegations regarding "the dates on which and the prices at which they purchases their shares, as

19   well as allegations concerning the trading volume of Century Aluminum stock on certain days,"

20   was sufficient to meet their statutory standing burden.  Id.  The Ninth Circuit disagreed, holding

21   that the plaintiffs' shares "could have come from the secondary offering, but the 'obvious

22   alternative explanation' is that they could instead have come from the pool of previously issued

23   shares," and therefore their allegations were not sufficient to rise above being "'merely consistent

24   with'" their assertion that their shares were traceable to the secondary offering.  Id. (quoting

25   Twombly, 550 U.S. at 567, and Iqbal, 556 U.S. at 678).

26          Accordingly, Plaintiffs have failed to sufficiently allege statutory standing for their

27   Securities Act claims.

28

                                          30

1    In sum, Plaintiffs' section 11 and 12(a)(2) claims against Avenue Capital are dismissed

2 because they are time-barred, and in the alternative, because Plaintiffs lack statutory standing.  It

3 may be the case that Plaintiffs can amend their complaint with further facts to sufficiently plead

4 statutory standing, but no possible amendment may cure the fact that Plaintiffs' claims are time-

5 barred by virtue of Magnachip's March 11, 2013 announcement, the subsequent complaint by

6 Lead Plaintiff, and market coverage.  Therefore, these claims are dismissed with prejudice

7                              **2.      Section 15 claims**

8    Section 15, much like Section 20(a) for Exchange Act claims, allows plaintiffs to also

9 bring claims against parties who are "control persons" for a primary violation of the Securities

10 Act.  See Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990) (en banc) (stating

11 that the "controlling person analysis" for Section 15 is the same as Section 20(a)).  Plaintiffs must

12 therefore allege (1) a primary violation of federal securities laws and (2) that the defendant

13 exercised actual power or control over the primary violator.  Howard v. Everex Sys., Inc., 228

14 F.3d 1057, 1065 (9th Cir. 2000).  The Court has concluded that Plaintiffs have failed to allege a

15 primary violation under section 11 or 12(a)(2).  Their section 15 claims are therefore also

16 dismissed with prejudice.

17                                 **CONCLUSION**

18    For the foregoing reasons, the Court reaches the following conclusions:  (1) in light of the

19 Notice of Settlement, the motions to dismiss in regards to all Defendants except Avenue Capital

20 are denied without prejudice to their re-filing if the settlement agreement is not approved;

21 (2) Defendants' motions to dismiss are denied as to Plaintiffs' claims against Avenue Capital

22 under sections 20(a) and 20A of the Exchange Act; and (3) Defendants' motions to dismiss are

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

United States District Court
Northern District of California

granted with prejudice as to Plaintiffs' claims against Avenue Capital under sections 12(a)(2) and 15 of the Securities Act.

**IT IS SO ORDERED.**

Dated: March 4, 2016

_____
JON S. TIGAR
United States District Judge