UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD HAYES, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MAGNACHIP SEMICONDUCTOR CORP., et al.,<br><br>    Defendants. | Case No. 14-cv-01160-JST<br><br>**ORDER GRANTING CLASS CERTIFICATION**<br><br>Re: ECF No. 231 |

## I.  BACKGROUND

MagnaChip is a Delaware corporation with its principal place of business in Seoul, Korea, which "designs and manufactures semiconductor products for high-volume consumer applications." ECF No. 231 at 9; ECF No. 249 at 10. After MagnaChip emerged from bankruptcy in 2009, Avenue Capital became its majority shareholder, owning 70.3% of the company's shares. ECF No. 231 at 9. Avenue Capital appointed three of its employees to MagnaChip's board of directors. Id.

In March 2011, MagnaChip completed an IPO and its stock began trading on the New York Stock Exchange ("NYSE") at $14 per share. Id. For the eleven consecutive quarters that followed, MagnaChip "posted positive net income and beat analysts' consensus estimates of [earnings per share]," and as a result, MagnaChip's stock rose to a high of $23.57 per share. Id. But Plaintiffs allege that, [w]hile MagnaChip appeared to be healthy and successful, in reality the 'success' was a sham and resulted from Defendants'[1] wide-ranging accounting fraud, which

---

[1] In addition to Avenue Capital, Plaintiffs' original suit named MagnaChip and several of its officers. ECF No. 1. Plaintiffs have since settled with all Defendants but Avenue Capital. ECF No. 270.

included fabricated sales, kickbacks, recognition of revenue for products that had not been manufactured, and channel stuffing." Id. at 10.  On January 27, 2014, MagnaChip "delayed the release of Q4 and year-end 2013 results," and the company's stock price declined by 8%.  Id.  Throughout 2014, MagnaChip issued what Plaintiffs' describe as "partial disclosures related to the fraud" described above."  Id.  Most importantly, on March 11, 2014, Avenue Capital released a disclosure stating that corrections to its revenue recognition methodology "will require the restatement of its financial statements" and that MagnaChip's financial statements from 2011 to 2013 "should no longer be relied upon."  Id. at 11.  According to Plaintiffs, although "these partial disclosures did in fact result in a price decline, [it] was far more limited than would have been experienced had the Company told the complete truth" immediately.  Id.  Finally, on February 12, 2015, "MagnaChip issued restated financials for the fiscal years 2011, 2012, and the first three quarters of 2015."  Id.  Plaintiffs allege that the restatements demonstrate how MagnaChip had fraudulently inflated its revenue and net profits.  Id.  Following this disclosure, MagnaChip's stock price fell 50%, and continued to decline throughout February 2015.  Id.

During the 2011 IPO, at three registered secondary offerings, and at a Rule 144A private sale, Avenue Capital sold portions of its MagnaChip holdings.  ECF No. 249 at 11.  Plaintiffs allege that Avenue Capital obtained over $300 million in revenue by "dump[ing] 85% of its MagnaChip shares" on "unsuspecting investors."  ECF No. 231 at 10.  Because "Avenue Capital was the largest beneficiary of the fraud alleged in this action, and the control person of MagnaChip throughout the Class Period," Plaintiffs argue that its actions violated Sections 20A and 20(a) of the Exchange Act, 15 U.S.C. § 78t-1.  Id. at 8.  Plaintiffs now seek to certify the following class:

> all persons who purchased or otherwise acquired MagnaChip Semiconductor Corporation ("MagnaChip" or the "Company") common stock between February 1, 2012 and February 12, 2015 (the "Class Period"), inclusive. Excluded from the Class are any parties who are or have been Defendants in this litigation, the present and former officers and directors of MagnaChip and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any current or former Defendant has or had a controlling interest.

Id. at 2. They also seek to appoint Keith Thomas and Herb Smith as class representatives, and Pomerantz, LLP and the Rosen Law Firm, P.A. as class counsel. Id. Plaintiffs submitted a report by Zachary Nye ("Nye Report") in support of their motion, ECF No. 232-1, and Avenue Capital submitted a rebuttal report by Paul Gompers ("Gompers Report"), ECF No. 249-2.

## II. LEGAL STANDARD

Class certification under Rule 23 is a two-step process. First, a plaintiff must demonstrate that the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) are met: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." Wang v. Chinese Daily News, Inc., 709 F.3d 829, 833 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351, (2011)).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) is met. Here, Plaintiffs invoke Rule 23(b)(3), which requires that Plaintiffs show both "predominance" and "superiority": that the presence of "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rules 23(a) and at least one of the three requirements under Rule 23(b) are met. See Dukes, 131 S. Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."). In ruling on class certification, courts do not consider the merits of the plaintiffs' claims. Keilholtz v. Lennox Hearth Products Inc., 268 F.R.D. 330, 335 (N.D. Cal. 2010). Courts "must take the substantive allegations of the complaint as true" but "need not accept conclusory or

generic allegations regarding the suitability of the litigation for resolution through class action." Id. (citations omitted). As a general matter, the Ninth Circuit has found Rule 23(b)(3) class actions to be "useful where a large number of purchasers or holders of securities claim to have been defrauded by a common course of dealing on the part of the defendants." Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913 (9th Cir. 1964).

### III. DISCUSSION

#### A. Rule 23(a) Requirements

##### 1. Numerosity

The numerosity requirement is satisfied when a plaintiff shows that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs contend that "[d]uring the class period, the number of MagnaChip shares outstanding ranged from approximately 34.1 million to 37.1 million shares." ECF No. 231 at 12. "The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange," the numerosity requirement is met. In re Cooper Companies Inc. Sec. Litig., 254 F.R.D. 628, 634 (C.D. Cal. 2009). Moreover, Avenue Capital does not contest numerosity. The Court concludes that Plaintiffs have satisfied their burden to show that the number of putative class members is sufficiently numerous that their joinder would be impracticable.

##### 2. Commonality

The commonality requirement is satisfied when a plaintiff shows that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists when plaintiffs' claims "depend upon a common contention" of "a nature that is capable of classwide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2545 (2011).

Thomas contends that this requirement is met, because questions of law or fact common to the putative class "include, among others: (i) whether MagnaChip's financial statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether Avenue Capital controlled MagnaChip during the Class Period; (iv) whether Avenue Capital has a 'good faith' defense to liability under Section 20(a) of

4

the Exchange Act; and (v) to what extent the members of the Class have sustained damages and the proper measure of damages." ECF No. 231 at 14.

The Court concludes that commonality exists because Plaintiffs claim that MagnaChip made the same alleged statements to the entire putative class, as members of the investing public. Thus, the information contained in the alleged statements is determinative of whether MagnaChip misrepresented material facts. Commonality also exists because whether Avenue Capital controlled MagnaChip is determinative of Avenue Capital's liability.

### 3.     Typicality

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted).

Plaintiffs argue that they satisfy the typicality requirement because their claims, like those of the other class members, "derive from the same legal theories and the same misrepresentations and omissions." ECF No. 231 at 14. Avenue Capital responds that Plaintiffs do not meet the typicality requirement because they "are subject to unique defenses that threaten to become the focus of the litigation." ECF No. 249 at 15.

First, Avenue Capital argues that both proposed class representatives are "subject to the defense that they did not rely on MagnaChip's alleged misstatements after March 11, 2014, when MagnaChip announced that nearly three years of its financial statements would be restated and 'should no longer be relied upon.'" Id. Given the Court's finding, discussed below in Part III.B.2., that the Class Period cannot extend beyond March 11, 2014, this argument is moot.

Second, Avenue Capital claims that Smith is subject to two unique defenses: (a) that "MagnaChip's allegedly fraudulent statements were not a factor in his purchasing decisions" because he continued to purchase MagnaChip stock after March 2014, ECF No. 249 at 16, and (b) that Smith was an "in-and-out trader" who therefore "will not be able to show loss causation," id. at 17 n.6. The Court disregards the first unique defense for the same reasons stated above. The

Court also rejects Avenue Capital's in-and-out trader argument. As Plaintiffs note, Smith retained several thousand shares of MagnaChip stock until after the final disclosure, which would make the in-and-out trader label inapposite. ECF No. 275 at 16. To the extent Avenue Capital claims otherwise, that is a factual dispute not appropriately resolved in this order.

Third, Avenue Capital claims that Thomas is subject to the "unique defense of non-reliance . . . because he testified that his transactions in MagnaChip stock were based on technical stock information . . . rather than MagnaChip's reported earnings or 'fundamentals.'" ECF No. 249 at 16 n.5. Although courts have disqualified "day-traders" from serving as lead plaintiffs in securities cases, Thomas's use of technical stock information did not rise to that level. Applestein v. Medivation, Inc., No. C 10-00998 MHP, 2010 WL 3749406, at *3 (N.D. Cal. Sept. 20, 2010) (finding atypical a proposed class representative who made as many as 44 trades in a single day). Indeed, Thomas testified that he "relied on the integrity of market prices to make his trading decisions" and that "he would not have purchased shares had he known of the alleged fraud." ECF No. 275 at 15. Under those circumstances, Thomas's use of technical stock information does disqualify him. See Hodges v. Immersion Corp., No. C-09-4073 MMC, 2009 U.S. Dist. LEXIS 122565, at *11 (N.D. Cal. Dec. 21, 2009) (refusing to disqualify a day-trader where defendants offered no evidence that "his particular trading activities would subject him to a defense that he would have purchased his shares regardless of the alleged fraud").

The Court concludes that Thomas's and Smith's claims are typical of those of the putative class members.

### 4. Adequacy of Representation

A plaintiff may bring claims on behalf of a class only if she "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998) (citations omitted).

Plaintiffs contend that they have "already demonstrated their adequacy by negotiating a favorable settlement from the settling Defendants, and vigorously pursuing remaining claims

against Avenue Capital." ECF No. 231 at 14.  They also claim to have "engaged qualified, experienced, and capable attorneys."  Id.  In response, Avenue Capital recycles the unique defense arguments it raised in its typicality analysis.  ECF No. 249 at 14.  The Court rejects those arguments for the reasons described above, and sees no evidence of any conflict of interest between the named representatives and the rest of the class.  Accordingly, the Court finds that Thomas, Smith and their counsel will adequately protect the interests of the class.

### B.     Rule 23(b)(3) Requirements

This provision requires the court to find that: (1) "the questions of law or fact common to the class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

#### 1.     Predominance

"The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case" and tests whether the proposed class is "'sufficiently cohesive to warrant adjudication by representation.'"  Wang v. Chinese Daily News, Inc., 737 F.3d 538, 545 (9th Cir. 2013) (quoting Hanlon, 150 F.3d at 1022).  Here, there are two main areas of dispute relating to predominance: reliance and damages.

##### a.     Reliance

First, the parties dispute whether Plaintiffs may properly invoke the "rebuttable presumption of reliance" outlined by the Supreme Court in Basic Inc. v. Levinson, 485 U.S. 224 (1988), which obviates the need to make individualized showings of reliance.  This presumption is based on "what is known as the 'fraud-on-the-market' theory, which holds that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2408 (2014) ("Halliburton II").  "Under this theory, plaintiffs' reliance on misleading statements about a company's financial position can be presumed if: (1) the alleged misrepresentations or omissions were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded stock between when the misrepresentations or omissions were effectuated and when the truth was revealed."  In re Montage Tech. Grp. Ltd. Secs. Litig., 2016

U.S. Dist. LEXIS 53734, at *20-21 (citing Halliburton II, 134 S. Ct. at 2407-2408). Only the question of market efficiency is disputed here.

The parties agree that a now-widely adopted district court decision, Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), outlines five relevant (but not exclusive) factors for determining market efficiency. ECF No. 231 at 17; ECF No. 249 at 20. For the reasons below, the Court agrees with Plaintiffs that the Cammer factors demonstrate that MagnaChip's stock traded on an efficient market, and therefore that individualized issues related to reliance will not predominate over class ones.

### Factor One: Weekly Trading Volume

The first Cammer factor is the "average weekly trading volume during the class period." 711 F. Supp. at 1286. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." Id. at 1292. According to Nye's Report, MagnaChip's average weekly share trading volume for the class period was 4.2% of shares outstanding. ECF No. 231 at 19. This is double the 2% that Cammer stated would justify a strong presumption of market efficiency. Avenue Capital responds MagnaChip's trading volume fell below 2% or 1% for multiple months during the class period, despite the 4.2% figure. ECF No. 249 at 21. But given that Cammer identified average trading volume as the relevant number, the Court does not find that response very persuasive. This factor favors a finding of market efficiency.

### Factor Two: Analyst Coverage

The second Cammer factor is whether a "significant number of securities analysts "followed and reported on a company's stock during the class period." 711 F. Supp. at 1286. According to the Nye Report, over 300 analysts reported on MagnaChip during the Class Period. ECF No. 231 at 20. Avenue Capital responds that Nye failed to "account for the significant decline in analyst coverage" toward the end of the Class Period, which it claims "fell by more than 50%." ECF No. 249 at 21. According to the Gompers Report, by the end of the class period, only seven analysts were covering MagnaChip's stock. Id. Avenue Capital argues that after this decline, the analyst coverage was no longer "significant," as Cammer requires. Id. But Avenue

Capital cites no case that identifies a threshold number of analysts and the Court declines to create one here.[2]  Moreover, the shortening of the Class Period, see below, reduces the force of Avenue Capital's argument.  This factor, too, weighs in favor of market efficiency.

**Factor Three: Market Makers and Arbitrageurs**

The third Cammer factor is the presence of "market makers" or "individuals [who] would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  711 F. Supp. at 1286.  Plaintiffs make two somewhat contradictory arguments about this factor.  First, in their moving papers, Plaintiffs argue that the factor is irrelevant because MagnaChip's stock traded on the NYSE during the Class Period.  ECF No. 231 at 22.  They claim that the NYSE's status as an "auction market" means that MagnaChip has a "single designated market maker," rather than multiple market makers.  Id. (citing Vinh Nguyen v. Radient Pharm. Corp., 287 F.R.D. 563, 573 (C.D. Cal. 2012).  Because the presence of a designated market maker suggests market efficiency, Plaintiffs say they need not otherwise show the presence of market makers.  ECF No. 231 at 20.  Avenue Capital responds that Plaintiffs single market maker argument fails "because approximately 82% of MagnaChip's total trading volume during the Proposed Class Period occurred on venues other than the NYSE."  To rebut this argument, Plaintiffs claim in their reply brief that Nye also found that a "significant number of market makers facilitated trading in MagnaChip shares," putting the number at over 170.  ECF No. 275 at 20.  In essence, Plaintiffs appear to argue that MagnaChip's designated market maker satisfies Cammer factor three, but even if it did not, that the 170 market makers facilitating trading do.  The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.

**Factor Four: S-3 Eligibility**

The fourth Cammer factor is the company's eligibility to file an S-3 Registration Statement in connection with public offerings.  711 F. Supp. at 1286.  Plaintiffs claim that "MagnaChip was eligible and did file S-3 registration statements with the SEC during the Class Period."  ECF No.

---

[2] It bears noting that other courts have weighed this factor in favor of market efficiency when only four or six analysts published reports during the class period.  See In re Nature's Sunshine Prod.'s Inc. Sec. Litig., 251 F.R.D. 656, 663 (D. Utah 2008).

9

231 at 21.  Avenue Capital faults Plaintiffs for failing to note that MagnaChip became "*ineligible* to file a Form S-3 beginning on January 27, 2014, when the Company announced it would delay the release of its fourth quarter and year-end 2012 financial results."  ECF No. 249 at 23.  Plaintiffs respond that where, as here, a company's "ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S–3 were not met," this factor still favors market efficiency.  Cammer, 711 F. Supp. at 1286.  Plaintiffs are correct that Avenue Capital does not challenge MagnaChip's ability to meet the minimum stock requirements to file S-3 Registration Statements.  Therefore, the Court concludes that this factor weighs in favor of a finding of market efficiency.

### Factor Five: Cause and Effect Relationship

The fifth Cammer factor is the existence of "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  711 F. Supp. at 1286.  Plaintiffs claim that the Nye Report demonstrates this cause and effect relationship.  ECF No. 231 at 21.  Nye "examined nine dates on which MagnaChip released quarterly or annual financial results" along with the "corrective disclosure dates examined in the complaints."  Id.  His analysis showed that "MagnaChip's stock price typically reacted more strongly on the event dates than on non-event dates during the Class Period."  Id.

Gompers, Avenue Capital's expert, criticizes Nye's cause and effect study on several grounds.  First, Gompers claims Nye should not have used "analyst reports published *after* each event to justify whether MagnaChip's stock price reacted efficiently.  ECF No. 249 at 23.  Nye does not effectively rebut this criticism, and neither did Plaintiffs' counsel at the hearing on this motion.  Nonetheless, Avenue Capital cites no case rejecting Nye's approach, and the Court concludes that while Nye might better have relied on a different set of analyst reports, the criticism reduces the persuasive force of his study only slightly.

Second, Gompers attacks the Nye Report for analyzing "only 15 event days out of the 763 trading days during the Class Period."  Id. at 24.  Plaintiffs say 15 event days is sufficient.  The parties do not identify, and the Court did not find, any cases on point from this district.  Because Plaintiffs have identified several out-of-district cases where a similar or lesser number of event

10

days sufficed, ECF No. 275 at 33, however, and their reasoning is persuasive. The Court rejects this particular challenge to Nye's cause and effect study.

Third, Gompers claims Nye's regression model suffers from a number of deficiencies: it failed to "control for the statistically significant effect that market-wide factors in Korea had on MagnaChip's returns," it relies on a flawed industry index that "excludes several potentially relevant companies and includes companies of questionable comparability," and it produced "residual returns" that demonstrate either a deficient model or an inefficient market. Id. As to the first criticism, even assuming the failure to control for Korea-specific information is a legitimate criticism, Plaintiffs correctly note that this would affect the "weight rather than admissibility" of the study. See Rudebusch v. Hughes, 313 F.3d 506, 516 (9th Cir. 2002). As to the second, Plaintiffs explain that even incorporating Gomper's suggestions related to the industry indexes, Nye's results remained the same, making that objection irrelevant. ECF No. 275 at 23. And as to the third, Plaintiffs' expert rejects the contention that all statistically significant returns in large stocks are explainable by identifiable news events. According to the Nye Report, "87% of MagnaChip's statistically significant dates were associated with news." Id. at 24. This figure, Plaintiffs claim, is similar to those found to satisfy Cammer in other cases. Id. (citing McIntire v. China MediaExpress Holdings, Inc., 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014); In re Alstom SA Sec. Litig., 253 F.R.D. 266, 280 (S.D.N.Y. 2008). Avenue Capital's criticisms are not substantial enough to warrant this Court's rejection of Nye's cause and effect study. The fifth factor also suggests that MagnaChip's stock traded on an efficient market.

All five factors weigh in favor of a finding market efficiency.[3] In many ways, this case is similar to In re Diamond Foods, Inc., where the defendant "purportedly identif[ied] fundamental flaws in plaintiff's event study," but did not "not provide a study or other evidence concluding that

---

[3] In addition to criticizing Nye's analysis of the Cammer factors, Avenue Capital offers the more general argument that the Nye Report fails to provide "an objective, unbiased standard for assessing market efficiency." ECF No. 249 at 20. Specifically, Avenue Capital claims Nye failed to test for one of three specific forms of market efficiency. Id. But Avenue Capital does not direct the Court to any case requiring this type of tiered analysis rather than the finding of "general efficiency" articulated by the Supreme Court in Halliburton II. 134 S. Ct. at 2414. Moreover, courts have acknowledged that "some subjectivity" is unavoidable in the context of event studies, which means the ultimate determination of market efficiency cannot be entirely objective. See In re Diamond Foods, 295 F.R.D. at 249. Here, the fact that Nye faithfully followed the Cammer factors weakens any argument that his analysis was subjective and therefore unreliable.

11

the market for [the relevant] stock was not efficient during the class period." 295 F.R.D. 240, 250 (N.D. Cal. 2013). Responding to similar attacks on a cause and effect study in a different case, one court in this district noted that "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion . . . . Defendants' arguments contesting the validity of plaintiffs' expert's conclusions based on his market model may be presented at trial." In re Montage Tech. Grp. Ltd. Secs. Litig., 2016 U.S. Dist. LEXIS 53734, at *28. The same is true here. In addition, the fact that MagnaChip trades on the NSYE, though not dispositive of market efficiency, certainly helps to confirm that conclusion. ECF No. 231 at 19 (citing cases). In sum, the preponderance of the evidence supports a finding of class-wide reliance.

### Rebuttal Evidence

Avenue Capital argues that even if Plaintiffs could demonstrate an efficient market and therefore invoke the presumption of reliance, that presumption is "rebutted as of March 11, 2014 because no investor could have reasonably relied after that date." ECF No. 249 at 31. Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1193 (2013) (internal citations and alterations omitted) ( "The presumption, however, is just that, and can be rebutted by appropriate evidence."); see also, Basic, 485 U.S., at 248–249 ("[I]f petitioners could show that the 'market makers' were privy to the truth . . . , and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone."). Specifically, Avenue Capital points to the language in its March 2014 disclosures that its prior financial statements "should not be relied upon." ECF No. 249 at 32. Avenue Capital argues that reliance after that disclosure would have been unreasonable. ECF No. 249 at 32. Plaintiffs respond that the 2014 statement was "itself false and misleading" and therefore could not be "fully corrective." ECF No. 275 at 11.[4]

Avenue Capital has the better argument here. A number of district courts have declined to

---

[4] Plaintiffs allege that the March 2014 statement disclosed that the fraud was related to revenue recognition for one sales channel, but hid the fact that the "fraud wiped out the majority of MagnaChip's reported profits, was extremely widespread in scope and nature, and involved MagnaChip's management." ECF No. 275 at 11.

extend the class period in a securities case beyond the date of disclosures like those made by MagnaChip here.  For example, in In re Fed. Nat. Mortg. Ass'n Sec., Derivative & ERISA Litig., 247 F.R.D. 32, 39–40 (D.D.C. 2008) ("Fannie"), the court ended the class period on the date that the "company explicitly warned investors to discount its prior financial statements and that it anticipated a restatement of around $9 billion as a result of a top-to-bottom review of its books."  The court explained that "there was nothing equivocal about [the company's] disavowal of its financial statements," and that the "announcement put investors on notice that Fannie Mae's financial future was, at best, uncertain."  Id.  Particularly given that the "market reacted immediately," the court decided that "investors who purchased Fannie Mae stock after [the disclosure] . . . should not be able to claim a reasonable reliance on Fannie Mae's financial statements."  Id.  Importantly, the court was not persuaded by the plaintiffs' argument that this disclosure was only partial.  Rather, it concluded that "while the subsequent disclosures in 2005 might have provided additional information as to the extent of the alleged fraud, investors were already proceeding with full knowledge that substantial errors and irregularities existed with the earlier financial statements."  Id.  This Court sees no way to distinguish this case from Fannie in light of the unequivocal nature of MagnaChip's March 2014 disclosure.  And like in Fannie, the fact that MagnaChip's disclosure may have only revealed part of the fraud does not change the fact that the disclosure did warn investors against any reliance on the company's prior financial statements.

The same is true of In re Nature's Sunshine Prod.'s Inc. Sec. Litig., 251 F.R.D. 656, 666–67 (D. Utah 2008) ("Nature").  There, the defendant argued that the class period should end once "Nature filed an 8–K warning investors not to rely on any of its financials."  Id.  The district court rejected the plaintiffs argument that the "8–K was only a partial corrective disclosure and that further corrective disclosures were revealed after [that initial disclosure], which made Nature's stock price continue to fall."  Instead, the court found as a matter of law that the 8–K served as "a curative disclosure . . . render[ed] it unreasonable for an investor, or the market, to continue to be mislead [sic] by the defendants alleged misrepresentations."  Id.[5]  This same reasoning requires the

---

[5] The Court does not dispute that "doubts regarding the reasonableness of the reliance should be resolved in favor of extending the class period," In re Data Access Sys. Sec. Litig., 103 F.R.D.

13

shortening of Plaintiffs' class period here. The question is not, as Plaintiffs' argue, whether the March 2014 disclosure was "fully corrective," ECF No. 275 at 11, but whether it made further reliance on MagnaChip's earlier financial reports unreasonable. The Court finds that it did.[6]

Contrary to Plaintiffs' position, Amgen does not counsel against resolving this question at the class certification stage. In Amgen, the defendant's "rebuttal evidence aimed to prove that the misrepresentations and omissions alleged in [the] complaint were immaterial" because, among other things, public documents already disclosed the subject of the misrepresentations at the time they were made. Amgen, 133 S. Ct. at 1203-04. The Court declined to consider the rebuttal evidence, explaining that while a "defendant could rebut the fraud-on-the-market presumption of reliance . . . by demonstrating that news of the truth credibly entered the market and dissipated the effects of prior misstatements, [] proof of that sort is a matter for trial." Id. (internal quotations and alterations omitted) (citing Basic, 485 U.S. at 248–249). Here, however, nobody is arguing that the original misrepresentations were immaterial or that evidence of MagnaChip's misconduct had already entered the market when MagnaChip released its fraudulent financial reports between 2011 and early 2014. Instead, Avenue Capital has argued that a subsequent disclosure made continued reliance on those financial reports unreasonable. Therefore, Amgen does not control, and the fact that the district court cases cited by Avenue Capital preceded Amgen does not mean they are no longer good law.[7]

The Court concludes that the presumption of market efficiency is rebutted as of March 11,

---

130, 143 (D.N.J. 1984), but nonetheless concludes that no doubt exists where a company explicitly warns investors not to rely on past financial reports because they will be restated.
[6] In re LDK Solar Sec. Litig., 255 F.R.D. 519, 527 (N.D. Cal. 2009), is distinguishable. There, unlike in this case, the defendant did not issue a report warning against reliance on prior financial statements. Rather, the court analyzed whether the class period should terminate on the date that the defendant "published a report disclosing [the comptroller's] departure from LDK and expressing generalized concerns about LDK's inventory accounting." Id. The court deemed this report a "partial disclosure" that did not "fully reveal[]" the fraud. Id. By contrast, courts have found a company's warning not to rely on prior financial statements to make future reliance on those statements unreasonable. See, e.g., Nature, 251 F.R.D. at 666–67. Those cases, not LDK, are persuasive here.
[7] The same point can be made with regard to Plaintiff's reliance on Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 813 (2011) ("Halliburton I"), in which the Supreme Court held that plaintiffs in a securities class action are not required "to show loss causation as a condition of obtaining class certification." Id. at 813. The Court imposes no such burden here as to any portion of the putative class period. It merely holds that, after March 11, 2014, reliance on Magnachip's prior disclosures was unreasonable as a matter of law.

14

2014, and ends the class period on that date.

### b. Damage Calculations

Second, the parties dispute whether individualized damages questions make this case unsuitable for class-wide resolution. Avenue Capital argues that Plaintiffs "must be able to show that 'their damages are capable of measurement on a class-wide basis'" to obtain certification, and that they have failed to make that showing. ECF No. 249 at 25 (citing Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013). Avenue Capital criticizes Nye's use of a "price inflation" theory generally, and also identifies several problems with Nye's methodology. Id. at 26-31.

The reasoning in Hatamian v. Advanced Micro Devices, Inc., a similar securities class action case in this district, is instructive. No. 14-cv-00226 YGR, 2016 U.S. Dist. LEXIS 34150, at *26 (N.D. Cal. Mar. 16, 2016). Hatamanian explained how the Ninth Circuit has applied Comcast to securities cases:

> The Ninth Circuit reads Comcast to demand only that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." Leyva v. Medline Indus., 716 F.3d 510, 514 (9th Cir. 2013) (citing Comcast, 133 S.Ct. at 1435) . . . The ultimate question, then, . . . is whether "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." Leyva, 716 F.3d at 514.

Id. at *23-25. In other words, Comcast does not require certification proponents to rely on a class-wide damages model to demonstrate predominance. Id. Like in Hatamanian, Nye's event study, if reliable, should suffice to show how damages could be calculated. ECF No. 275 at 25; see In re Montage Tech. Grp. Ltd. Secs. Litig., 2016 U.S. Dist. LEXIS 53734, at *38 (explaining that in "securities fraud matter[s] . . . , courts have found that a price impact analysis such as an event study can serve as a method of calculating class-wide damages").

Avenue Capital attacks the methodology of Nye's event study on several grounds similar to those raised by the defendant in Hatamanian. The critiques fall into two main categories. First, Avenue Capital attacks the "fit" of Nye's damages methodology, arguing that the study fails to take into account price inflation over time, the impact of the 2014 corrective disclosures, and the impact of confounding news. ECF No. 249 at 26-29. Like the defendant in Hatamanian, Avenue Capital points to a Southern District of Texas case as an example of a court rejecting an event

study under Comcast as insufficient tailored.  In re BP p.l.c. Sec. Litig., No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).  But as the Hatamanian court recognized, In re BP is distinguishable because in that case the problem was the event study's failure to "take into account two differing theories of fraud liability plaintiffs were pursuing."  2016 U.S. Dist. LEXIS 34150, at *26.  Plaintiffs have only one theory here.  The flaws that Avenue Capital identifies in Nye's study, like in Hatamanian, are "are ultimately immaterial to class certification" because they relate to loss causation, an issue "properly addressed by a fact-finder on the merits."  Id.[8]

Second, Avenue Capital argues that Nye's proposal for calculating Section 20A damages is inadequate.  ECF No. 249 at 26.  Nye's Report contains a one-sentence explanation of Section 20A damages: "The disgorgement remedy under § 20A of the Exchange Act can be calculated in a similarly mechanical manner for all Class members who purchased MagnaChip shares contemporaneously with Avenue Capital's August 1, 2013 sale of MagnaChip stock."  ECF No. 231-2 at 29.  The Court agrees that this explanation is short, but sees no reason to require Plaintiffs to repeat their description of the event study used to calculate Section 20(a) damages if the study is the same for both types of claims.  Nor does the Court find material Plaintiffs' use of the term "disgorgement" when referring to the measure of Section 20A damages.  Some courts have described the "measure of [Section 20A] damages as amount of disgorged profits," In re Petco Animal Supplies Inc. Sec. Litig., No. 05-CV-0823-H RBB, 2006 WL 6829623, at *10 (S.D. Cal. Aug. 1, 2006), and the Court will certainly keep in mind the language of the statute that Avenue Capital identifies, which sets a limit on total recovery.  ECF No. 249 at 29.  Finally, the Court acknowledges that "no class member should be allowed to recover more than the amount of its economic loss," meaning Section 20A and Section 20(a) damages should not be aggregated if that figure would exceed actual damages.  Id. at 30 (citing The Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d 1017 (9th Cir. 1999).  But Plaintiffs are correct that this issue can be resolved on a class-wide basis and therefore should not prevent certification.

### 2.     Superiority

---

[8] Avenue Capital is correct that In re Diamond Foods held that calculating damages is only a mechanical task when there are no "specific complications that would make such a calculation impossible or ill-advised in this case."  In re Diamond Foods, Inc., Sec. Litig., 295 F.R.D. at 252.  But as discussed above, the complications identified by Avenue Capital do not rise to that level.

The second Rule 23(b)(3) requirement is superiority. In determining superiority, courts must consider the four factors of Rule 23(b)(3): (1) the class members' interests in individually controlling a separate action; (2) the extent and nature of litigation concerning the controversy already begun by or against class members; (3) the desirability of concentrating the litigation in the particular forum; and (4) the manageability of a class action. Hodges v. Akeena Solar, Inc., 274 F.R.D. 259, 270–71 (N.D. Cal. 2011) (citing Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1190 (9th Cir. 2001). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation," and is certainly superior "if no realistic alternative exists." Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234-35 (9th Cir. 1996).

Courts in this district have recognized the utility of the class action device in securities cases. In re UTStarcom, Inc. Sec. Litig., No. C 04-04908 JW, 2010 WL 1945737, at *10 (N.D. Cal. May 12, 2010); In re Juniper Networks, Inc. Sec. Litig., 264 F.R.D. 584 (N.D. Cal. 2009). Not only are all factors met here, ECF No. 231 at 23, but Avenue Capital also does not appear to contest superiority. The Court concludes that a class action is superior to other methods for resolving this controversy.

## CONCLUSION

The Court certifies the class, but imposes a March 11, 2014 end date for the Class Period. The Court appoints Keith Thomas and Herb Smith as class representatives, and Pomerantz, LLP and the Rosen Law Firm, P.A. as class counsel.

IT IS SO ORDERED.

Dated: December 22, 2016

_____
JON S. TIGAR
United States District Judge

17